**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| TAI JAN BAO, et al.,<br><br>   Plaintiffs,<br><br>  v.<br><br>SOLARCITY CORPORATION, et al.,<br><br>   Defendants. | Case No. 14-cv-01435-BLF<br><br>**ORDER GRANTING MOTION TO DISMISS SECOND AMENDED COMPLAINT WITH LEAVE TO AMEND**<br><br>[Re: ECF 69] |

Before the Court is Defendants' Motion to Dismiss the Second Amended Complaint ("SAC"). ECF 69. Defendants argue that, even with the SAC's new allegations, Plaintiff fails to establish scienter under the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") and therefore fails to state a claim under Federal Rule of Civil Procedure 12(b)(6). Plaintiff opposes, arguing that the new allegations cure the deficiencies of the First Amended Complaint ("FAC"). ECF 72.

For the reasons set forth below, Defendants' Motion to Dismiss is GRANTED with leave to amend the § 10(b) claim and the § 20(a) claim against Defendants Rive and Kelly, but not the § 20(a) claim against Defendant Musk.

**I. BACKGROUND**

 **A. Procedural History**

This is Plaintiff's third attempt to plead his claims under the PSLRA. The Court granted Defendants' motion to dismiss the previous complaint on April 27, 2015 with leave to amend both claims. *See* Order Granting Mot. to Dismiss With Leave to Amend ("First Dismissal Order"), ECF 65. In the First Dismissal Order, the Court determined that Plaintiff had alleged only motive and opportunity and held that, without more, the complaint did not satisfy the PSLRA's exacting

pleading requirements. *Id* at 7. The Court dismissed the § 10(b) and § 20(a) claims accordingly. *Id*. at 7-8. The Court also noted the weakness of Plaintiff's § 20(a) claim against Defendant Musk. *Id.* at 8-9.

Plaintiff filed the SAC on June 16, 2015. ECF 66. On August 7, 2015, Defendants filed this motion to dismiss. On September 18, 2015, Plaintiff opposed. On October 15, 2015, Defendants replied. ECF 73. The Court heard argument on this motion on October 29, 2015.

### B. Factual Allegations

The First Dismissal Order sets forth the general factual background of this case. The Court summarizes the allegations, including Plaintiff's new allegations, below.

Defendant SolarCity Corporation ("SolarCity") is a Delaware corporation that derives revenue in two ways: sales of solar energy systems and renewable, twenty-year leases of solar energy products. SAC ¶¶ 21, 29-31. Defendant Rive founded the company with his brother and is SolarCity's Chief Executive Officer ("CEO"). *Id.* ¶ 22. Defendant Kelly was the company's Chief Financial Officer ("CFO") during the relevant time period. *Id.* ¶ 23. Defendant Musk is the Chairman of the Board of Directors and provided the "initial concept" for SolarCity. *Id.* ¶ 24. Musk and the Rives are cousins. *Id.* The Court refers to Rive, Kelly, and Musk collectively as "Individual Defendants" and all defendants collectively as "Defendants."

Lead plaintiff James Webb ("Plaintiff") represents a putative class of investors who purchased SolarCity securities between December 12, 2012 and March 18, 2014 ("Class Period"). *Id.* ¶ 1, 20. Plaintiff alleges that Defendants deliberately manipulated their accounting formula to "portray the illusion of profitability." *Id.* ¶ 54. In the SAC, Plaintiff describes the alleged error in detail. *Id.* ¶¶ 55, 66-69. Specifically, Plaintiff alleges that Defendants miscalculated the burden ratio they used to allocate overhead costs between leases and sales by including the prior period's overhead costs in the numerator, but excluding the prior period's direct costs from the denominator. *Id.* ¶ 68. This inflated the ratio and shifted overhead costs from sales, where they would have been recognized immediately, to leases, where they amortized over a twenty-year period so only a fraction was recognized in any given year. *Id.* ¶¶ 53-54, 56. Plaintiff points to the significance of the accounting error by alleging that sales were responsible for more than 60

percent of revenue in both 2011 and 2012. *Id.* ¶ 33.

Plaintiff relies in large part on confidential witnesses ("CWs") to suggest that the Individual Defendant knew of or deliberately ignored this accounting error. In the FAC, Plaintiff offered two confidential witnesses ("CWs"), both of whom left SolarCity before the Class Period. Those CWs stated that SolarCity's accounting and financials were "a mess" and that the corporate controller likely informed Kelly and Rive of "what they were doing" with overhead accounting. *Id.* ¶¶ 38, 39.

In the SAC, Plaintiff adds eight new confidential witnesses. Five of the new witnesses—CWs 3, 6, 8, 9, and 10—similarly did not work at SolarCity during the Class Period, which commenced in December 2012, the same month SolarCity went public.[1] These witnesses explained that, during their tenure with SolarCity, the cost accounting team was "lean," *id.* ¶ 40 (CW 3); Kelly sat with the accounting department, *id.* ¶ 47 (CW 8), and was involved in accounting policy decisions, *id.* ¶¶ 40 (CW 3), 45 (CW 6); and Rive was also involved in accounting discussions at "a high level," *id.* ¶ 45 (CW 6), and the decisions of other departments on a more detailed basis, *id.* ¶¶ 48 (CW 9), 49 (CW 10). CWs also recalled that the Rive brothers told employees at all-hands meetings, held at unidentified times between November 2007 and September 2012, "We're not profitable on a GAAP basis" but that, on a non-GAAP basis, long-term revenue could cover short-term costs, *id.* ¶ 47 (CW 8), and stated that company had to show profit before it could go public, *id.* ¶ 48 (CW 9). Of the witnesses who worked at SolarCity during the Class Period, CW 4, an Accounts Payable Specialist from January 2011 to August 2014, stated that the overhead costs team consisted of seven employees and that they stayed in corporate headquarters even after other accounting department employees transferred to Las Vegas in 2012.

---

[1] CW3 was a Senior Manager for fund relations in SolarCity's Structured Finance Department from September 2011 to September 2012. SAC ¶ 40. CW6 was Director of Fund Accounting at SolarCity from June 2012 to September 2012. *Id.* ¶ 45. CW8 worked at SolarCity from November 2007 to September 2012, first as a solar consultant from November 2007 to March 2010 and then as a Commercial Project Development Manager from March 2010 to September 2012. *Id.* ¶ 47. CW9 worked as an Administrative Assistant and Sales Operations Administrator at SolarCity from October 2008 to January 2012. *Id.* ¶ 48. CW10 worked as Director of Sales at SolarCity from May 2008 to January 2011. *Id.* ¶ 49.

*Id.* ¶ 41. CW 5 was a Project Development Manager at SolarCity from July 2011 to May 2014. S/he reported to the Vice President of Commercial Sales and participated on conference calls with Rive. CW 5 stated that Rive knew about negative margins in large cash sales. *Id.* ¶ 42, 43.

Plaintiff alleges that the accounting error began in the first quarter of 2012, the year Solar City went public, and continued for seven quarters. *Id.* ¶¶ 13, 56. Plaintiff alleges that, during this time, Defendants not only secured financing through SolarCity's initial public offering ("IPO") in December 2012, *id.* ¶ 79, but also acquired two companies in September and December 2013, *id.* ¶¶ 81-83, and raised nearly $400 million through secondary offerings in October 2013, *id.* ¶¶ 84-86. In addition, Plaintiff alleges that the timing enabled Musk to secure a $275 million loan from Goldman Sachs without having to provide additional collateral, *id.* ¶¶ 87-91.

Plaintiff alleges that the error violated Generally Accepted Accounting Principles ("GAAP") and materially misstated gross profits, net income/loss, and earnings per share ("EPS"). *Id.* ¶ 34. Plaintiff alleges that, as a result, Defendants issued materially false and misleading statements on twenty-one different occasions during the Class Period. *Id.* ¶¶ 100-194.

On March 3, 2014, Defendants announced that senior management had discovered an error in the overhead accounting formula that had originated in Q1 2012. *Id.* ¶ 64. Shortly before the disclosure, Peter Rive stepped down as Chief Operations Officer. *Id.* ¶ 77. Plaintiff alleges that the disclosure shows that Individual Defendants were responsible for and monitored the company's gross margins and were well-versed in cost accounting. *Id.* ¶ 65. Plaintiff also alleges that SolarCity did not need to restate its financials for 2010 and 2011, suggesting that the burden ratio was properly calculated for years that did not directly affect the IPO. *Id.* ¶ 70.

On March 18, 2014, Defendants issued restated financials, which revealed that, contrary to SolarCity's prior reports of consistent sales profit, sales had had a negative gross margin for six of the affected quarters (Q2 and Q4 2012 and every quarter of 2013) and made only a slight profit in two of them (Q1 and Q3 2012). *Id.* ¶ 198. As a result, Plaintiff and other class members allegedly suffered significant losses and damages. *Id.* ¶¶ 200-201. In August 2014, Kelly resigned as CFO. *Id.* ¶ 78.

Based on the above allegations, the SAC, like the FAC, asserts that (1) all Defendants

1  violated § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b–5 of the
2  Securities and Exchange Commission ("SEC") and (2) each Individual Defendant is liable as a
3  controlling person under § 20(a) of the Exchange Act.

**II.    LEGAL STANDARDS**

**A.    Rule 12(b)(6)**

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff. *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011). However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

**B.    Rule 9(b) and the PSLRA**

In addition, a plaintiff asserting a private securities fraud action must meet the heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b) and the PSLRA. *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see also In re VeriFone*, 704 F.3d at 701. Similarly, the PSLRA requires that the complaint "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading . . . ." 15 U.S.C. § 78u–4(b)(1)(B).

The PSLRA further requires that the complaint "state with particularity facts giving rise to

United States District Court
Northern District of California

a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2)(A). "To satisfy the requisite state of mind element, a complaint must allege that the defendant[ ] made false or misleading statements either intentionally or with deliberate recklessness." *In re VeriFone*, 704 F.3d at 701 (internal quotation marks and citation omitted) (alteration in original). The scienter allegations must give rise not only to a plausible inference of scienter, but to an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

"The relevant inquiry is 'whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *In re VeriFone*, 704 F.3d at 701 (citing *Tellabs*, 551 U.S. at 323). "[A] dual analysis"—that is, first considering allegations individually and then in combination—"remains permissible so long as it does not unduly focus on the weakness of individual allegations to the exclusion of the whole picture." *Id.* at 703. "To avoid potential pitfalls that may arise from conducting a dual analysis," a court can instead "approach [a] case through a holistic review of the allegations . . . [without] simply ignor[ing] the individual allegations and the inferences drawn from them." *Id.*

### C. Confidential Witnesses

To satisfy the PSLRA pleading requirements, "a complaint relying on statements from confidential witnesses must pass two hurdles." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) (citing *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015-16 (9th Cir. 2005)). First, the confidential witnesses "must be described with sufficient particularity to establish their reliability and personal knowledge [of the events they report]." *Id.* "Second, those statements . . . must themselves be indicative of scienter." *Id.*

### III. DISCUSSION

#### A. Claim 1 – Section 10(b) and Rule 10b-5

"To state a securities fraud claim, plaintiff must plead: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or

6

1   omission; (5) economic loss; and (6) loss causation." *Reese v. Malone*, 747 F.3d 557, 567 (9th Cir.
2   2014) (internal quotation marks and citation omitted). As in their First Motion to Dismiss,
3   Defendants challenge only the sufficiency of the allegations with respect to scienter. Mot. at 6-23.
4         In the First Dismissal Order, the Court determined that a holistic analysis of the FAC did
5   not support a strong inference of scienter. First Dismissal Order at 5-7. The Court noted the lack of
6   allegations suggesting that the accounting error was something more than non-actionable mistake.
7   The Court provided possible examples of such allegations, including that the formula changed just
8   before the Class Period and that Defendants knew it had changed "in a way that was contrary to
9   prior practice and to GAAP," "that Defendants had actual access to information suggesting that
10  the overhead expenses had been misallocated," or that "allocation of overhead expenses is such a
11  prominent piece of financial information that it would have been absurd for management to be
12  unaware of the misallocation." *Id.* at 5-6. In addition, the Court found the existing allegations
13  deficient: the "allegations of corporate reshuffling and Defendants' Sarbanes-Oxley certifications
14  lack[ed] . . . probative value" while the confidential witnesses offered "little reliable insight into
15  what occurred during the class period" because "both left SolarCity before the first of the disputed
16  statements were made." *Id.* at 7.
17        Plaintiff has attempted to cure these deficiencies with new allegations. Most significantly,
18  Plaintiff has introduced eight new confidential witnesses. In addition, Plaintiff has further
19  described the March 3, 2014 disclosure.
20        The Court now considers whether these additions suffice. Following the Ninth Circuit's
21  approach in *In re Verifone,* the Court begins with a holistic assessment of the allegations.
22        Plaintiff argues that, taken as a whole, his allegations conjure the following picture:
23  Defendants knew that, historically, SolarCity's sales gross margins were negative. At a uniquely
24  opportune time, the margins flipped to show profit. Defendants knew of this shift, which affected
25  the operation that comprised more than 60 percent of their revenue, and Defendants also knew that
26  GAAP violations could have led to that change. The overhead accounting team, which was
27  responsible for the change, consisted of about seven employees and was kept in corporate
28  headquarters, near Individual Defendants. In addition, the error affected only the numbers that

7

really mattered—financials for 2012 and 2013—while the numbers for 2010 and 2011 were calculated correctly. In the past, Individual Defendants had gotten involved in the details of decisions of certain departments, though not overhead accounting, and made accounting decisions at a "high level."

While this picture may appear convincing, Plaintiff argues more than his allegations deliver. Significantly, Plaintiff's confidential witnesses continue to fall short. Defendant argues that each of the CWs lacks personal knowledge and/or fails to offer information indicative of scienter. Given the current state of the allegations, the Court agrees.

First, just like the confidential witnesses in the FAC, five of the eight new CWs—3, 6, 8, 9, and 10—did not work at SolarCity during the Class Period and can therefore offer "little reliable insight into what occurred during the class period." First Dismissal Order at 7; *see also Zucco Partners*, 552 F.3d at 996-97 (9th Cir. 2009). Furthermore, these CWs fail to offer statements that are "themselves . . . indicative of scienter." *Id.* at 995. For example, their statements that Individual Defendants were involved in accounting decisions are too conclusory, speculative, and/or vague to hold weight. Specifically, CW 3 "stated that CFO Robert Kelly was involved in financial and accounting policy decisions at SolarCity," SAC ¶ 40; CW 6 stated that Kelly was "definitely" involved in decisions and Rive in discussions, both "at a high level," about accounting policies for funds set up with third-party investors to pay for installing solar systems, *id.* ¶ 45; and CW 10 stated that Rive "was quite hands-on when it came to sales," *id.* ¶ 48. These statements offer no detail about the decisions the Individual Defendants made or knew about. None alleges that Individual Defendants were involved in overhead accounting. And, given the statements' conclusory nature, the Court cannot infer Individual Defendants' knowledge of any specific accounting decision, much less the overhead accounting error.

Only CW 9 identified a specific decision in which Rive was involved—approving a change in the method for paying commissions in sales—but this decision was not clearly related to accounting, much less overhead accounting. The Court cannot infer that, because Rive approved a decision about how to pay commissions at some point between October 2008 and January 2012, Rive knew of the accounting error during the Class Period. *Id.* ¶ 48. CW 9 him/herself offered

only speculation on this point, stating that Rive "totally would have been aware of" changes in overhead accounting. *Id.*

In fact, Plaintiff has again failed to offer any confidential witness who could have personal knowledge of Defendants' specific conduct regarding accounting practices that would provide sufficient support for a reasonable inference regarding Defendants' state of mind because each CW, including those working at SolarCity during the Class Period, lacked sufficient contact with Defendants. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 65 F. Supp. 3d 840, 859 n.8 (N.D. Cal. 2014); *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 949 (N.D. Cal. 2010) ("it is difficult to surmise how the opinions and observations of the CWs [who had no personal contact with individual defendants] could support a reasonable inference about what these individual Defendants knew or did not know at the time each of the challenged statements was made."). CW 7, for example, only learned that Kelly and Rive were "actively involved in SolarCity's financials" from conversations with SolarCity's Director of Corporate Finance. SAC ¶ 46. Such "[k]nowledge [based] on vague hearsay . . . is not enough to satisfy [the] reliability standard." *Zucco Partners*, 552 F.3d at 997 (9th Cir. 2009). Perhaps most glaringly, not a single confidential witness alleges that Defendants knew of the accounting error central to this case.

CW 5, who participated on conference calls with the Rive brothers and worked at SolarCity during the Class Period, comes closest. As discussed at the hearing on October 29, CW 5 is Plaintiff's strongest witness.

CW 5 was a Project Development Manager in the Commercial Sales Department from July 2011 to May 2014 and stated that the Rive brothers "definitely had an understanding of what overhead is" and "know what they are doing." SAC ¶ 42, 43. However, these statements provide no examples of the Rives' understanding and are, again, too conclusory to indicate scienter. In addition, CW 5 does not specify the Rive brother to which these statements apply. Even if they apply to both brothers, the allegation that the Rives understood the concept of overhead accounting is not enough to suggest that they knew how SolarCity's overhead accounting team chose to calculate it or that they directed the overhead accounting team to miscalculate it. In

9

addition, CW 5's seeming lack of understanding of the concepts discussed on the calls casts some doubt on his/her understanding of Rive's knowledge. *See id.* ¶43 (referring to Rive mentioning "really strange kind of accounting rules").

CW 5 also stated that Rive knew of negative margins in "cash sales," which were generally sales of large solar systems. *Id.* ¶ 42. CW 5 was directly involved in such sales and stated that at least 60 percent of his/her sales were negative. *Id.* CW 5 recalled that, during the conference calls, the Rive brothers wanted to know why projects were coming in with negative margins and asked about timelines for revenue recognition. *Id.* ¶ 43.

At the hearing, Plaintiff argued that CW 5's statements show that Rive knew sales had negative margins even as SolarCity was publishing positive margins. While the Court would find allegations of such simultaneity convincing, CW 5's statement falls short of Plaintiff's characterization in at least two ways. First, CW 5 does not state when in his/her tenure from July 2011 to May 2014 the conference calls discussing negative margins occurred; if they occurred before the relevant time period, they cannot establish simultaneity. Second, Plaintiff does not specify the relationship between cash sales and total sales. CW 5 only worked with large, public sector projects. *Id.* ¶ 42. The Court cannot infer whether negative margins for cash sales necessarily translated into negative gross sales margins, the number at issue here. Thus, even CW 5 lacks personal knowledge of facts sufficient to support an inference of scienter. Plaintiff stated at the hearing that he can amend to cure these deficiencies.

In addition, the Court notes that CW 8's statement that the Rive brothers told employees at all-hands meetings that they were not profitable on a GAAP basis but could be considered profitable using non-GAAP methods may similarly suffice for an inference of scienter if the all-hands meetings occurred in Q2 2012, when CW 8 still worked at SolarCity and for which SolarCity originally published positive sales gross margins. If those statements were made earlier in CW 8's long tenure, however, they may amount to nothing more than true statements made to bolster employee confidence. *Cf. Brodsky v. Yahoo! Inc.* 630 F. Supp. 2d 1104, 1116 ("Hearing at a meeting that revenue forecasts will not be reached is not equivalent to knowing that [the company] misstated its revenues.").

Furthermore, and significantly for the holistic assessment, Plaintiff skirts the fact that, during the Class Period, Musk purchased more than 2.1 million shares and Rive purchased 107,000 shares. Crosson Decl., Exhs. 6-10, ECF 70-6–ECF 70-10.[2] This weighs against an inference of scienter. *See Cho v. UCBH Holdings, Inc.*, No. C 09-4208 JSW, 2011 WL 3809903 at *17 (N.D. Cal. May 17, 2011).

In addition, Defendants point to facts that convincingly challenge other of Plaintiff's allegations. For example, while annual sales gross margins had historically been negative, they were experiencing a trend of increasing profitability, countering Plaintiff's argument of the obviousness of the error. *See* Mot. at 17 (citing SAC ¶ 58).

Nevertheless, Plaintiff asserts that the inference that "SolarCity employed this allocation formula originating in Q1 2012 in an effort to portray profitable sales gross margins in the run up to its December 2012 IP" is "far more likely" than the alternative innocent inference. Opp. at 15. Defendants argue that the inference of an innocent mistake in the implementation of an otherwise proper formula is stronger.

The Court agrees with Defendants. At most, the allegations again suggest no more than motive—the timing of the error—and opportunity—Defendants' knowledge of sales' history of losses and of the effect that violating GAAP could have, their supposed involvement with accounting, and their physical location. As discussed above, many of the allegations are too weak, irrelevant, or conclusory to support Plaintiff's arguments. Furthermore, even if the allegations sufficed to show motive and opportunity, they would not suffice to state a claim.

"If scienter could be pleaded merely by alleging that officers and directors possess motive and opportunity to enhance a company's business prospects, 'virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'" First Dismissal Order at 6-7 (quoting *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027,

---

[2] In connection with the present motion, Defendants filed a Request for Judicial Notice ("RJN") of numerous exhibits. ECF 71. Exhibits 3 and 4 are referenced in the SAC and may be considered as incorporated by reference therein. *Tellabs*, 551 U.S. at 322. Exhibits 5-10 are SEC filings that are appropriate for judicial notice because they are matters of public record not subject to reasonable dispute. Fed. R. Evid. 201(b); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049,1064 n.7 (9th Cir. 2008). As such, Defendants' RJN is GRANTED with respect to Exhibits 3-10.

1038 (9th Cir. 2002)). "[T]he omission must derive from something more egregious than even 'white heart/empty head' good faith." *In re Verifone*, 704 F.3d at 702 (citing *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc)). "Rather, the plaintiff must plead 'a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Zucco Partners*, 552 F.3d at 991 (quoting *Hollinger*, 914 F.2d at 1569).

To establish sufficient obviousness, Plaintiff asks the Court, in part, to draw a core-operations inference. "[T]he core-operations inference can be one relevant part of a complaint that raises a serious inference of scienter," *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). "Under this theory, scienter may be imputed 'based on the inference that key officers have knowledge of the 'core operations' of the company.'" *Mulligan v. Impax Labs, Inc.,* No. C-13-1037-EMC, 2014 WL 1569246, at *20 (N.D. Cal. Apr. 18, 2014) (quoting *Reese*, 747 at 575). "[T]he nature of the relevant fact [must be] of such prominence that it would be absurd to suggest that management was without knowledge of the matter.'" *Id*. (quoting *Reese*, 747 F.3d at 575).

The Court previously found Plaintiff's core operations argument "unavailing" after distinguishing this case from *In re Diamond Foods, Inc., Sec. Litig.*, No. C 11-05386 WHA, 2012 WL 6000923 (N.D. Cal. Nov. 30, 2012). *See* First Dismissal Order at 6. Instead of *Diamond Foods,* Plaintiff now relies on *Mulligan* for the same argument. *See* Opp. at 16. But *Mulligan*, like *Diamond Foods*, is so distinguishable on its facts as to be inapplicable.

In *Mulligan*, the CEO and CFO of a pharmaceutical company misrepresented the condition of its manufacturing and quality control departments after having failed numerous FDA inspections and receiving a warning letter from the FDA. The court found it "'absurd' to think that the CEO and CFO . . . would be unaware of the alleged substandard, non-compliant conditions" because manufacturing and quality control constitute "the heart of a company whose main business is manufacturing pharmaceuticals for public consumption." *Id.* at *21. In contrast, SolarCity's sales operation does not constitute the "heart" of the company; instead, it constitutes

12

approximately 60 percent of revenue and less than 10 percent of installations. *See* Reply at 10-11. Furthermore, *Mulligan*'s finding was bolstered by the FDA's warnings. *Mulligan*, 2014 WL 1569246at *21. Here, Plaintiff does not allege that SolarCity ever received external notices, much less warnings from governmental agencies.

Accordingly, Plaintiff has again failed to provide sufficient allegations to give rise to a core-operations inference. *See* First Dismissal Order at 6. "[T]he falsity of the original representations would not be immediately obvious to corporate management." *Zucco Partners,* 552 F.3d at 1000-01. The relevant fact—an error from a ratio used to allocate one subset of fixed costs—was not sufficiently prominent to make Defendants' ignorance of it "absurd." Rather, the error was, as the Court noted at the hearing on the first motion to dismiss, "down in the weeds."

Plaintiff argues that his new allegations show that Individual Defendants, too, were "down in the weeds" of accounting. Opp. at 16. The Court disagrees. As discussed above, Plaintiff's allegations regarding Individual Defendants' "high level" management of accounting and more detailed management of other departments are vague, conclusory, and speculative. Plaintiff offers only one example of a specific decision made by an Individual Defendant—how to pay commissions—which occurred outside the Class Period and is not alleged to have concerned accounting. Thus, the allegations do not give rise to a core operations inference; instead, they suggest, at most, motive and opportunity.

In summary, the Court concludes that, viewed holistically as required under *Tellabs*, Plaintiff's allegations do not give rise to a strong inference of scienter this is as "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Most significantly, no CW alleges that Defendants knew that sales margins were negative when SolarCity published positive numbers or that Defendants knew or recklessly failed to know about the error in the accounting formula. Plaintiff stated at the hearing that he can amend to cure these deficiencies. The Court accordingly GRANTS the motion to dismiss with leave to amend.

### B.     Claim 2 – Section 20(a)

Section 20(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be

liable jointly and severally with and to the same extent as such controller person." A plaintiff suing under § 20(a) must demonstrate: (1) "a primary violation of federal securities laws" and (2) "that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). The SEC has defined "control" as "the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

As before, Plaintiff has failed to state a § 20(a) claim because he has failed to state a claim of a primary violation of the securities laws. *See* First Dismissal Order at 8.

In addition, Defendants again urge the Court to dismiss Plaintiff's § 20(a) claim against Musk for failure to adequately allege his individual liability as a control person over SolarCity. Mot. at 24-25. To establish a § 20(a) claim, a plaintiff must allege specific facts concerning a defendant's responsibilities within the company that demonstrate his involvement in the day-to-day affairs of the company or specific control over the preparation and release of the allegedly false and misleading statements. *See* First Dismissal Order at 8 (citing *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1163-64 (9th Cir. 1996); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1031 (S.D. Cal. 2005)).

In the Court's First Dismissal Order, the Court noted that Plaintiff's allegations that Musk is Chairman of the Board of Directors, owns roughly 30% of SolarCity's outstanding shares, is related to SolarCity's officers, and signed certain of SolarCity's financial statements "fall short." *Id.* at 8. Plaintiff amended to allege that Musk is a member of SolarCity's executive management team and that he is "continuously involved in SolarCity's operations and decisions at the executive level and maintains the power to direct or cause the direction of the management and/or policies at SolarCity." SAC ¶ 10. In addition, Plaintiff alleges that Rive publicly stated that, metaphorically, Musk rides in the passenger seat as Rive drives and sometimes "instructs [Rive] to swerve into a pothole" to avoid invisible walls. *Id.* In the interview, Rive also "compared his cousin to Neo, the star character of the movie The Matrix, who can stop bullets because he understands the nature of reality. . . . Rive said[,] 'He sees the infrastructure of the game differently.'" *Id.*

These allegations, too, fall short. SolarCity's statement that Musk is a member of its

"executive management team" is no different in effect than SolarCity's statement that he is on the "senior leadership team," which the Court already found lacking because, while it "suggests high level guidance of the company," it "does not indicate that he participates in its day-to-day oversight or is authorized to control the preparation of financial statements." First Dismissal Order at 9. The allegation regarding Musk's involvement in SolarCity's operations and decisions is too conclusory to hold any weight. And Plaintiff's characterization of Rive's statement that Musk "instructs" him to avoid invisible walls as a public admission that Musk exercises actual authority over SolarCity is absurd, much like Plaintiff's reliance on Rive comparing Musk to Neo, "a character whose very identity is based on his ability to exercise more control, at a more fundamental level, than anyone else." Opp. at 24. This simply asks too much. While Rive may consider Musk a visionary, this does not suffice to show Musk's control over SolarCity.

Given the results of the Court's previous grant of leave to amend the allegations regarding Musk as a control person, the Court concludes that further amendment would be futile. Accordingly, the Court GRANTS Defendants' Motion to Dismiss Plaintiff's claim against Musk as a control person under § 20(a) without leave to amend.

**IV. ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED that Defendants' Motion to Dismiss the Amended Complaint is GRANTED, with leave to amend except for the § 20(a) claim against Musk. Any amended complaint shall be filed **on or before February 15, 2016.**

Dated: January 5, 2016

_____
BETH LABSON FREEMAN
United States District Judge

15