**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
1925 Century Park East
Suite 2100
Los Angeles, CA 90067-2722
Telephone:  (310) 201-9150
Fax:  (310) 201-9160

**POMERANTZ LLP**
Jeremy A. Lieberman
Emma Gilmore
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665

*Attorneys for Lead Plaintiff*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| TAI JAN BAO, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> SOLARCITY CORP., LYNDON R. RIVE, AND ROBERT D. KELLY, <br><br> Defendants. | **No. 14-cv-01435 – BLF (HRL)** <br><br> <u>**CLASS ACTION**</u> <br><br> **THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> **DEMAND FOR JURY TRIAL** |

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

Lead Plaintiff James Webb and Plaintiff Tai Jan Bao (collectively, "Plaintiffs or "Plaintiff"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their second amended complaint ("Complaint" or "Compl.") against defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding SolarCity Corporation, ("SolarCity" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.   Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired SolarCity securities between December 12, 2012 and March 18, 2014, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against the Company and certain of its top officials.

2.      SolarCity sells renewable energy to its customers at prices below utility rates, primarily through the leasing or sale of solar energy systems.  The Company offered its shares to the public for the first time on December 2012, and commenced a secondary offering in October 2013.

3.      SolarCity has two main revenue streams: operating leases and solar energy systems sales.  Solar energy systems sales have been a significant component of the Company's total revenues, as well as its reported net income.  For example, during the year ended December 31, 2012 alone, revenues from sales of the Company's solar energy systems represented 61% of the Company's full revenues.  Unlike lease revenues, which were spread over the duration of the Company's 20-year lease, sales revenues were recognized in full upon installation.  Unbeknownst to investors, however, the cost

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          1**

of solar energy systems sales dwarfed the revenues derived thereof, making it impossible for SolarCity to break even, let alone report a profit. Accordingly, Defendants had a concrete motive to shift costs from sales to leases, thereby immediately recognizing revenues and net income without the corresponding costs. The costs associated with sales were instead pushed to leases, where they would be amortized over the 20-year lease term, allowing the Company to falsely report profits for both sales and leases.

4.     This maneuver also allowed the Company to inflate the solar energy systems sales' reported gross margins. Defendants reported an increase in gross margins related to SolarCity's sales over the prior years of over 100%, from a negative (14%) sales gross margin in 2011 and a negative (19%) sales gross margin in 2010 to a reported gross profit margin of 21% in 2012. Defendants' manipulation also affected the Company's reported net income and earnings per share, resulting in materially understated net loss and better earnings per share. This scheme occurred for *seven consecutive quarters*, starting with the first quarter of 2012, the year the Company went public.

5.     Confidential witnesses with first-hand knowledge of SolarCity's solar system sales segment stated that, despite the Company's representations, SolarCity's Class Period sales gross margins were overwhelmingly negative. These witnesses, who regularly participated in conference calls with SolarCity's senior management, including CEO Lyndon Rive and COO Peter Rive, to discuss the negative margins, explain that senior management was acutely aware that the cash sale projects were unprofitable.

6.     Shortly before the truth emerged, SolarCity's Chief Operating Officer, Peter Rive (the co-founder of SolarCity) was replaced. And after the Company restated its financials, as described in detail herein, SolarCity's Chief Financial Officer, defendant Kelly, resigned.

7.     Defendants had concrete motives to commit fraud. SolarCity vied to create a public market for its common stock in order to obtain needed financing for working capital, capital expenditures, and for strategic acquisitions intended to increase efficiencies and lower costs. Keeping SolarCity's stock at artificially inflated prices enabled the Company to finance its acquisitions with stock appealing enough to be used as currency. During the Class Period, SolarCity made two

significant acquisitions whose total value was over $250 million.  For each acquisition, SolarCity paid over 95% of the purchase price with SolarCity common stock.

8.    During the Class Period, SolarCity also commenced two secondary offerings, which further enabled the Company to raise approximately $400 million.

9.    Defendants were also motivated to keep SolarCity's stock artificially inflated in order to avoid a forced sale of Elon Musk's stock as a result of margin calls.  Musk is the founder of SolarCity and its largest shareholder, holding over 30% of the Company's outstanding shares.  During the Class Period, Musk had pledged six million shares of his SolarCity stock on margin to secure full recourse, private loans, from Goldman Sachs of almost $300 million.  This type of loan carries significant liabilities, because it is structured to allow a bank to request that the borrower furnish additional collateral or sell shares in the event the stock declines.  The Securities and Exchange Commission has chastised this type of reckless pledging, warning that it "ha[s] the potential to influence management's performance and decisions"—which is exactly what occurred here.  This risk was particularly acute where, as here, key executives at SolarCity were related to both one another and to Musk—Defendant Lyndon Rive, SolarCity's co-founder and CEO, and Peter Rive, SolarCity's co-founder and CTO, were brothers, and the Rive brothers were Musk's cousins.

10.    On March 3, 2014, SolarCity announced that it discovered tens of millions in overhead expenses that it had incorrectly classified.  SolarCity claimed that this misclassification was purportedly the result of an error in the formula for allocating overhead expenses between operating lease assets and the cost of solar energy systems sales originating in Q1 2012.  The Company declared that it would reallocate overhead expenses from leased systems to systems sales, impacting the 2013 and 2012 GAAP financial statements.[1]  SolarCity announced that it expected an increase in the cost of solar energy systems sales of approximately $16-$20 million on the statement of operations for the nine

---

[1]    Generally accepted accounting principles (GAAP) refer to the standard framework of guidelines for financial accounting used in any given jurisdiction.  These include the standards, conventions, and rules that accountants follow in recording and summarizing, and in the preparation of financial statements.

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**          **3**

month period ended September 30, 2013 and an increase of approximately $20-$23 million to the same line item for the full-year 2012.  The Company buffered this news by underscoring that overhead expenses in total would not be amended and that the changes do not affect the net cash flows or any forward financial guidance.

11.    On this news, SolarCity securities declined $1.70 per share, or over 2%, to close at $83.26 per share on March 3, 2014.

12.    The severity of the Company's financial manipulations was revealed on March 18, 2014, when SolarCity disclosed more information regarding its true financial condition.  For the first time, the Company disclosed "Adjustments to the Consolidated Statement of Operations for the year ended December 31, 2012)," revealing restatement numbers for the year ended December 32, 2012.  The Company disclosed restated solar energy systems sales costs of revenues of $84.856 million; gross profit of $27.456 million; net loss of $(113.726) million; basic net loss per share of $(7.68) and diluted net loss per share of $(7.69).  For the first time, the Company also disclosed restated numbers for each quarter of 2012 and for each quarter of 2013, as detailed herein, for each of the following relevant metrics: cost of solar energy systems sales; gross profit; net loss; and basic and diluted earnings per share.   These disclosures revealed for the first time that the Company's solar energy systems sales unit had operated at a loss for six quarters (each quarter of 2013 as well as Q2 and Q4 2012) and barely broke even in two quarters (Q1 2012 and Q3 2012).

13.    Grasping for the first time that the Company's critical revenue-generating sales business was incurring staggering losses, as well as the fact that the Company's net income and reported gross profits were grossly overstated, the Company's shares were punished with an immediate drop of $4.40, or almost 6%, to close on March 19, 2014 at $72.70 per share on unusually high trading volume.

14.    As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the

Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

17.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as the Company maintains corporate offices in this District.

18.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

19.     Plaintiffs, as set forth in their previously filed Certifications, acquired SolarCity securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the truth about the Company's financial statements.

20.     Defendant SolarCity is a Delaware corporation with its principal executive offices located at 3055 Clearview Way, San Mateo, California 94402.  SolarCity's common stock trades on the NASDAQ under the ticker symbol "SCTY."

21.     Defendant Lyndon R. Rive ("Rive") was, at all relevant times, the Company's Chief Executive Officer.  Rive is the co-founder of SolarCity.  He is the brother of co-founder and Chief Technology Officer Peter Rive, and is Musk's cousin.

22.     Defendant Robert D. Kelly ("Kelly") was, at all relevant times, the Company's Chief Financial Officer.

23.     The defendants referenced above in ¶¶ 21-22 are sometimes referred to herein as the "Individual Defendants."

24.     The defendants referenced above in ¶¶ 20-22 are sometimes referred to herein as the "Defendants."

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          5**

**RELEVANT NON-PARTIES**

25.     Elon Musk ("Musk") was, at all relevant times, the Chairman of SolarCity's Board of Directors.  Musk provided the initial concept for SolarCity.  Musk and Defendant Rive are cousins.

**SUBSTANTIVE ALLEGATIONS**

**Background**

26.     SolarCity sells renewable energy to its customers at prices below utility rates, primarily through the leasing or sale of solar energy systems.  The Company operates in 14 states.  SolarCity generates revenues from a mix of residential customers, commercial entities like Walmart, eBay, and Intel, and various government entities.  SolarCity was founded in 2006.  Since then, it purports to have provided or contracted to provide solar systems or services to more than 50,000 customers.

27.     SolarCity went public in December 2012.  On December 13, 2012, the Company filed with the Securities and Exchange Commission (the "SEC") a prospectus in connection with its initial public offering of SolarCity common stock.  The prospectus is part of SolarCity's registration statement on Form S-1.  The last amendment to the registration statement was filed with the SEC on December 12, 2012.  The offering raised $92 million and after expenses, the Company received $85,305,010.

**Revenues From the Solar Energy Systems Sales Represent a Significant Source of Revenue to SolarCity**

28.     The bulk of SolarCity's revenues is derived from two identifiable and separate business operations:  *sales* of solar energy systems and *leases* of the Company's solar energy products.  The Company offers its customers the option to either purchase and own solar energy systems, or to purchase the energy that its solar energy systems produce through various financed arrangements, i.e. long-term contracts structured as leases and power purchase agreements.  In each of these financed structures, the Company installs its solar energy system at the customer's premises and charges the customer a monthly fee for the power produced.

29.     Thus, unlike an outright sale of a solar energy system, under a solar lease or a power purchase agreement ("PPA"), which is akin to a lease, the Company charges customers a monthly fee for the power produced by its solar energy systems.  In the lease structure, the monthly payment is pre-

determined and includes a production guarantee.  In the power purchase agreement structure, the Company charges customers a fee per kilowatt hour (kWh), based on the amount of electricity actually produced by the solar energy system.  The amount of operating lease revenues depends partly on the amount of energy generated by solar energy systems under power purchase agreements, which in turn depends in part on the amount of sunlight.

30.     Under SolarCity's standard customer agreements, its solar energy customers purchase energy for 20 years.  Because the Company's solar energy systems (i.e. its assets) have an estimated life of 30 years, the Company offers its customers renewal contracts at the end of the original contract term.

31.     Under GAAP, revenues derived from the sales of solar energy systems are recognized differently than revenues earned pursuant to lease and power purchase agreements.  Revenue is comprised of the gross income generated by selling goods (sales) or by performing services (professional fees, commission income).  Sales revenues are generally recognized when the Company installs the solar energy system and it passes inspection by the utility or applicable authority.  In contrast, the Company accounts for its leases and power purchase agreements as operating leases.  As directed by GAAP, the Company recognizes the revenues from these leases on a straight-line basis over the term of the lease.  Accordingly, lease revenues are recognized ratably over the term of the lease.  While the total revenues the Company collects during the life of the 20-year lease are typically significant, SolarCity can only recognize a fraction of those revenues per year.

32.     In contrast, sales revenues are recognized in full upon installation.  Therefore, sales revenues constitute a large revenue component of SolarCity's total revenues.  For example, solar energy systems sales during the years ended December 31, 2012 and 2011, represented 63% and 61% respectively, of SolarCity's total revenue for those periods.  Throughout the Class Period, sales revenues continued to represent a large portion of SolarCity's total revenues.  In 2012 alone, the Company's sales revenues were nearly double the amount of revenues the Company derived from its lease unit.  The Company reported sales revenues of $81.046 million, in contrast with operating lease

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS         7**

revenues of $47.616 million.[2]

33.     While the sales revenues were important to and contributed significantly to SolarCity's net income, unbeknownst to investors the costs associated with those revenues were massive, and were not being properly accounted for nor disclosed to investors.  Under GAAP, the cost of goods sold is subtracted from sales revenues in arriving at gross profit and, subsequently, at net income.  Thus, in order to craft an image of profitability critical to consummating its acquisitions and public offerings, the Company pushed these costs to its leasing unit, whereby said costs would only be recognized and deducted from net income ratably, over the duration of the lease.  Thus, the Company sought to have its cake and eat it too—it recognized the revenues from its sales immediately, yet pushed the costs from these very same sales to its lease business and amortized them over twenty years.  As a result, the Company's reported net income and gross margins were hopelessly inflated during the Class Period. When the true costs associated with the solar energy systems sales were revealed, it was clear that SolarCity's gross profits, net income/loss, and EPS[3] were materially misstated.  For example, accounting for the true costs associated with the solar energy systems sales, for full year 2012 the Company overstated its overall gross profit by over $23 million, or 46%, and understated its net loss by at least $22 million, or over 24% percent.  Moreover, the Company's reported gross margin was materially lower than reported, at 21.63%, rather than its reported 40%.

**The Individual Defendants Knew or Were Reckless in Not Knowing That Material Weaknesses in SolarCity's Internal Controls Subjected the Company to Accounting Manipulations, and Were Focused on the Allocation of Overhead Costs During the Class Period**

34.     As explained, SolarCity derives a significant amount of its revenues from its solar energy systems sales.  Accordingly, this unit was sufficiently prominent to capture Defendants' attention.

35.     Moreover, Defendants knew that SolarCity's internal controls were plagued with

---

[2] The restated revenue numbers were $46.098 million for operating lease revenues and $80.810 million for sales revenues.

[3] EPS is a market value ratio that reflects the amount of profit per each share held.  EPS equals net income minus preferred dividends, divided by common stock outstanding.

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          8**

material weaknesses, which had already caused several restatements by March 31, 2013.  On that day, Defendants disclosed that "[i]n connection with the audits of our consolidated financial statements for 2010 and 2011 we identified material weaknesses in our internal control over financial reporting…A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, *such that there is a reasonable possibility that a material misstatement of a company's annual or interim financial statements will not be prevented or detected on a timely basis*."  These significant weaknesses resulted in restatements of SolarCity's 2008, 2009 and 2010 consolidated financial statements.  Moreover, deficiencies in the design and operation of SolarCity's internal controls resulted in audit adjustments and delayed the Company's financial statement close process for the years ended December 31, 2010 and 2011.

36.     Defendants therefore knew or, at a minimum, were reckless in not knowing that SolarCity's deficient internal controls were therefore at high risk of being subject to material accounting manipulations.

37.     Confidential witnesses have explained that the Company's accounting and financial systems continued to be flawed in 2012.  CW1 was an Accounts Payable Specialist at SolarCity from January 2010 to July 2012.  CW1 reported to the manager of accounts payable.  In the course of his/her job, CW1 participated in a monthly and annual financial close process that required the Company to accrue all of its debt, its credit, revenue and payouts existing at the end of the month and at the end of the year.  After close out, this data was then supplied to the Company employees who prepared the financial statements.  The close process at SolarCity, however, was "never on time" and almost always missed its deadlines.  SolarCity missed the deadlines almost every month during CW1's tenure with the Company.  CW1 said that the accounting and financials at the Company were "a mess."

38.     CW2 worked as a Senior Accountant at SolarCity's San Mateo, CA, headquarters from January 2012 to the end of May 2012.  CW2 was a contractor and reported to Bernadette Solana, Senior Accounting Manager.  When CW2 was hired in January 2012, the Company "hadn't closed the books in a year," CW2 said.  CW2 explained that all the accounting work was being done in preparation for the Company's initial public offering.  Ajmere Dale, the corporate controller, talked with CEO Lyndon

Rive about accounting issues.  Dale told Defendant Rive what they had to do to recognize revenue, according to CW2.   Dale also discussed the topic of how to allocate overhead costs with CFO Robert Kelly and then with the owners of the company, CEO Lyndon Rive and Peter Rive.  Dale likely told Kelly and the Rive brothers "what they were doing" with the overhead accounting.  "Those people were the owners of the privately held company at the time," CW2 said.

39.     As described by confidential witnesses who worked at SolarCity during the Class Period, the cost accounting team at the Company was very small.  CW3 was a Senior Manager for fund relations in SolarCity's Structured Finance Department from September 2011 to September 2012, reporting to the Vice President of Structured Finance.  CW3's job involved ensuring that large partner investors, such as banks and corporations like Google, were provided with financial reports and information about earnings, costs and profits, as required by their structured financing deals.  CW3 explained that the cost accounting team was a "lean team" when he/she was at SolarCity, particularly in the 2011 and 2012 time period.  CW3 recalled that the cost accounting group was comprised of 6 to 7 people who sat together in a cluster of cubicles located at SolarCity's corporate headquarters in San Mateo, California.  The group reported up to Ajmere Dale, the Corporate Controller.  CW3 also noted that there was often "antagonism" between the fund accounting and structured finance teams because information was withheld by Albert Luu, the VP of Structured Finance and Strategy, who seemed to be the source of the reluctance to provide the information.  CW3 also stated that CFO Robert Kelly was involved in financial and accounting policy decisions at SolarCity.  CW3 was aware of the CFO's involvement in these decisions because he/she was responsible for providing financial information to third party vendors.

40.     CW4 also described the overhead cost accounting department as being very small.  CW4 was an Accounts Payable Specialist at SolarCity from January 2011 to August 2014, reporting to the Senior Accounts Payable Manager.  CW4 worked within the Accounts Payable Department and was responsible for paying and keeping books of the invoices for subcontractors on solar installation projects.  CW4 explained that a separate team of Accounts Payable Specialists worked on overhead cost accounting, and that team sat near the General Ledger department in SolarCity's corporate

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          10**

headquarters.   According to CW4, the overhead team had about seven employees who worked exclusively on overhead costs.  The overhead reports were submitted to the Accounting Manager, who reported to the Controller.  The overhead team remained at corporate headquarters even after other employees in the Accounts Payable Department were transferred to an office in Las Vegas in about 2012.

41.    A confidential witness directly involved in solar system sales during the Class Period, CW5, represented that during his/her tenure (covering the Class Period), SolarCity's sales segment often showed negative margins and explained that CEO Lyndon Rive and COO Peter Rive were aware of the negative margins of the cash sale projects and the costs for the projects, and that they participated in phone conferences to discuss these issues.  This confidential witness also explained that the Rive brothers also were knowledgeable and adept with accounting issues, including complicated accounting rules for when and how SolarCity could recognize revenue, as well as complex structured financing agreements for PPAs.  CW5 was a Project Development Manager at SolarCity from July 2011 to May 2014 and reported to the VP of Commercial Sales.  CW5 was one of the few employees at SolarCity directly involved in cash sales, which were generally sales of large solar systems.  CW5 regularly sold large projects to public entities, such as school districts, which used bonds to buy the system.  CW5 was required to charge a 10 percent mark-up margin to the customers on all cash sales.  If the project was particularly large, CW5 had some flexibility to lower the 10 percent margin.  If the project was small, CW5 might be required to charge more than a 10 percent margin.  Despite the built-in 10 percent margin, however, many of CW5's cash sale projects came in with a negative margin at the time construction of the system was completed.  "I knew that when we built projects, we would come in negative as far as margin was concerned," CW5 said. "We would sell a project at 10 percent margin—a cash deal—we would build it, and it would cost more than the cost (to build) and the 10 percent margin. We would come in with a negative margin."  CW5 estimated that he/she sold about $12 million to $13 million in solar systems each of the three years he/she was at SolarCity.  Some of CW5's projects were as large as $6 million to $7 million each.  CW5 said he/she sold about 12 projects in total during his/her time at SolarCity.  Of those, CW5 recalled, "at least 60 percent were negative."  The negative margins

were also discussed on conference calls.

42.    CW 5 confirmed that the sales segment experienced negative margins during the Class Period, 2012 and 2013. "They were not making profit margins, or if they were, they were much lower than expected," said CW5. "If the margin was supposed to be 15 percent, it would come in at 3 percent." When asked if CW5 was referring to gross margins or net margins, CW5 responded that it was gross margins. CW5 explained that net margins, which include indirect costs, would have showed even lower margins. When asked if the negative margins CW5 saw for cash sales were for cash sale projects throughout the Company or just for his/her own cash sale projects, CW5 explained that cash sale projects in general at the Company were showing negative or far below expected cash margins — not just his/her own sales. CW5 learned this from talking with other sales people at SolarCity.

43.    In the meantime, as shown below in the SolarCity Restatement analysis, SolarCity was publicly reporting stellar gross margins for cash sales: full year 2012 sales gross margins of positive 20.50% (when in reality the gross margins were negative 5.01%); positive 27.40% sales gross margins for Q1 2012 (when in reality sales gross margins were only positive 1.12%); positive 8.98% sales gross margins for Q2 2012 (when in reality sales gross margins were negative 7.10%); positive 23.02% sales gross margins for Q3 2012 (when in reality sales gross margins were only positive 5.72%); positive 42.13% sales gross margins for Q4 2012 (when in reality sales gross margins were negative 24.70%); positive 20.87% sales gross margins for Q1 2013 (when in reality sales gross margins were negative 12.14%); positive 12.08% sales gross margins for Q2 2013 (when in reality sales gross margins were negative 32.71%); and positive 4.89% sales gross margins (when in reality sales gross margins were negative 9.76%).

44.    Asked if COO Lyndon Rive and CFO Bob Kelly were aware of the poor performance of the cash sales segment, CW5 stated that "everybody at the high level knew about it." Because of the poor margins of the cash sales, SolarCity's salespeople were directed to move away from cash sales to leases. "They kept discouraging us from doing cash deals," CW5 said. CW5 recalled the pressure not to do cash sales began about a year after he/she started at SolarCity, which would have been in mid-2012.

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**        **12**

45.     CW5 explained that he/she regularly participated in a number of conference calls to discuss cash sale projects that came in with negative margins.   CW5 said that CEO Lyndon Rive and COO Pete Rive, and sometimes CFO Robert Kelly, participated in these conference calls.   During the calls, the Rive brothers wanted to know why projects were coming in with negative margins.   The Rive brothers also asked about timelines for revenue recognition, wanting to know when and how SolarCity could recognize revenue from the cash sale projects.   "It would always be really strange kind of accounting rules," CW5 said.   From these phone conferences, it was clear to CW5 that the Rive brothers were aware that cash sale projects were coming in with negative margins.   They were also aware of costs, including costs that CW5 was not privy to.   "They had very specific information of what the costs were for projects," CW5 said.   They were also privy to purchasing information.   CW5 described the Rive brothers as "smart people" who were knowledgeable and adept with complex accounting rules and issues, such as revenue recognition requirements.   "They definitely had an understanding of what overhead is," CW5 said.   "They know what they are doing."

46.     CW5 confirmed that the Rive brothers and Kelly were aware of the poor cash sales margins because reports about cash sales projects were submitted to them.   The reports compared the estimated costs for projects, which were used to set the price, to the actual costs to complete the projects.   The comparison showed the negative and low margins of the projects.   "I don't know if they looked at it line by line," CW5 said.   "They received an overview. They were verbally aware of the situation."

47.     CW5 also explained that there was a general understanding among employees at SolarCity that cash sales were not profitable for the Company.   "We were losing money on cash sales in particular," CW5 said. "That's why they didn't want us selling cash deals."   For this reason, the Company preferred PPAs, which were basically financing agreements with customers that allowed SolarCity to charge finance rates and collect money over a long period of time.   "We make money off financing projects," CW5 said. "They don't make money off cash deals."   CW5 explained that the PPAs also allowed SolarCity to spread costs for those projects out over several years, which also

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          13**

improved the Company's profits. "That's why they did it," CW5 said of spreading out costs. "Normally with a Power Purchase Agreement they would be able to make that (negative margin) up with cash flow analysis," CW5 explained. "They can't do that with a cash deal. They are effectively acting as a lender and charge huge interest. A negative margin doesn't matter (with a PPA) because we're going to be charging them (the customer) so much over time."

48.     CW6 corroborates that Robert Kelly, Lyndon Rive, and Peter Rive had knowledge of and were involved in accounting issues. CW6 was Director of Fund Accounting at SolarCity from June 2012 to September 2012. CW6's job involved accounting for the funds set up with third party investors to pay for the cost of installation of solar systems. CW6 explained that on the fund side where he/she was involved, CFO Robert Kelly was "definitely" involved in discussions and decisions about accounting policies. At a "high-level," Kelly was making decisions about accounting issues, said CW6. CW6 also stated that CEO Lyndon Rive and COO Peter Rive were involved in discussions about accounting issues on the fund side. "At a high level, in general yes, they were involved," Albrecht said. CW6 said that the Rive brothers appeared to fully understand and grasp the accounting issues discussed.

49.     CW7 worked as a B2B Marketing Manager at SolarCity from May 2013 to April 2014, reporting to the Director of Product Marketing and Partner Marketing. Before that time, from June 2011 to May 2013, CW7 was a Project Development Associate working on the Walmart account, reporting to the Senior Project Developer—National Accounts. CW7 worked in SolarCity's corporate headquarters in San Mateo and his/her job as a Project Development Associate on the Walmart account put him/her in contact with a number of other employees at SolarCity's headquarters. At that time, Walmart was SolarCity's largest commercial account. CW7 learned from his/her conversations with SolarCity's Director of Corporate Finance, Carlo Woods that Woods met weekly with CFO Robert Kelly, CEO Lyndon Rive and COO Peter Rive to discuss the financial health of the Company, and that Kelly and the Rive brothers were actively involved in SolarCity's financials. CW7 also explained that the sales projects at SolarCity had a lower margin than the leased projects, which averaged margins of 10 percent to 15 percent. For the PPA and other leases in the commercial division, where CW7

worked, SolarCity vied for leasing and PPA deals with a 10 to 15 percent margin. Direct sales projects were making less than that, CW7 said.

50. CW8 worked at SolarCity from November 2007 to September 2012. CW8 was a Commercial Project Development Manager from March 2010 to September 2012 and during that period he/she reported to the Director of Channel Sales. From November 2007 to March 2010, CW8 worked as a solar consultant for SolarCity. During his/her employment as a Commercial Project Development Manager from March 2010 to September 2012, CW8 recalled discussions about SolarCity's profitability at "all-hands" meetings led by CEO Lyndon Rive and COO Peter Rive. CW8 stated that during his/her time at SolarCity, the Rive brothers held internal meetings once or twice a year, during which they gave a presentation to staff on how the Company was doing. At the end of the meetings, the brothers held a question and answer session, and CW8 recalled that the question always came up: "Are we profitable?" According to CW8, the Rive brothers always told staff, "We're not profitable on a GAAP basis." The Rive brothers explained to the employees that if they looked at the Company's finances in another way (not on a GAAP basis) they would be able to show more revenue over a long-term basis that would cover short-term costs. Those short-term costs made SolarCity look unprofitable on a GAAP basis. CW8 also stated that CFO Robert Kelly's desk was located in the accounting department at SolarCity's headquarters. Kelly and Ajmere Dale, the Corporate Controller, both sat within the area where accounting employees were located, CW8 said.

51. CW9 worked as an Administrative Assistant and Sales Operations Administrator at SolarCity from October 2008 to January 2012. CW9 reported to SolarCity's VP of Sales and Business Development, and later to the Director of Sales Operations. CW9 was responsible for setting up and assisting the sales operations department. CW9 was regularly involved in presenting the Rive brothers with proposals from CW9's department that needed the Rive brothers' approval. When CW9 spoke with the controller, Ajmere Dale, about financial issues, Dale often told CW9 they needed to obtain approval from the CFO or from the Rive brothers. "They were intimately involved in the Company in all aspects," CW9 said, referring to the Rive brothers. For example, when the Company wanted to change the way it paid commissions to sales people, CW9 was part of presenting his/her department's

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**          **15**

ideas to the Rive brothers.  The commission payment changes, like the other issues CW9 presented, were discussed in detail with the Rive brothers; David White, the CFO at the time; Seth Weisman, General Counsel; and Ajmere Dale, the Corporate Controller.  CW9 explained that this group led the Company and made all major decisions, with the Rive brothers making the final call.  The Rive brothers also "bred the culture" at the Company to encourage discussions with them about new ideas and strategic plans for the Company.  "It was, 'let's talk about it, let's put it all on the table,'" CW9 said of the Rive brother's style of management.  But "ultimately, Lyndon and Pete would make the decisions." Asked if the Rive brothers were involved in or aware of a decision to change the way the Company was accounting for its overhead costs, CW9 said, "absolutely, they totally would have been aware of it." Before going public, the Rive brothers regularly talked to employees at Company-wide meetings about how the Company was doing, CW9 said.  "They definitely had profitable quarters," CW9 said.  But the Company was not profitable on an annual basis while CW9 was there.  According to CW9, during staff meetings, the Rive brothers said that "before we can go public, we have to make sure we've got the revenue stream in place to show that we've got depth.  We have to show a profit before we go public." CW9 said the Rive brothers also discussed accounting methods at the Company-wide meetings.  "They definitely talked about the accounting methods they were using and how they were doing it," CW9 said. "I think they said we show profits if the accounting is done this one way, but we're not profitable by the way they had to do it for going public."  According to CW9, the Rive brothers said the Company looked profitable if they used an accounting method that was not permitted for public companies.  CW9 also recalled that the Rive brothers told employees that "we can't go public with that" method of accounting.  During the last few months of CW9's employment, CW9 said the Company was making shifts in how it was doing things in preparation for going public.

52.    CW10 worked as Director of Sales at SolarCity from May 2008 to January 2011.  CW10 was based in Southern California and reported to the VP of Sales and Business Development.  CW10 was responsible for expanding, training, deploying and guiding the Company's sales force in Southern California.  CW10 stated that Lyndon and Peter Rive were hands-on on everything.  CEO Lyndon Rive often participated in CW10's regional sales calls.  "He was quite hands-on when it came to sales,"

CW10 said. "I would say Lyndon was more hands-on than Peter when it came to the actual sales organization, ramping up the territories, and the sales process." Peter Rive, however, was deeply involved in other aspects of the company. Peter Rive was deeply involved with "everything outside of sales – marketing, installations, even the finance side," CW10 said. According to CW10, Peter was the backbone of that organization during CW10's time at the Company. CW10 recalled that the Rive brothers discussed profitability at Company-wide meetings. "When they put it in terms of GAAP accounting standards, we were not profitable."

53. CW11 was the Office Manager for SolarCity's corporate headquarters in San Mateo, California, from June 2010 to September 2013. From discussions CW11 had with his/her colleagues and from comments made by CEO Lyndon Rive, COO Pete Rive and CFO Bob Kelly in meetings, CW11 was aware that SolarCity was not earning a profit during his/her employment. "The company was not profitable," CW11 said. "The whole time I was there, which was only three years, I was always told that the company was not producing a profit. I always thought to myself, 'How are they staying in business?'"

**To Portray Profitability, Defendants Shifted Costs From Sales to Leases**

54. A sign of good financial health and how effectively a company is managed is its ability to generate a satisfactory profit and return on investment. Investors will refrain from investing in or pay less for the shares of a business if it has poor earnings potential because of the adverse effect on the market price of stock and dividends.

55. Key ratios of operating performance include the gross profit margin percent and the profit margin. The gross profit margin indicates the percentage of each dollar remaining after the business has paid for its goods. Profit margin is profit divided by net sales. It indicates the profits obtained from revenue and thus is an essential indicator of financial health. Further, it indicates an entity's pricing, cost structure, and production efficiency.

56. Analysts considered these and other related metrics (*e.g.*, net income, EPS) in recommending that investors *buy* SolarCity common stock. *See*, *e.g.*, Roth Capital Partners, Company Note and Equity Research on SolarCity Corporation, dated March 7, 2013.

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**          **17**

57.   The cost of revenue[4] from SolarCity's leases and power purchase agreements is primarily comprised of the depreciation of the cost of the solar energy systems, which is depreciated over the estimated useful life of 30 years, and the amortization of indirect costs, which is amortized over the term of the lease or power purchase agreement.  Accordingly, in contrast with costs associated with the sales of solar energy systems, which were significant and had to be incurred in full in the period in which they accrued, the lease costs were significantly lower because they were spread out over a twenty-year period.

58.   While revenues from solar energy systems sales were significant, so were the costs associated with the revenue derived from those sales.  Those costs exceeded the revenues generated from the solar energy systems sales.  Defendants concealed this critical fact from investors.  In order to portray the illusion of profitability, Defendants shifted costs from sales to leases. This misallocation allowed the Company to immediately recognize revenues and income from its solar energy systems sales, yet push the costs associated with those transactions to leases, where they would be amortized over a twenty-year period.

59.   A simple example illustrates Defendants' manipulation:

Sale Example (Correct Reporting):

Solar Panel Sale: $100

Cost of Solar Panel: $80

Indirect (Overhead) costs: $25

Net Loss: ($5)      ($100-$80-$25)

In this instance, SolarCity sells a solar panel for $100.  It cost SolarCity $80 to acquire the panel and an additional $25 in indirect costs (for example, shipping costs).  SolarCity recognizes a net loss of $5, derived by subtracting from the $100 revenue received from the sale of the solar panel the costs associated with that revenue ($80 + $25).

Lease Example (Correct Reporting):

Lease Solar Panel for $7 per year Revenue

---

[4] Cost of goods sold is the cost of the merchandise or services sold.  In a typical business, for example, it is the cost of buying goods from the manufacturer, which are acquired for sale purposes.

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS        18**

Cost of Solar Panel is $80 which is depreciated over 30 years: $2.67 per year

Indirect (Overhead) Costs of $25 is amortized over 20 years: $1.25 per year

Net Profit: $3.08 ($7-$2.67-$1.25)

In this example, SolarCity leases a panel for 20 years and collects $7 per year in revenues. The cost of the panel is still $80, but that cost is depreciated over 30 years (the life of the asset), meaning SolarCity's direct cost is $2.67 per year. Meanwhile, the indirect cost of $25 is amortized over 20 years (the duration of the lease), meaning SolarCity's indirect cost per year is $1.25. SolarCity recognizes a net profit of $3.08 per year, derived by subtracting from the $7 revenue received from the lease of the solar panel the costs associated with that revenue ($2.67 + $1.25).

SolarCity Shifts Indirect Cost from Sale to Lease:

Now Indirect (Overhead) Cost for Lease goes from $25 to $50 ($25 as shown in the correct reporting above, plus an extra $25 shifted from cost of sales, assuming all indirect costs were shifted), amortized over 20 years: $2.50 per year

New Net Profit on Sales is now $20 ($100-$80)

New Net Profit on Lease is lowered to $1.83 ($7-$2.65-$2.50)

In this example, SolarCity manipulates its accounting by shifting indirect costs from sale to lease. Thus, indirect costs for lease increase from $25 to $50. The indirect cost of $50 is amortized over 20 years (the duration of the lease), meaning SolarCity's indirect cost per year is $2.50. The leased systems still shows a profit, albeit smaller than before. In the meantime, SolarCity's total costs related to sales are now only $80 (instead of $80 + $25), enabling SolarCity to show a net profit on sales of $20 ($100 revenue - $80 cost). Through this maneuver, the lease absorbs the indirect costs from the sale side and now both lease and sale have a profit, thereby inflating the Company's overall net income and gross margins, as well as the Company's reported gross profits and margins for solar energy systems sales.

60. This practice occurred at SolarCity for *seven consecutive quarters*, commencing with the first quarter of 2012, the year SolarCity went public, as reflected in the tables below:

**2012 SolarCity Restatement Analysis**

| | Original 1Q2012 | Adj | Restated 1Q2012 | Original 2Q2012 | Adj | Restated 2Q2012 | Original 3Q2012 | Adj | Restated 3Q2012 | Original 4Q2012 | Adj | Restated 4Q2012 | YE 2012 As Previously Reported | Adj | 2012 Restated |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | | | | | | | | | | |
| Operating leases | 8,139 | 0 | 8,139 | 11,528 | 0 | 11,528 | 13,917 | 0 | 13,917 | 14,032 | (1,518) | 12,514 | 47,616 | (1,518) | 46,098 |
| Solar energy systems sales | 16,702 | (236) | 16,466 | 35,046 | 0 | 35,046 | 18,057 | 0 | 18,057 | 11,241 | 0 | 11,241 | 81,046 | (236) | 80,810 |
| Total revenue | 24,841 | (236) | 24,605 | 46,574 | 0 | 46,574 | 31,974 | 0 | 31,974 | 25,273 | (1,518) | 23,755 | 128,662 | (1,754) | 126,908 |
| **Cost of revenue:** | | | | | | | | | | | | | | | |
| Operating leases | 2,582 | 222 | 2,804 | 3,710 | 186 | 3,896 | 2,323 | 112 | 2,435 | 4,731 | 730 | 5,461 | 13,346 | 1,250 | 14,596 |
| Solar energy systems | 12,125 | 4,156 | 16,281 | 31,899 | 5,634 | 37,533 | 13,900 | 3,125 | 17,025 | 6,505 | 7,512 | 14,017 | 64,429 | 20,427 | 84,856 |
| Total cost of revenue | 14,707 | 4,378 | 19,085 | 35,609 | 5,820 | 41,429 | 16,223 | 3,237 | 19,460 | 11,236 | 8,242 | 19,478 | 77,775 | 21,677 | 99,452 |
| **Gross profit** | 10,134 | (4,614) | 5,520 | 10,965 | (5,820) | 5,145 | 15,751 | (3,237) | 12,514 | 14,037 | (9,760) | 4,277 | 50,887 | (23,431) | 27,456 |
| **Operating expenses:** | | | | | | | | | | | | | | | |
| Sales and marketing | 16,131 | 0 | 16,131 | 15,700 | 0 | 15,700 | 18,145 | 0 | 18,145 | 19,416 | 0 | 19,416 | 69,392 | — | 69,392 |
| General and administrative | 8,562 | 0 | 8,562 | 10,788 | 0 | 10,788 | 12,554 | 0 | 12,554 | 18,451 | (1,280) | 17,171 | 50,355 | (1,280) | 49,075 |
| Total operating expenses | 24,693 | 0 | 24,693 | 26,488 | 0 | 26,488 | 30,699 | 0 | 30,699 | 37,867 | (1,280) | 36,587 | 119,747 | (1,280) | 118,467 |
| Loss from operations | (14,559) | (4,614) | (19,173) | (15,523) | (5,820) | (21,343) | (14,948) | (3,237) | (18,185) | (23,830) | (8,480) | (32,310) | (68,860) | (22,151) | (91,011) |
| Interest expense, net | 3,494 | 0 | 3,494 | 4,841 | 0 | 4,841 | 6,587 | 0 | 6,587 | 5,220 | 0 | 5,220 | 20,142 | — | 20,142 |
| Other expense, net | 8,974 | 0 | 8,974 | 1,455 | 0 | 1,455 | 7,466 | 0 | 7,466 | (15,376) | 0 | (15,376) | 2,519 | — | 2,519 |
| Loss before income taxes | (27,027) | (4,614) | (31,641) | (21,819) | (5,820) | (27,639) | (29,001) | (3,237) | (32,238) | (13,674) | (8,480) | (22,154) | (91,521) | (22,151) | (113,672) |
| Income tax benefit - provision | (35) | 15 | (20) | (30) | 0 | (30) | (42) | (15) | (57) | 53 | 0 | 53 | (54) | — | (54) |
| **Net loss** | (27,062) | (4,599) | (31,661) | (21,849) | (5,820) | (27,669) | (29,043) | (3,252) | (32,295) | (13,621) | (8,480) | (22,101) | (91,575) | (22,151) | (113,726) |
| Net income -loss) attributable to noncontrolling interests | (29,818) | 11,185 | (18,633) | 3,984 | 404 | 4,388 | 9,028 | 4,883 | 13,911 | (10,578) | (3,479) | (14,057) | (27,384) | 12,993 | (14,391) |
| Net -loss) income attributable to stockholders | 2,756 | (15,784) | (13,028) | (25,833) | (6,224) | (32,057) | (38,071) | (8,135) | (46,206) | (3,043) | (5,001) | (8,044) | (64,191) | (35,144) | (99,335) |
| *Net -loss) income attributable to common stockholders* | | | | | | | | | | | | | | | |
| Basic | 453 | (13,481) | (13,028) | (25,833) | (6,224) | (32,057) | (38,071) | (8,135) | (46,206) | (13,134) | (5,001) | (18,135) | (74,282) | (35,144) | (109,426) |
| Diluted | 656 | (13,684) | (13,028) | (25,833) | (6,224) | (32,057) | (38,071) | (8,135) | (46,206) | (27,950) | (5,001) | (32,951) | (74,559) | (35,144) | (109,703) |
| *Net -loss) income per share attributable to common stockholders* | | | | | | | | | | | | | | | |
| Basic | 0.04 | (1.28) | (1.24) | (2.37) | (0.57) | (2.94) | (3.41) | (0.73) | (4.14) | (0.54) | (0.21) | (0.75) | (5.22) | (2.46) | (7.68) |
| Diluted | 0.04 | (1.28) | (1.24) | (2.37) | (0.57) | (2.94) | (3.41) | (0.73) | (4.14) | (1.10) | (0.20) | (1.30) | (5.23) | (2.46) | (7.69) |
| *Weighted average shares used to compute net -loss) income per share attributable to common stockholders* | | | | | | | | | | | | | | | |
| Basic | 10,503,931 | 0 | 10,503,931 | 10,897,198 | 0 | 10,897,198 | 11,161,789 | 0 | 11,161,789 | 24,283,731 | 0 | 24,283,731 | 14,240,187 | 0 | 14,240,181 |
| Diluted | 17,076,172 | (6,572,786) | 10,503,931 | 10,897,198 | 0 | 10,897,198 | 11,161,789 | 0 | 11,161,789 | 25,310,651 | 0 | 25,310,651 | 14,267,767 | 0 | 14,267,767 |
| **Solar Energy System Sales Segment Analysis** | | | | | | | | | | | | | | | |
| Solar Energy System Sales | 16,702 | (236) | 16,466 | 35,046 | 0 | 35,046 | 18,057 | 0 | 18,057 | 11,241 | 0 | 11,241 | 81,046 | (236) | 80,810 |
| Cost of Revenue for Solar | 12,125 | 4,156 | 16,281 | 31,899 | 5,634 | 37,533 | 13,900 | 3,125 | 17,025 | 6,505 | 7,512 | 14,017 | 64,429 | 20,427 | 84,856 |
| **Gross Profit/(Loss) Fro** | 4,577 | (4,392) | 185 | 3,147 | (5,634) | (2,487) | 4,157 | (3,125) | 1,032 | 4,736 | (7,512) | (2,776) | 16,617 | (20,663) | (4,046) |
| **Gross Margin %** | 27.40% | | 1.12% | 8.98% | | -7.10% | 23.02% | | 5.72% | 42.13% | | -24.70% | 20.50% | | -5.01% |
| **Operating leases Segment Analysis** | | | | | | | | | | | | | | | |
| Operating Lease Sales | 8,139 | 0 | 8,139 | 11,528 | 0 | 11,528 | 13,917 | 0 | 13,917 | 14,032 | (1,518) | 12,514 | 47,616 | (1,518) | 46,098 |
| Cost of Revenue for Opera | 2,582 | 222 | 2,804 | 3,710 | 186 | 3,896 | 2,323 | 112 | 2,435 | 4,731 | 730 | 5,461 | 13,346 | 1,250 | 14,596 |
| **Gross Profit/(Loss) Fro** | 5,557 | (222) | 5,335 | 7,818 | (186) | 7,632 | 11,594 | (112) | 11,482 | 9,301 | (2,248) | 7,053 | 34,270 | (2,768) | 31,502 |
| **Gross Margin %** | 68.28% | | 65.55% | 67.82% | | 66.20% | 83.31% | | 82.50% | 66.28% | | 56.36% | 71.97% | | 68.34% |
| **Overall Gross Margin Analysis** | | | | | | | | | | | | | | | |
| Revenue | 24,841 | (236) | 24,605 | 46,574 | 0 | 46,574 | 31,974 | 0 | 31,974 | 25,273 | (1,518) | 23,755 | 128,662 | (1,754) | 126,908 |
| Cost of Revenue | 14,707 | 4,378 | 19,085 | 35,609 | 5,820 | 41,429 | 16,223 | 3,237 | 19,460 | 11,236 | 8,242 | 19,478 | 77,775 | 21,677 | 99,452 |
| **Gross Profit** | 10,134 | (4,614) | 5,520 | 10,965 | (5,820) | 5,145 | 15,751 | (3,237) | 12,514 | 14,037 | (9,760) | 4,277 | 50,887 | (23,431) | 27,456 |
| **Gross Margin %** | 40.80% | | 22.43% | 23.54% | | 11.05% | 49.26% | | 39.14% | 55.54% | | 18.00% | 39.55% | | 21.63% |

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          20**

**2013 SolarCity Restatement Analysis**

| | Original 1Q2013 | Adjustment | Restated 1Q2013 | Original 2Q2013 | Adj | Restated 2Q2013 | Original 3Q2013 | Adj | Restated 3Q2013 |
|---|---|---|---|---|---|---|---|---|---|
| Revenue: | | | | | | | | | |
| Operating leases | 15,089 | 0 | 15,089 | 20,608 | 0 | 20,608 | 24,796 | 0 | 24,796 |
| Solar energy systems sales | 14,899 | 0 | 14,899 | 17,341 | 0 | 17,341 | 23,804 | 0 | 23,804 |
| Total revenue | 29,988 | 0 | 29,988 | 37,949 | 0 | 37,949 | 48,600 | 0 | 48,600 |
| Cost of revenue: | | | | | | | | | |
| Operating leases | 5,503 | 249 | 5,752 | 7,223 | (429) | 6,794 | 8,423 | 196 | 8,619 |
| Solar energy systems | 11,789 | 4,918 | 16,707 | 15,247 | 7,767 | 23,014 | 22,640 | 3,488 | 26,128 |
| Total cost of revenue | 17,292 | 5,167 | 22,459 | 22,470 | 7,338 | 29,808 | 31,063 | 3,684 | 34,747 |
| | | | | | | | | | |
| Gross profit: | 12,696 | (5,167) | 7,529 | 15,479 | (7,338) | 8,141 | 17,537 | (3,684) | 13,853 |
| Operating expenses: | | | | | | | | | |
| Sales and marketing | 17,879 | 0 | 17,879 | 21,344 | 0 | 21,344 | 24,310 | 0 | 24,310 |
| General and administrative | 16,618 | (247) | 16,371 | 21,176 | 1,090 | 22,266 | 21,893 | (467) | 21,426 |
| Total operating expenses | 34,497 | (247) | 34,250 | 42,520 | 1,090 | 43,610 | 46,203 | (467) | 45,736 |
| | | | | | | | | | |
| Loss from operations | (21,801) | (4,920) | (26,721) | (27,041) | (8,428) | (35,469) | (28,666) | (3,217) | (31,883) |
| Interest expense, net | 6,319 | 0 | 6,319 | 5,421 | 0 | 5,421 | 5,781 | 0 | 5,781 |
| Other expense, net | 140 | 0 | 140 | 162 | 0 | 162 | 123 | 0 | 123 |
| | | | | | | | | | |
| Loss before income taxes | (28,260) | (4,920) | (33,180) | (32,624) | (8,428) | (41,052) | (34,570) | (3,217) | (37,787) |
| Income tax benefit -provision) | 105 | 0 | 105 | (25) | 0 | (25) | (23) | 0 | (23) |
| | | | | | | | | | |
| Net loss | (28,155) | (4,920) | (33,075) | (32,649) | (8,428) | (41,077) | (34,593) | (3,217) | (37,810) |
| Net income -loss) attributable to noncontrolling interests | 2,839 | 5,003 | 7,842 | (8,764) | 7,150 | (1,614) | (37,949) | 2,242 | (35,707) |
| | | | | | | | | | |
| Net -loss) income attributable to stockholders | (30,994) | (9,923) | (40,917) | (23,885) | (15,578) | (39,463) | 3,356 | (5,459) | (2,103) |
| | | | | | | | | | |
| *Net -loss) income attributable to common stockholders* | | | | | | | | | |
| Basic | (30,994) | (9,923) | (40,917) | (23,885) | (15,578) | (39,463) | 3,356 | (5,459) | (2,103) |
| Diluted | (30,994) | (9,923) | (40,917) | (23,885) | (15,578) | (39,463) | 3,356 | (5,459) | (2,103) |
| *Net -loss) income per share attributable to common stockholders* | | | | | | | | | |
| Basic | (0.41) | (0.13) | (0.54) | (0.31) | (0.21) | (0.52) | 0.04 | (0.07) | (0.03) |
| Diluted | (0.41) | (0.13) | (0.54) | (0.31) | (0.21) | (0.52) | 0.04 | (0.07) | (0.03) |
| *Weighted average shares used to compute net - loss) income per share attributable to common stockholders* | | | | | | | | | |
| Basic | 75,186,430 | 0 | 75,186,430 | 76,529,698 | 0 | 76,529,698 | 79,918,110 | 0 | 79,918,110 |
| Diluted | 75,186,430 | 0 | 75,186,430 | 76,529,698 | 0 | 76,529,698 | 88,054,393 | (8,136,283) | 79,918,110 |
| | | | | | | | | | |
| **Solar Energy System Sales Segment Analysis** | | | | | | | | | |
| Solar Energy System Sales | 14,899 | 0 | 14,899 | 17,341 | 0 | 17,341 | 23,804 | 0 | 23,804 |
| Cost of Revenue for Solar Energy Systems Sales | 11,789 | 4,918 | 16,707 | 15,247 | 7,767 | 23,014 | 22,640 | 3,488 | 26,128 |
| | | | | | | | | | |
| Gross Profit/(Loss) From Solar Energy System Sa | 3,110 | (4,918) | (1,808) | 2,094 | (7,767) | (5,673) | 1,164 | (3,488) | (2,324) |
| Gross Margin % | 20.87% | | -12.14% | 12.08% | | -32.71% | 4.89% | | -9.76% |
| | | | | | | | | | |
| Operating leases Segment Analysis | | | | | | | | | |
| Operating Lease Sales | 15,089 | 0 | 15,089 | 20,608 | 0 | 20,608 | 24,796 | 0 | 24,796 |
| Cost of Revenue for Operating Lease | 5,503 | 249 | 5,752 | 7,223 | (429) | 6,794 | 8,423 | 196 | 8,619 |
| | | | | | | | | | |
| Gross Profit/(Loss) From Operating Lease | 9,586 | (249) | 9,337 | 13,385 | 429 | 13,814 | 16,373 | (196) | 16,177 |
| Gross Margin % | 63.53% | | 61.88% | 64.95% | | 67.03% | 66.03% | | 65.24% |
| | | | | | | | | | |
| **Overall Gross Margin Analysis** | | | | | | | | | |
| Revenue | 29,988 | 0 | 29,988 | 37,949 | 0 | 37,949 | 48,600 | 0 | 48,600 |
| Cost of Revenue | 17,292 | 5,167 | 22,459 | 22,470 | 7,338 | 29,808 | 31,063 | 3,684 | 34,747 |
| | | | | | | | | | |
| Gross Profit | 12,696 | (5,167) | 7,529 | 15,479 | (7,338) | 8,141 | 17,537 | (3,684) | 13,853 |
| Gross Margin | 42.34% | | 25.11% | 40.79% | | 21.45% | 36.08% | | 28.50% |

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**       **21**

61.     By improperly shifting costs associated with sales revenues to the leased systems, for each of those seven consecutive quarters Defendants misleadingly reported costs *lower* than revenues for SolarCity's systems sales: (i) for Q1 2012, revenues of $16.702 million vs. costs of $12.125 million; (ii) for Q2 2012, revenues of $35.046 million vs. costs of $31.899 million; (iii) for Q3 2012, revenues of $18.057 million vs. costs of $13.900 million; (iv) for Q4 2012, revenues of $11.241 million vs. costs of $6.505 million; (v) for Q1 2013, revenues of $14.899 million vs. costs of $11.789 million; (vi) for Q2 2013, revenues of $17.341 million vs. costs of $15.247 million; and (vii) for Q3 2013, revenues of $23.804 million vs. costs of $22.640 million.  These accounting manipulations were material: for Q1 2012, the Company underreported $4.156 million in costs; for Q2 2012, it underreported $5.634 million in costs; for Q3 2012, it underreported $3.125 million in costs; for Q4 2012, it underreported $7.512 million in costs; for Q1 2013, it underreported $4.918 million in costs; for Q2 2013, it underreported $7.767 million in costs; and for Q3 2013, it underreported $3.488 million in costs.

62.     Through their manipulation, Defendants reported full year 2012 sales revenues higher than their corresponding costs, with $81.046 million revenues from solar energy systems sales and costs of only $64.429 million, creating a facade of profitability for its critical solar energy systems sales. Consistent with these numbers, the Company reported a gross profit margin *of 21%* for its solar energy systems sales.  This "healthy" gross margin signified a 100% increase from the negative (14%) sales gross margin the Company reported for full year 2011, and more than a 100% increase from the negative (19%) sales gross margin it reported for full year 2010.  Investors relied on this significant turn-around of SolarCity's sales business in 2012 when they purchased shares after the Company went public in December 2012.  In reality, however, the gross margin for the solar energy systems sales was negative (5%).

63.     Moreover, as reflected in the tables above, Defendants materially overstated SolarCity's sales gross profit and gross margin *for seven consecutive quarters*:  (i) for Q1 2012, Defendants reported gross profit of $4.577 million when in reality the gross profit was $185,000.00, a difference of $4.392 million and reported a corresponding gross margin of 27.40% when in reality the gross margin was only 1.12%; (ii) for Q2, 2012, Defendants reported gross profit of $3.147 million when in reality

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**          **22**

the gross profit was negative $(2.487) million, a difference of $5.634 million and reported a corresponding gross margin of 8.98% when in reality the gross margin was negative (7.10%); (iii) for Q3, 2012, Defendants reported gross profit of $4.157 million when in reality the gross profit was $1.032 million, a difference of $3.125 million and reported a corresponding gross margin of 23.02% when in reality the gross margin was 5.72%; (iv) for Q4, 2012, Defendants reported gross profit of $4.736 million when in reality the gross profit was negative $(2.776) million, a difference of $7.512 million and reported a corresponding gross margin of 42.13% when in reality the gross margin was negative (24.70%); (v) for Q1, 2013, Defendants reported gross profit of $3.110 million when in reality the gross profit was negative $(1.808), a difference of $4.918 million and reported a corresponding gross margin of 20.87% when in reality the gross margin was negative (12.14%); (vi) for Q2, 2013, Defendants reported gross profit of $2.094 million when in reality the gross profit was negative $(5.673), a difference of $7.767 million and reported a corresponding gross margin of 12.08% when in reality the gross margin was negative (32.71%); and (vii) for Q3, 2013, Defendants reported gross profit of $1.164 million when in reality the gross profit was negative $(2.324) million, a difference of $3.488 million and reported a corresponding gross margin of 4.89% when in reality the gross margin was negative (9.76%).

64.     The artificially low costs associated with solar systems sales materially affected other critical metrics: SolarCity's net income (loss) and its EPS.  As reflected in the tables above, net loss was materially *understated* for *seven consecutive quarters*: (i) for Q1 2012, net loss was understated by $15.784 million, from an actual net loss of negative $(13.028) million to a reported net income of $2.756 million; (ii) for Q2 2012, net loss was understated by $6.224 million, from an actual net loss of negative $(32.057) million to a reported net loss of negative $(25.833) million; (iii) for Q3 2012, net loss was understated by $8.135 million, from an actual net loss of negative $(46.206) million to a reported net loss of negative $(38.071) million; (iv) for Q4 2012, net loss was understated by $5.001 million, from an actual net loss of negative $(8.044) million to a reported net loss of negative $(3.043) million; (v) for Q1 2013, net loss was understated by 9.923 million, from an actual net loss of negative $(40.917) million to a reported net loss of negative $(30.994) million; (vi) for Q2 2013, net loss was

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**          **23**

understated by $15.578 million, from an actual net loss of negative $(39.463) million to a reported net loss of negative $(23.885) million; and (vii) for Q3 2013, net loss was understated by $5.459 million, from an actual net loss of negative $(2.103) million to a reported net income of $3.356 million.

65.    As reflected in the tables above, EPS numbers also were materially misstated during the Class Period: (i) for Q1 2012, basic and diluted EPS numbers were overstated by $(1.28), from actual EPS of $(1.24) to reported EPS of $0.04; (ii) for Q2 2012, basic and diluted EPS numbers were overstated by $(0.57), from actual EPS of $(2.94) to reported EPS of $(2.37); (iii) for Q3 2012, basic and diluted EPS numbers were overstated by $(0.73), from actual EPS of $(4.14) to reported EPS of $(3.41); (iv) for Q4 2012, basic EPS was overstated by $(0.21) from actual EPS of $(0.75) to reported EPS of $(0.54) and diluted EPS was overstated by $(0.20) from actual EPS of $(1.30) to reported EPS of $(1.10); (v) for FY 2012, basic EPS was overstated by $(2.46), from actual basic EPS of $(7.68) to reported basic EPS of $(5.22) and diluted EPS was overstated by $(2.46), from actual diluted EPS of $(7.69) to reported diluted EPS of $(5.23); (vi) for Q1 2013, basic and diluted EPS numbers were overstated by $(0.13), from actual EPS of $(0.54) to reported EPS of $(0.41); (vii) for Q2 2013, basic and diluted EPS numbers were overstated by $(0.21), from actual EPS of $(0.52) to reported EPS of $(0.31); and (viii) for Q3 2013, basic and diluted EPS numbers were overstated by $(0.07), from actual EPS of $(0.03) to reported EPS of $0.04.

66.    Had Defendants accurately disclosed the costs associated with the solar energy systems sales, it would have been readily apparent even to an unsophisticated investor that SolarCity's sales unit was in shambles.  There was virtually no gross profit for seven straight quarters.  Even worse, the gross profit margins for sales were overwhelmingly negative, a sign that SolarCity was not even able to break even.   SolarCity's sales business thus generated no money to pay for business expenses and be profitable.  These poor metrics also affected SolarCity's bottom line and EPS, demonstrating far more substantial losses than initially reported.

**On March 3, 2014, SolarCity Disclosed That There Would Be a Reallocation of Overhead Expenses From Leases to Sales, Which, As Reflected Above, Significantly Impacted the Company's Gross Margins and Other Important Metrics**

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          **24**

67.     On March 3, 2014, SolarCity suddenly announced that there would be a reallocation of overhead expenses from leased systems to system sales, which would affect the 2013 and 2012 GAAP financial statements.   The Company announced that audited statements would be filed on or before March 18, 2014.

68.     Relatedly, at that time, SolarCity also disclosed that a change in the way it accounted for overhead costs occurred in the first quarter of 2012.   Specifically with respect to overhead allocation, SolarCity disclosed on March 3, 2014 that "senior management review of preliminary year-end financial statements and internal controls identified [an] ***overhead allocation error originating in Q1 2012***."  SolarCity learned that it improperly accounted for overhead costs when "***solar energy system sale gross margins appeared inconsistent***."  *See* SolarCity Q4 2013 Reporting Update: "Overhead Allocation Issue – Issue Identification – Solar energy system sale gross margins appeared inconsistent."[5]

69.     Moreover, SolarCity acknowledged in March 2014 that its "senior management" identified the overhead allocation error as part of their "review of preliminary year-end financial statements and internal controls."   This affirmation, particularly when combined with the Company's further acknowledgment that the overhead allocation issue would have been detected as a result of inconsistencies in sales gross margins, cements the fact that the Individual Defendants, who were responsible for and monitored the Company's gross margins and were well-versed in cost accounting, had knowledge of the overhead manipulation.

70.     In seeking to explain the improper allocation methodology of costs, on March 3, 2014 SolarCity represented that it "miscalculated the burden ratio."  Starting with Q1 2012, SolarCity applied the following formula to allocate costs:

$$\frac{\text{Allocable Overhead}}{\rule{3cm}{0.4pt}} = \text{Burden Ratio}$$

---

[5]     SolarCity represented that "the error was identified and goes back to Q1 2012, but there is carryover from Q4 2011."

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**          **25**

Direct Expenses

71.     SolarCity applied the burden ratio to total direct expenses to determine overhead allocated to Operating Lease Assets.  The Company calculated the Cost of Solar Energy System Sales by subtracting the total expenses capitalized in operating lease assets from total expenses.  In other words, the burden ratio percentage was first allocated to the Leasing Division's total direct expenses.  Whatever remained from the amount allocated to the leasing division was then allocated to the sales division.

72.     SolarCity eventually disclosed that it "miscalculated [the] burden ratio" because "prior period overhead was included in the numerator but prior period direct costs were excluded from the denominator."  This "incorrect ratio resulted in higher amounts capitalized in operating lease assets and lower amounts expensed in solar energy system sales."   By including prior period overhead in the numerator but excluding related prior period direct costs from the denominator, SolarCity was able to report a higher burden ratio which in turn allowed the Company to allocate more costs to the leasing division and less costs to the sales division.

73.     For example, assume (i) prior period allocable overhead (leasing) of $10 million and (ii) direct costs of $20 million.  Assume also that $5 million of the $20 million direct costs related to the prior period.  The correct burden ratio should have been 50% ($10 million/$20million).  By improperly excluding prior period direct costs, SolarCity would instead report a burden ratio of 66.6% ($10million/15million).  SolarCity represented that it applied the burden ratio to current period total direct costs to determine the overhead allocated to operating lease assets.  Thus, assuming current period total direct costs of $20 million, SolarCity would apply the higher 66.6% burden ratio to that amount, resulting in $13.3 million allocable overhead to leases.  If SolarCity would have applied the correct (lower) burden ratio of 50%, the allocable overhead to *leases* would be *lower*, at $10 million. The more SolarCity allocates to leases, the less it has to allocate to sales.  Through this sleight-of-hand, SolarCity was able to allocate and report more overhead to leases and less to sales.

74.     It strains credulity that SolarCity could include the prior period overhead in the numerator but exclude the related prior period direct costs from the denominator, yet have no idea

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          26**

whatsoever that this calculation was improper.  Indeed, by not needing to restate its 2010 and 2011 financials, the Company admits that it properly calculated its burden ratio in those years.  How could SolarCity have properly placed prior period overhead costs in the numerator and prior period direct costs in the denominator for the years of 2011 and 2010, yet conveniently forget to apply such costs in the denominator for 2012 and the first three quarters of 2013?  All SolarCity needed to do was to apply the same formula it had applied in prior years.  Far more likely is that SolarCity employed this allocation formula originating in Q1 2012 in an effort to portray profitable sales gross margins in the run up to its December 2012 IPO.  Indeed, this "denominator snafu" could not have come at a more convenient time for the Company.  This newly-minted formula permitted SolarCity to report *seven consecutive quarters of highly improved sales gross margins starting with Q1 2012*.  Touting a record three quarters of gross margins and profits, Defendants were able to raise $94 million in crucially needed funds from the IPO.  Continuing the "denominator error" in the first three quarters of 2013, SolarCity was able to raise an additional $396 million from stock and note offering proceeds in October 2013 and complete critical acquisitions paid with SolarCity's common stock.

75.     As described in detail above, confidential witnesses with first-hand knowledge of SolarCity's cash sales state that during the Class Period the sales gross margins were overwhelmingly negative.  This fact is confirmed by SolarCity's restatement, which reflects sales gross **loss** margins **for five of the seven quarters at issue and another quarter barely reaching a gross profit of 1%**.  Yet, in direct contrast with prior years, in 2012 SolarCity reported sales gross profit margins of over 20% when in reality the sales gross margins were negative 5%, and reported similarly embellished gross profit margins for the first three quarters of 2013, when in reality those 2013 quarters showed gross loss margins.  Contrary to Defendants' assertions, it should not have taken them a full seven quarters to notice the steep increase in margins and profitability.

76.     Dr. Joshua Ronen, an eminent Professor of Accounting and former Peat Marwick Faculty Fellow at the New York University's Leonard N. Stern School of Business, reviewed the Company's restatement restating financials for full year 2012 and the first three quarters of 2013, as set forth in SolarCity's Form 10-K filed with the SEC on March 18, 2014, its previous 10-K and the 10-Qs

1  for the respective periods, the Company's March 3, 2014 press release announcing the need to restate

2  its historical financial statements, as well as the Company Q4 2013 Reporting Update, published by the

3  Company on March 3, 2014.  In light of that review, and in reliance on the allegations of the Complaint,

4  Dr. Ronen made the following assessment:

> In reviewing the Company's statements regarding its restatement due to an error in the formula for allocating overhead expenses between sales and leases, there exists strong evidence that the restatement was precipitated by a significant change in accounting policy or formula for allocating overhead expenses beginning in Q1 of 2012, in the lead up to the Company's anticipated December 2012 initial public offering ("IPO"), and continuing through the third quarter of 2013.  The first piece of evidence pointing to this conclusion is the Company's own admission that "we discovered an error in the formula for allocating overhead expenses between Operating Lease assets and the cost of Solar Energy System sales ***originating in Q1 2012***."  *See March 3, 2014 SolarCity Press Release, Reallocation of Overhead Expenses; see similarly SolarCity, Q4 2013 Reporting Update, March 3, 2014* ("Senior management review of preliminary year-end financial statements and internal controls identified overhead allocation error ***originating in Q1 2012***.") (emphasis added).

> Moreover, the financial impact of the restatement further suggests that it was the result of a significant change of accounting policy or formula beginning in Q1 2012.  This change permitted the Company to report a significant and favorable impact on the Company's reported gross margins starting with 2012, in sharp contrast to prior years.  For example, for fiscal year ("FY") 2012, the Company reported gross profit margin of 21% for its solar energy systems sales, compared to a ***negative*** (14%) gross profit margin for FY 2011 and a ***negative*** (19%) gross profit margin for FY 2010.  In the restatement, the Company acknowledged that its gross profit margin for this segment was ***negative*** (5%), consistent with its reported financial statements in 2011 (negative 14%) and 2010 (negative 19%).  Similarly, for the previously reported FY 2012, the Company reported a gross profit of $16.6 million from its systems sales segment, a 432% increase from its gross loss margin of $5.0 million for FY 2011, and a 495% increase from its gross loss margin of $4.2 million in FY 2010.  Ultimately, the Company restated its systems sales segment gross profit margin to a gross loss margin of $4.04 million, again consistent with FY 2011 and 2010.

> The sharp divergence of the Company's initially reported 2012 and 2013 financial statements from its 2010 and 2011 financial results, coupled with the fact that the restated results for the 2012 and 2013 periods were generally consistent with the Company's reported financial results in 2010 and 2011, suggests that a significant change in accounting policy or formula for

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**        **28**

calculating overhead costs occurred in the first quarter of 2012, and continued through the third quarter of 2013.

SolarCity publicly identified the error in the allocation formula long after the IPO was completed.  SolarCity claimed that it was ultimately able to identify the issue because "Solar energy system sale gross margins appeared inconsistent."  *See* Q4 2013 Reporting Update at slide 7.  But SolarCity's system sales gross margins "appeared inconsistent" as early as Q1 2012, when SolarCity changed the overhead allocation formula.  That change permitted SolarCity to report a sudden, significant increase (over 100%) in gross margins for solar energy systems sales for fiscal year 2012.

**The Actual Performance of SolarCity's Solar Energy Systems Sales Would Have Been Material to Investors**

77.      SEC regulations require that determinations of materiality include assessments of both quantitative and qualitative factors.  The SEC has promulgated Staff Accounting Bulletins representing interpretations and policies followed by the Division of Corporate Finance and the Office of the Chief Accountant in administering the disclosure requirements of the federal securities laws.   SEC Staff Accounting Bulletin No. 99 "SAB 99" discusses materiality by explaining that an item is qualitatively material if an event affects the total mix of information in the context of surrounding circumstances, whether or not an investor would deem the information sufficiently important:

Under the governing principles, an assessment of materiality requires that one views the facts in the context of the 'surrounding circumstances,' as the accounting literature puts it, or the 'total mix' of information, in the words of the Supreme Court.

Materiality concerns the significance of an item to users of a registrant's financial statements.  A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important.

SAB 99.

78.      SAB 99 sets forth examples where even a quantitatively small misstatement of a financial statement item can be material:

- Whether the misstatement *changes a loss into income or vice versa*

- Whether the misstatement *concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability…*

(emphasis added).

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**      **29**

79. Accounting pronouncements mirror the SEC's view. According to the Financial Accounting Standard Board, the omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item. See Statement of Financial Accounting Concept No. 2, Qualitative Characteristics of Accounting Information, at ¶ 132.

80. The actual performance of SolarCity's solar energy systems sales was both quantitatively and qualitatively material to investors. It was quantitatively material because Defendants understated tens of millions of dollars in costs, thereby inflating its reported net income and gross profits. It was qualitatively material because the manipulations changed income into loss and further because they concerned a portion of SolarCity's business playing a significant role in the Company's operations and profitability.

**Corporate Reshuffling and CFO Resignation**

81. Shortly before the truth regarding Defendants' accounting practices emerged, on February 24, 2014, SolarCity announced the appointment of Tanguy Serra as Chief Operations Officer, replacing Peter Rive.

82. On July 30, 2014, Defendant Kelly announced his intention to resign as Chief Financial Officer, including as Principal Financial and Accounting Officer, of SolarCity Corporation, with an effective date of August 11, 2014. Defendant Kelly remained an employee of SolarCity through August 18, 2014.

**Defendants Had Concrete Motives to Commit Fraud**

*(1) The December 2012 Initial Public Offering (the "IPO")*

83. SolarCity went public in December 2012, registering for sale over 10 million shares of common stock, including 1,725,000 shares registered for sale upon the exercise of the underwriters' over-allotment option. SolarCity estimated its net proceeds to be approximately $94.6 million. Had SolarCity disclosed that beginning with the first quarter of 2012 and continuing through the year, its solar energy systems sales business was highly unprofitable, and that the Company's reported net losses

were far more severe than initially reported, it is highly questionable that the IPO would have occurred. SolarCity needed the IPO to proceed in order to obtain additional financing to be used as working capital, capital expenditures, and for acquisitions of complementary businesses, technologies and other assets.

84.     By peddling the IPO, SolarCity created a public market for its common stock and increased its visibility in the marketplace.  A public market for SolarCity's common stock facilitated future access to public equity markets and enhanced the Company's ability to use its common stock as a means of attracting and retaining key employees and, significantly, as consideration for acquisitions. Thus, the IPO created SolarCity publicly traded stock that served as an acquisition currency.

(2) *Growth by Acquisitions*

85.     As a new public company, SolarCity pursued significant acquisitions designed to reduce the Company's costs and improve efficiencies.  These acquisitions were largely paid for with millions of SolarCity shares.  Defendants were therefore incentivized to keep SolarCity's shares at artificially inflated prices, making the equity more appealing as an acquisition currency in SolarCity's stock financed acquisitions.

86.     On September 6, 2013, SolarCity purchased certain assets of Paramount Energy Solutions, LLC ("Paramount Energy").  Paramount Energy was a leading direct-to-consumer marketer and was one of SolarCity's channel partners through a customer referral arrangement.  The acquired assets included Paramount Energy's interest in a financing fund that it had formed with an investor that is also the investor in some of SolarCity's existing funds, executed end-user customer agreements together with the associated solar energy systems in various stages of completion and various databases and arrangements used by Paramount Energy in its acquisition of new customers.  The acquisition enabled SolarCity to develop and offer solar energy systems directly to a broader customer base and to better compete with other energy producers, as well as to drive a lower cost of customer acquisition. The purchase consideration was comprised of $3.7 million in cash and 3,674,565 shares of the Company's common stock, inclusive of 379,146 shares held in escrow until September 2014 to cover any general representations and warranties, with an aggregate fair value of $108.8 million based on the

closing price of the Company's common stock on the acquisition date. Additionally, the Company was obligated to pay to the sellers an additional $4.0 million after the acquisition date, of which $3.2 million was paid in October 2013. The stock consideration SolarCity gave Paramount was based on the recent closing price of SolarCity's common stock. SolarCity's common stock comprised over 95% of the consideration paid.

87.     On December 11, 2013, SolarCity acquired Zep Solar, Inc. ("Zep Solar"). Zep Solar designs and supplies solar energy system mounting solutions for photovoltaic panels and also licenses its patented technology to other third parties. Zep Solar contracts with manufacturers in China to produce its products, and was a key supplier to SolarCity. The acquisition enabled SolarCity to control the design and manufacture of the Zep Solar products that are key components in the installation of SolarCity's solar energy systems. SolarCity expects that the acquisition will lead to improved efficiencies and cost reductions. SolarCity planned to continue offering the Zep Compatible platform to international installers looking to increase their productivity. The acquisition consideration was comprised of $2.4 million in cash, 2,751,793 shares of the Company's common stock and the assumption of fully vested options to purchase 303,151 shares of the Company's common stock, which replaced certain fully vested options of Zep Solar's common stock. The total purchase consideration was $157.823 million. The stock consideration SolarCity gave Paramount was based on the recent closing price of SolarCity's common stock. SolarCity's common stock comprised over 98% of the consideration paid.

   *(3) The Secondary Offerings*

88.     After the IPO, SolarCity commenced two secondary offerings on October 15, 2013. SolarCity had an incentive to conceal the true state of its solar energy systems sales in order to raise additional capital from investors. These offerings came on the heels of SolarCity's acquisition of Zep Solar. SolarCity offered for sale 3,400,000 shares of common stock. In addition, the Company granted the common stock underwriters an option to purchase up to an additional 510,000 shares of common stock, which the underwriters exercised in full in connection with the closing. Concurrently with the offering of the common stock, SolarCity also offered 200,000,000 convertible senior notes due 2018

pursuant to a separate registration statement.  In addition, the Company granted the note underwriters an option to purchase up to an additional $30.0 million aggregate principal amount of notes, which the underwriters exercised in full in connection with the closing.  The Company gave holders of the notes the option to convert their notes into shares of SolarCity's common stock at their option, before the maturity date.

89.    SolarCity's common stock offering closed on October 21, 2013, with the issuance of 3,910,000 shares of common stock.  The Company received net proceeds from the common stock offering of approximately $174.2 million.

90.    SolarCity's note offering closed on October 21, 2013, with the issuance of $230.0 million aggregate principal amount of the notes.  The Company received net proceeds from the note offering of approximately $222.4 million.

### (4) Musk Pledged Six Million Shares of SolarCity on Margin

91.    Goldman Sachs Bank USA, an affiliate of Goldman, Sachs & Co., made loans in an aggregate amount of $125 million to Musk, SolarCity's chairman, and to the Elon Musk Revocable Trust dated July 22, 2003 (the "Trust").  Goldman Sachs Bank USA agreed to make additional extensions of credit in an aggregate amount of $150 million to Musk and the Trust, which together with the outstanding $125 million totaled $275 million.  These loans were full recourse against Musk and the Trust and were secured in part by a pledge of a portion of the SolarCity capital stock owned by Musk and the Trust.  If the price of SolarCity's common stock declined, Musk could be forced by Goldman Sachs Bank USA to provide additional collateral for the loans or to sell shares of SolarCity capital stock in order to remain within the margin limitations imposed under the terms of his loans.  The loans between Goldman Sachs Bank USA, Musk and the Trust prohibited the non-pledged shares owned by Musk and the Trust from being pledged to secure other loans.  Any sales of capital stock following a margin call that was not satisfied could cause the price of SolarCity's common stock to decline abruptly.

92.     Musk is Defendant Rive's cousin.  Musk provided the initial concept for SolarCity, which was co-founded in 2006 by Musk's cousins Lyndon and Peter Rive.  Musk remains the largest SolarCity shareholder.

93.     At the commencement of the IPO, Musk was SolarCity's largest shareholder, beneficially owning 18,849,991 shares of common stock, or 30.6% of the Company's outstanding shares.  Musk had pledged 6,000,000—about one-third—of those shares as collateral on margin to secure certain personal indebtedness owed to Goldman Sachs Bank USA.

94.

95.     Defendants had a motive to keep SolarCity's common stock at artificially inflated prices to avoid a forced sale of Musk and the Trust's stock in SolarCity as a result of margin calls.  Musk's pledge of SolarCity shares exposed his large ownership interest in SolarCity to the risk of sudden and involuntary open-market liquidation through margin calls.  In turn, a margin call on such a substantial number of shares also would inevitably result in an abrupt devaluation of SolarCity's share price.

96.     The practice of the top echelon borrowing against their equity stakes has been chastised by regulators, with former SEC Chairman Arthur Levitt saying the practice should be banned: "The perception of management borrowing against their own holdings is so bad…I would encourage shareholders to push companies to implement such protections where they don't currently exist…If the only way is regulation by stock exchanges or other bodies, I would certainly favor that."  *See* ThomsonReuters, "Former SEC head slams Green Mountain directors' borrowing practice," May 9, 2012.

97.     Indeed, the SEC has explained that "[t]o the extent that shares beneficially owned by [for example] named executive officers, directors and director nominees are used as collateral, these shares may be subject to material risk or contingencies that do not apply to other shares beneficially owned by these persons. *These circumstances have the potential to influence management's performance and decisions*." (emphasis added).

98.     Here, the Individual Defendants had ultimate control over management decisions.

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          34**

99.     Indeed, SolarCity's insiders have had substantial control over the Company.  As of December 12, 2012, SolarCity's directors, executive officers, and each of its stockholders owning greater than 5% of the Company's outstanding common stock, in the aggregate, owned approximately *77.7%* of the outstanding shares of its common stock.

> *(5) Additional Scienter Allegations*

100.     The Individual Defendants were each motivated to maintain their lucrative positions, and increase their compensation over their normal salary, and their personal net worth.

101.     Certain of the Individual Defendants pocketed handsome salaries.  In 2011, Defendant Rive received a total of $4,105,185 in compensation, including a salary of $251,731 and option awards of $3,753,400, while Defendant Kelly received a total of $2,960,035 in compensation, including a salary of $46,731 and option awards of $2,882,014.

102.     The Individual Defendants beneficially owned massive amounts of SolarCity's common stock.  As of December 12, 2012,  Defendant Rive owned 4,160,711 shares and Defendant Kelly owned 96,840 shares.

103.     Musk owned 18,849,991 shares.

104.     Throughout the Class Period, Defendants Rive and Kelly discussed and provided Sarbanes Oxley certifications, and they signed SolarCity's Form 10-K, which directly addressed the subject of SolarCity's cost of revenues associated with the sales and lease systems, including the gross margins for these units, and other related metrics.  By discussing and providing certifications and signatures regarding these very issues, the Individual Defendants are deemed knowledgeable about these topics.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

> **(1) Statements Made in SolarCity's Amendment No. 5 to Form S-1 filed with the SEC on December 12, 2012**

105.     On December 12, 2012, the Company filed with the SEC Amendment No. 5 to Form S-1 Registration Statement, in connection with the initial public offering of SolarCity's shares of common

stock.[6]   The Company announced that it was offering to sell 11,434,988 shares in the initial public offering.   For the nine months ended September 30, 2012, the Company reported cost of revenues for its solar energy systems sales of $57.924 million; overall gross profit of $36.850 million; and net loss of $(77.954) million.   The Company also represented that its financial statements have been prepared in accordance with U.S generally accepted accounting principles, or GAAP.

106.   Pursuant to the requirements of the Securities Act of 1933, Amendment No. 5 to Form S-1 was signed by Defendants Rive and Kelly in their official capacities.

107.   Defendants' statements in ¶ 100 above were materially false and misleading because:

i.   SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $70.839 million vs. its reported $57.924 million, a difference of $12.915 million or 22.3% (Compl. ¶¶ 29-73);

ii.   SolarCity's overall gross profit was materially lower than reported, at $23.179 million vs. its reported $36.850 million, a difference of $13.671 million or 37.1% (Compl. ¶¶ 29-73);

iii.   SolarCity's net loss was materially higher than reported, at $(91.625) million vs. its reported $(77.954) million, a difference of $13.671 million or 17.5% (Compl. ¶¶ 29-73); and

iv.   Defendants' financial statements failed to meet GAAP requirements because the Company's cost of revenues, gross profit, and net loss were materially misstated.

### (2) Statements Made in SolarCity's Prospectus Filed With the SEC on December 13, 2012

108.   On December 13, 2012, the Company filed with the SEC a prospectus for the initial public offering of SolarCity's shares of common stock.   The prospectus is part of SolarCity's registration statement on Form S-1.   For the nine months ended September 30, 2012, the Company reported cost of revenues for its solar energy systems sales of $57.924 million; overall gross profit of $36.850 million; and net loss of $(77.954) million.   The Company also represented that its financial statements have been prepared in accordance with U.S generally accepted accounting principles, or GAAP.

109.   Defendants' statements in ¶ 103 above were materially false and misleading because:

---

[6] The initial Form S-1 was filed with the SEC on October 5, 2012.

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**          **36**

i.    SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $70.839 million vs. its reported $57.924 million, a difference of $12.915 million or 22.3% (Compl. ¶¶ 29-73);

ii.    SolarCity's overall gross profit was materially lower than reported, at $23.179 million vs. its reported $36.850 million, a difference of $13.671 million or 37.1% (Compl. ¶¶ 29-73);

iii.    SolarCity's net loss was materially higher than reported, at $(91.625) million vs. its reported $(77.954) million, a difference of $13.671 million or 17.5% (Compl. ¶¶ 29-73); and

iv.    Defendants' financial statements failed to meet GAAP requirements because the Company's cost of revenues, gross profit, and net loss were materially misstated.

### (3) Statements Made in SolarCity's Form 8-K Filed With the SEC on March 6, 2013

110.    On March 6, 2013, the Company issued a press release, which was also filed with the SEC on Form 8-K, regarding the Company's financial results for the fourth quarter and fiscal year ended December 31, 2012, and certain other information.  For the three months ended December 31, 2012, the Company reported cost of revenues for its solar energy systems sales of $6.505 million; gross profit of $14.037 million; net loss of $(13.621) million; basic net loss per share attributable to common stockholders of $(0.54); and diluted net loss per share attributable to common stockholders of $(1.10).

111.    Pursuant to the requirements of the Securities Exchange Act of 1934, SolarCity had duly caused the Form 8-K to be signed on its behalf by Defendant Rive in its official capacity.

112.    Defendants' statements in ¶ 105 above were materially false and misleading because:

i.    SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $14.017 million vs. its reported $6.505 million, a difference of $7.512 million or 115.5% (Compl. ¶¶ 29-73);

ii.    SolarCity's overall gross profit was materially lower than reported, at $4.277 million vs. its reported $14.037 million, a difference of $9.760 million or 69.5% (Compl. ¶¶ 29-73);

iii.    SolarCity's net loss was materially higher than reported, at $(22.101 million) vs. its reported $(13.621 million), a difference of $8.480 million or 62.3% (Compl. ¶¶ 29-73); and

iv.    SolarCity's basic EPS was materially lower than reported, at $(0.75) vs. its reported $(0.54), a difference of $0.21 or 38.9%; and SolarCity's diluted EPS was materially lower than reported, at $(1.30) vs. its reported $(1.10), a difference of $0.20 or over 18.2% (Compl. ¶¶ 29-73).

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS    **37**

113.    For the year ended December 31, 2012, the Company reported cost of revenues for its solar energy systems sales of $64.429 million; gross profit of $50.887 million; net loss of $(91.575) million; basic net loss per share attributable to common stockholders of $(5.22); and diluted net loss per share attributable to common stockholders of $(5.23).

114.    Defendants' statements in ¶ 108 above were materially false and misleading because:

    i.    SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $84.856 million vs. its reported $64.429 million, a difference of $20.427 million or over 31.7% (Compl. ¶¶ 29-73);

    ii.    SolarCity's overall gross profit was materially lower than reported, at $27.456 million vs. its reported $50.887 million, a difference of $23.431 million or 46.0% (Compl. ¶¶ 29-73);

    iii.    SolarCity's net loss was materially higher than reported, at $(113.726) million vs. its reported $(91.575) million, a difference of $22.151 million or 24.2% (Compl. ¶¶ 29-73); and

    iv.    SolarCity's basic EPS was materially lower than reported, at $(7.68) vs. its reported $(5.22), a difference of $2.46 or 47.1%; and SolarCity's diluted EPS was materially lower than reported, at $(7.69) vs. its reported $(5.23), a difference of $2.46 or 47.0% (Compl. ¶¶ 29-73).

### (4) Statements Made at SolarCity's Q4 2012 Earnings Call held on March 6, 2013

115.    On March 6, 2013, SolarCity held an earnings call with investors to discuss the fourth quarter and full year results for 2012.  The Company's participants included Defendants Rive and Kelly.  During that Call, Defendant Kelly touted SolarCity's gross profit for the full year 2012, pegging it at $51 million.

116.    Defendant Kelly's statement in ¶ 110 above was materially false and misleading because:

    i.    SolarCity's overall gross profit was materially lower than reported, at $27.456 million vs. its reported $51 million, a difference of $23.431 million or 46.0% (Compl. ¶¶ 29-73).

### (5) Statements Made at the Roth Capital Conference Held on March 19, 2013

117.    On March 19, 2013, Defendant Kelly made a presentation about SolarCity at the Roth Capital Conference, entitled "Delivering Better Energy."  SolarCity posted the presentation on the

---

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**    **38**

Company's website.   Defendant Kelly reported that for the year ended 2012, costs of revenues for the solar energy systems sales were $64.429 million, and gross profit was $50.887 million.

118.   Defendant Kelly's statements in ¶ 112 above were materially false and misleading because:

      i.     SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $84.856 million vs. its reported $64.429 million, a difference of $20.427 million or over 31.7% (Compl. ¶¶ 29-73); and

      ii.    SolarCity's overall gross profit was materially lower than reported, at $27.456 million vs. its reported $50.887 million, a difference of $23.431 million or 46.0% (Compl. ¶¶ 29-73).

### (6) Statements Made in SolarCity's 2012 Form 10-K Filed With the SEC on March 27, 2013

119.   On March 27, 2013, the Company filed with the SEC on Form 10-K its annual report for the period ended December 31, 2012, which was signed by Defendants Rive and Kelly, and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Rive and Kelly, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

120.   Pursuant to the requirements of the Securities and Exchange Act of 1934, the 2012 Form 10-K was signed by Defendants Rive and Kelly in their official capacities.

121.   In the 2012 10-K, for the year ended December 31, 2012, the Company reported cost of revenues for its solar energy systems sales of $64.429 million; gross profit of $50.887 million and a corresponding gross profit margin of 40%; net loss of $(91.575) million; basic net loss per share attributable to common stockholders of $(5.22); and diluted net loss per share attributable to common stockholders of $(5.23).  The Company also reported $16.617 million of gross profit for its solar energy system sales and a corresponding gross profit margin of 21%.[7]

122.   Defendants' statements in ¶ 116 above were materially false and misleading because:

---

[7] The 2012 10-K also was filed as an Annual Report on SEC's website on May 7, 2013.  It contained the same false and misleading statements.

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**     **39**

i.      SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $84.856 million vs. its reported $64.429 million, a difference of $20.427 million or over 31.7% (Compl. ¶¶ 29-73);

ii.      SolarCity's overall gross profit was materially lower than reported, at $27.456 million vs. its reported $50.887 million, a difference of $23.431 million or 46.0%; and its corresponding gross margin % was materially lower than reported, at 21.63%  vs. its reported 40% (Compl. ¶¶ 29-73).

iii.      SolarCity's net loss was materially higher than reported, at $(113.726) million vs. its reported $(91.575) million, a difference of $22.151 million or 24.2% (Compl. ¶¶ 29-73);

iv.      SolarCity's basic EPS was materially lower than reported, at $(7.68) vs. its reported $(5.22), a difference of $2.46 or 47.1%; and SolarCity's diluted EPS was materially lower than reported, at $(7.69) vs. its reported $(5.23), a difference of $2.46 or over 47% (Compl. ¶¶ 29-73); and

v.      SolarCity's gross profit from solar energy system sales was materially lower than reported, at $(4.046) million instead of its reported $16.617 million, a difference of $20.663 million or 124.3%; and its corresponding gross margin was materially lower than reported, at (5.01)% loss vs. its reported 20.50%, a difference of over 100% (Compl. ¶¶ 29-73).

123.      The 2012 10-K also reported the following metrics for the three months ended December 31, 2012: cost of revenues for its solar energy systems sales of $6.505 million; gross profit of $14.037 million; net loss of $(13.621) million; basic net loss per share attributable to common stockholders of $(0.54); and diluted net loss per share attributable to common stockholders of $(1.10).

124.      Defendants' statements in ¶ 118 above were materially false and misleading because:

i.      SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $14.017 million vs. its reported $6.505, a difference of $7.512 million or 115.5% (Compl. ¶¶ 29-73);

ii.      SolarCity's overall gross profit was materially lower than reported, at $4.277 million vs. its reported $14.037 million, a difference of $9.760 million or 69.5% (Compl. ¶¶ 29-73);

iii.      SolarCity's net loss was materially higher than reported, at $(22.101 million) vs. its reported $(13.621 million), a difference $8.480 million or 62.3% (Compl. ¶¶ 29-73); and

iv.      SolarCity's basic EPS was materially lower than reported, at $(0.75) vs. its reported $(0.54), a difference of $0.21 or 38.9%; and SolarCity's diluted EPS was materially lower than reported, at $(1.30) vs. its reported $(1.10), a difference of $0.20 or 18.2% (Compl. ¶¶ 29-73).

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**      **40**

125.   The 2012 10-K further reported the following metrics for the three months ended September 30, 2012: cost of revenues for its solar energy systems sales of $13.900 million; gross profit of $15.751 million; net loss of $(29.043) million; and basic and diluted net loss per share attributable to common stockholders of $(3.41).

126.   Defendants' statements in ¶ 120 above were materially false and misleading because:

i.   SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $17.025 million vs. its reported $13.900, a difference of $3.125 million or 22.5% (Compl. ¶¶ 29-73);

ii.   SolarCity's overall gross profit was materially lower than reported, at $12.514 million vs. its reported $15.751 million, a difference of $3.237 million or 20.6% (Compl. ¶¶ 29-73);

iii.   SolarCity's net loss was materially higher than reported, at $(32.295 million) vs. its reported $(29.043 million), a difference of $3.252 million or 11.2% (Compl. ¶¶ 29-73); and

iv.   SolarCity's basic and diluted EPS numbers were materially lower than reported, at $(4.14) vs. its reported $(3.41), a difference of $0.73 or 21.4% (Compl. ¶¶ 29-73).

127.   The 2012 10-K further reported the following metrics for the three months ended June 30, 2012: cost of revenues for its solar energy systems sales of $31.899 million; gross profit of $10.965 million; net loss of $(21.849) million; and basic and diluted net loss per share attributable to common stockholders of $(2.37).

128.   Defendants' statements in ¶ 122 above were materially false and misleading because:

i.   SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $37.533 million vs. its reported $31.889 million, a difference of $5.634 million or 17.7% (Compl. ¶¶ 29-73);

ii.   SolarCity's overall gross profit was materially lower than reported, at $5.145 million vs. its reported $10.965 million, a difference of $5.820 million or 53.1% (Compl. ¶¶ 29-73);

iii.   SolarCity's net loss was materially higher than reported, at $(27.669 million) vs. its reported $(21.849 million), a difference of $5.820 million or 26.6% (Compl. ¶¶ 29-73); and

iv.   SolarCity's basic and diluted EPS numbers were materially lower than reported, at $(2.94) vs. its reported $(2.37), a difference of $0.57 or 24.1% (Compl. ¶¶ 29-73).

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**          **41**

129.   The 2012 10-K further reported the following metrics for the three months ended March 31, 2012: cost of revenues for its solar energy systems sales of $12.125 million; gross profit of $10.134 million; net loss of $(27.062) million; and basic and diluted net profit per share attributable to common stockholders of $0.04.

130.   Defendants' statements in ¶ 124 above were materially false and misleading because:

    i.    SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $16.281 million vs. its reported $12.125 million, a difference of $4.156 million or 34.3% (Compl. ¶¶ 29-73);

    ii.    SolarCity's overall gross profit was materially lower than reported, at $5.520 million vs. its reported $10.134 million, a difference of $4.614 million or 45.5% (Compl. ¶¶ 29-73);

    iii.    SolarCity's net loss was materially higher than reported, at $(31.661 million) vs. its reported $(27.062 million), a difference of $4.599 million or 17.0% (Compl. ¶¶ 29-73); and

    iv.    SolarCity's basic and diluted EPS numbers were materially lower than reported, at a loss of $(1.24) vs. its reported $0.04, a difference of $1.28 or over 3200% (Compl. ¶¶ 29-73).

131.   The 2012 10-K also represented that SolarCity's financial statements have been prepared in accordance with U.S generally accepted accounting principles, or GAAP.

132.   Defendants' statements in ¶ 126 above were materially false and misleading because:

    i.    Defendants' financial statements failed to meet GAAP requirements because the Company's cost of revenues, gross profit, gross margin, net loss, and EPS were materially misstated.

### (7) Statements Made at the Bank of America Merrill Lynch 2013 Smid Cap Conference on May 8, 2013

133.   On May 8, 2013, Defendant Kelly made a presentation on SolarCity at the Bank of America Merrill Lynch 2013 Smid Cap Conference, entitled "Delivering Better Energy."   SolarCity posted the presentation on the Company's website.   Defendant Kelly reported that for the year ended 2012, costs of revenues for the solar energy systems sales were $64.429 million, and gross profit was $50.887 million.

134.   Defendant Kelly's statements in ¶ 128 above were materially false and misleading because:

i.   SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $84.856 million vs. its reported $64.429 million, a difference of $20.427 million or over 31.7% (Compl. ¶¶ 29-73); and

ii.  SolarCity's overall gross profit was materially lower than reported, at $27.456 million vs. its reported $50.887 million, a difference of $23.431 million or 46.0% (Compl. ¶¶ 29-73).

### *(8) Statements Made in SolarCity's Form 8-K Filed With the SEC on May 13, 2013*

135.  On May 13, 2013, the Company issued a press release, which was also filed with the SEC on Form 8-K, regarding the Company's financial results for the first quarter ended March 31, 2013, and certain other information.  For the three months ended March 31, 2013, the Company reported cost of revenues for its solar energy systems sales of $11.789 million; gross profit of $12.696 million; net loss of $(28.155) million; and basic and diluted net loss per share attributable to common stockholders of $(0.41).

136.  Pursuant to the requirements of the Securities Exchange Act of 1934, SolarCity had duly caused the Form 8-K to be signed on its behalf by Defendant Rive in its official capacity.

137.  Defendants' statements in ¶ 130 above were materially false and misleading because:

i.   SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $16.707 million vs. its reported $11.789 million, a difference of $4.918 million or 41.7% (Compl. ¶¶ 29-73);

ii.  SolarCity's overall gross profit was materially lower than reported, at $7.529 million vs. its reported $12.696 million, a difference of $5.167 million or 40.7% (Compl. ¶¶ 29-73);

iii. SolarCity's net loss was materially higher than reported, at $(33.075 million) vs. its reported $(28.155 million), a difference of $4.920 million or 17.5% (Compl. ¶¶ 29-73); and

iv.  SolarCity's basic and diluted EPS numbers were materially lower than reported, at $(0.54) vs. its reported $(0.41), a difference of $0.13 or 31.7% (Compl. ¶¶ 29-73).

### *(9) Statements Made in SolarCity's Form Q1 2013 10-Q filed with the SEC on May 15, 2013*

138.  On May 15, 2013, the Company filed with the SEC a quarterly report on Form 10-Q for the period ended March 31, 2013, which included Certifications by Defendants Rive and Kelly, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any

material changes to the Company's financial reporting.  For the three months ended March 31, 2013, the Company reported cost of revenues for its solar energy systems sales of $11.789 million;   gross profit of $12.696 million; net loss of $(28.155) million; and basic and diluted net loss per share attributable to common stockholders of $(0.41).  The Company also reported $3.110 million of gross profit for its solar energy system sales and a corresponding gross profit margin of 21%.

139.   Pursuant to the requirements of the Securities Exchange Act of 1934, SolarCity had duly caused the Form 10-Q to be signed on its behalf by Defendant Rive in its official capacity.

140.   Defendants' statements in ¶ 133 above were materially false and misleading because:

    i.    SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $16.707 million vs. its reported $11.789 million, a difference of $4.918 million or 41.7% (Compl. ¶¶ 29-73);

    ii.    SolarCity's overall gross profit was materially lower than reported, at $7.529 million vs. its reported $12.696 million, a difference of $5.167 million or 40.7% (Compl. ¶¶ 29-73);

    iii.    SolarCity's net loss was materially higher than reported, at $(33.075 million) vs. its reported $(28.155 million), a difference of $4.920 million or 17.5% (Compl. ¶¶ 29-73);

    iv.    SolarCity's basic and diluted EPS numbers were materially lower than reported, at $(0.54) vs. its reported $(0.41), a difference of $0.13 or 31.7% (Compl. ¶¶ 29-73); and

    v.    SolarCity's gross profit from solar energy system sales was materially lower than reported, at $(1.808) million instead of its reported $3.110 million, a difference of $4.918 million or 158.1%; and its corresponding gross margin % was materially lower than reported, a (12.14%) vs. its reported 20.87%, a difference of over 100% (Compl. ¶¶ 29-73).

141.   The Q1 10-Q 2013 also reported the following metrics for the three months ended March 31, 2012: cost of revenues for its solar energy systems sales of $12.125 million; gross profit of $10.134 million; net loss of $(27.062) million; and basic and diluted net profit per share attributable to common stockholders of $0.04.  The Company also reported $4.557 million of gross profit for its solar energy system sales and a corresponding gross profit margin of 27%.

142.   Defendants' statements in ¶ 136 above were materially false and misleading because:

    i.    SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $16.281 million vs. its reported $12.125 million, a difference of $4.156 million or 34.3% (Compl. ¶¶ 29-73);

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS    **44**

ii.     SolarCity's overall gross profit was materially lower than reported, at $5.520 million vs. its reported $10.134 million, a difference of $4.614 million or 45.5% (Compl. ¶¶ 29-73);

iii.    SolarCity's net loss was materially higher than reported, at $(31.661 million) vs. its reported $(27.062 million), a difference of $4.599 million or 17.0% (Compl. ¶¶ 29-73);

iv.     SolarCity's basic and diluted EPS numbers were materially lower than reported, at a loss of $(1.24) vs. its reported profit of $0.04, a difference of $1.28 or over 3200% (Compl. ¶¶ 29-73); and

v.      SolarCity's gross profit from solar energy system sales was materially lower than reported, at $185,000.00 instead of its reported profit of $4.577 million, a difference of $4.392 million or 96.0%; and its corresponding gross margin % was materially lower than reported, at 1.12% vs. its reported 27.40%, a difference of 96.0% (Compl. ¶¶ 29-73).

**(10)  *Statements Made in SolarCity's Forms S-1 Registration Statements Filed With the SEC on June 18, 2013***

143.    On June 18, 2013, the Company filed with the SEC two separate Form S-1 Registration Statements, announcing an offering of $175,000,000 aggregate Convertible Senior Notes due 2018 and a concurrent offering of 2,800,000 shares of SolarCity common stock that the Company will loan to Goldman Sachs Financial Markets, L.P., an affiliate of Goldman, Sachs &Co., to facilitate the offering of the notes.  For the year ended December 31, 2012, the Company reported cost of revenues for its solar energy systems sales of $64.429 million; gross profit of $50.887 million; net loss of $(91.575) million; basic net loss per share attributable to common stockholders of $(5.22); and diluted net loss per share attributable to common stockholders of $(5.23).

144.    Pursuant to the requirements of the Securities Act of 1933, the S-1 Forms were signed by Defendants Rive and Kelly in their official capacities.

145.    Defendants' statements in ¶ 138 above were materially false and misleading because:

i.      SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $84.856 million vs. its reported $64.429 million, a difference of $20.427 million or over 31.7% (Compl. ¶¶ 29-73);

ii.     SolarCity's overall gross profit was materially lower than reported, at $27.456 million vs. its reported $50.887 million, a difference of $23.431 million or 46.0%; and its corresponding gross margin % was materially lower than reported, at 21.63%  vs. its reported 40% (Compl. ¶¶ 29-73);

     iii.    SolarCity's net loss was materially higher than reported, at $(113.726) million vs. its reported $(91.575) million, a difference of $22.151 million or 24.2% (Compl. ¶¶ 29-73); and

     iv.    SolarCity's basic EPS was materially lower than reported, at $(7.68) vs. its reported $(5.22), a difference of 2.46 or 47.1%; and SolarCity's diluted EPS was materially lower than reported, at $(7.69) vs. its reported $(5.23), a difference of $2.46 or over 47.0% (Compl. ¶¶ 29-73).

146.    The S-1 Forms also incorporated by reference SolarCity's Annual Report on Form 10-K for the fiscal year ended December 31, 2012.  As described above, the 2012 10-K contained materially false and misleading statements for the reasons set forth in ¶¶ 114-127 above.

147.    The S-1 Forms further incorporated by reference SolarCity's Quarterly Report on Form 10-Q for the quarter ended March 31, 2013.   As described above, the Q1 2013 10-Q contained materially false and misleading statements for the reasons set forth in ¶¶ 133-137 above.

     **(11)**    *Statements Made in SolarCity's Amendments No. 2 to Forms S-1 Registration Statements Filed With the SEC on August 2, 2013*

148.    On August 2, 2013, the Company filed with the SEC Amendments No. 2 to the Forms S-1 Registration Statements, announcing an offering of $175,000,000 aggregate Convertible Senior Notes due 2018 and a concurrent offering of 2,800,000 shares of SolarCity common stock that the Company will loan to Goldman Sachs Financial Markets, L.P., an affiliate of Goldman, Sachs &Co., to facilitate the offering of the notes.  For the year ended December 31, 2012, the Company reported cost of revenues for its solar energy systems sales of $64.429 million; gross profit of $50.887 million; net loss of $(91.575) million; basic net loss per share attributable to common stockholders of $(5.22); and diluted net loss per share attributable to common stockholders of $(5.23).

149.    Pursuant to the requirements of the Securities Act of 1933, Amendments No. 2 to the S-1 Forms were signed by Defendants Rive and Kelly in their official capacities.

150.    Defendants' statements in ¶ 143 above were materially false and misleading because:

     i.    SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $84.856 million vs. its reported $64.429 million, a difference of $20.427 million or over 31.7% (Compl. ¶¶ 29-73);

     ii.    SolarCity's overall gross profit was materially lower than reported, at $27.456 million vs. its reported $50.887 million, a difference of $23.431 million or 46.0%; and its corresponding gross margin % was materially lower than reported, at 21.63%  vs. its reported 40% (Compl. ¶¶ 29-73);

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**    **46**

iii.    SolarCity's net loss was materially higher than reported, at $(113.726) million vs. its reported $(91.575) million, a difference of $22.151 million or 24.2% (Compl. ¶¶ 29-73); and

iv.    SolarCity's basic EPS was materially lower than reported, at $(7.68) vs. its reported $(5.22), a difference of 2.46 or 47.1%; and SolarCity's diluted EPS was materially lower than reported, at $(7.69) vs. its reported $(5.23), a difference of $2.46 or over 47.0% (Compl. ¶¶ 29-73).

151.    Amendments No. 2 to the S-1 Forms also incorporated by reference SolarCity's Annual Report on Form 10-K for the fiscal year ended December 31, 2012.  As described above, the 2012 10-K contained materially false and misleading statements for the reasons set forth in ¶¶ 114-127 above.

152.    Amendments No. 2 to the S-1 Forms further incorporated by reference SolarCity's Quarterly Report on Form 10-Q for the quarter ended March 31, 2013.  As described above, the Q1 2013 10-Q contained materially false and misleading statements for the reasons set forth in ¶¶ 133-137 above.

### (12)    Statements Made in SolarCity's Form 8-K Filed With the SEC on August 7, 2013

153.    On August 7, 2013, the Company issued a press release, which was also filed with the SEC on Form 8-K, regarding the Company's financial results for second quarter ended June 30, 2013, and certain other information.  For the three months ended June 30, 2013, the Company reported cost of revenues for its solar energy systems sales of $15.247 million; gross profit of $15.479 million;  net loss of $(32.649) million; and basic and diluted net loss per share attributable to common stockholders of $(0.31).

154.    Pursuant to the requirements of the Securities Exchange Act of 1934, SolarCity had duly caused the Form 8-K to be signed on its behalf by Defendant Rive in its official capacity.

155.    Defendants' statements in ¶ 148 above were materially false and misleading because:

i.    SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $23.014 million vs. its reported $15.247 million, a difference of $7.767 million or 50.9% (Compl. ¶¶ 29-73);

ii.    SolarCity's overall gross profit was materially lower than reported, at $8.141 million vs. its reported $15.479 million, a difference of $7.338 million or 47.4% (Compl. ¶¶ 29-73);

---

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**          **47**

iii.   SolarCity's net loss was materially higher than reported, at $(41.077) million vs. its reported $(32.649) million, a difference of $8.428 million or 25.8% (Compl. ¶¶ 29-73); and

iv.   SolarCity's basic and diluted EPS numbers were materially lower than reported, at $(0.52) vs. its reported $(0.31), a difference of $0.21 or 67.7% (Compl. ¶¶ 29-73).

### (13)   *Statements Made at SolarCity's Q2 2013 Earnings Call held on August 7, 2013*

156.   On August 7, 2013, SolarCity held an earnings call with investors to discuss the second quarter 2013 earnings.  The Company's participants included Defendants Rive and Kelly.  During that call, Defendant Kelly told investors that SolarCity's gross margin profit for its solar system sales was 12% for the quarter, compared to 9% for the comparable quarter in the prior year.

157.   Defendant Kelly's statement in ¶ 151 above was materially false and misleading because:

i.   SolarCity's gross margin from solar energy system sales for 2Q 2013 was materially lower than reported, at -32.71% vs. its reported gross margin of 12%, a difference of over 100%, and SolarCity's gross margin from solar energy system sales for 2Q 2012 was materially lower than reported, at -7.10% vs. its reported gross margin of 9%, a difference of over 100% (Compl. ¶¶ 29-73).

### (14)   *Statements Made in SolarCity's Form Q2 2013 10-Q Filed With the SEC on August 9, 2013*

158.   On August 9, 2013, the Company filed with the SEC a quarterly report on Form 10-Q for the period ended June 30, 2013, which included Certifications by Defendants Rive and Kelly, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's financial reporting.  For the three months ended June 30, 2013, the Company reported cost of revenues for its solar energy systems sales of $15.247 million; gross profit of $15.479 million; net loss of $(32.649) million; and basic and diluted net loss per share attributable to common stockholders of $(0.31).  The Company also reported $2.094 million of gross profit for its solar energy system sales and a corresponding gross profit margin of 12%.

159.   Pursuant to the requirements of the Securities Exchange Act of 1934, SolarCity had duly caused the Form 10-Q to be signed on its behalf by Defendant Rive in its official capacity.

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**      **48**

160.   Defendants' statements in ¶ 153 above were materially false and misleading because:

    i.    SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $23.014 million vs. its reported $15.247 million, a difference of $7.767 million or 50.9% (Compl. ¶¶ 29-73);

    ii.    SolarCity's overall gross profit was materially lower than reported, at $8.141 million vs. its reported $15.479 million, a difference of $7.338 million or 47.4% (Compl. ¶¶ 29-73);

    iii.    SolarCity's net loss was materially higher than reported, at $(41.077) million vs. its reported $(32.649) million, a difference of $(8.428) million or 25.8% (Compl. ¶¶ 29-73);

    iv.    SolarCity's basic and diluted EPS numbers were materially lower than reported, at $(0.52) vs. its reported $(0.31), a difference of $0.21 or 67.7% (Compl. ¶¶ 29-73); and

    v.    SolarCity's gross profit from solar energy system sales was materially lower than reported, at $(5.673) million instead of its reported $2.094 million, a difference of $7.767 million or over 100%; and its corresponding gross margin was materially lower than reported, a (32.71)% vs. its reported 12.08%, a difference of over 100% (Compl. ¶¶ 29-73).

161.   The Q2 10-Q 2013 also reported the following metrics for the three months ended June 30, 2012: cost of revenues for its solar energy systems sales of $31.899 million; gross profit of $10.965 million; net loss of $(21.849) million; and basic and diluted net loss per share attributable to common stockholders of $(2.37). The Company also reported $3.147 million of gross profit for its solar energy system sales and a corresponding gross profit margin of 9%.

162.   Defendants' statements in ¶ 156 above were materially false and misleading because:

    i.    SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $37.533 million vs. its reported $31.899 million, a difference of $5.634 million or 17.7% (Compl. ¶¶ 29-73);

    ii.    SolarCity's overall gross profit was materially lower than reported, at $5.145 million vs. its reported $10.965 million, a difference of $5.820 million or 53.1% (Compl. ¶¶ 29-73);

    iii.    SolarCity's net loss was materially higher than reported, at $(27.669) million vs. its reported $(21.849) million, a difference of $5.820 million or 26.6% (Compl. ¶¶ 29-73);

    iv.    SolarCity's basic and diluted EPS numbers were materially lower than reported, at $(2.94) vs. its reported $(2.37), a difference of $0.57 or 24.1% (Compl. ¶¶ 29-73); and

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**    **49**

v.    SolarCity's gross profit from solar energy system sales was materially lower than reported, at $(2.487) million instead of its reported $3.147 million, a difference of $5.634 million or over 179.0%; and its corresponding gross margin was materially lower than reported, at (7.10)% vs. its reported 8.98%, a difference of over 100% (Compl. ¶¶ 29-73).

**(15)    *Statements Made in SolarCity's Amendments No. 3 to Forms S-1 Registration Statements Filed With the SEC on August 29, 2013***

163.    On August 29, 2013, the Company filed with the SEC Amendments No. 3 to the Forms S-1 Registration Statements, announcing an offering of $100,000,000 aggregate Convertible Senior Notes due 2018 and a concurrent offering of 2,800,000 shares of SolarCity common stock.  For the year ended December 31, 2012, the Company reported cost of revenues for its solar energy systems sales of $64.429 million; gross profit of $50.887 million; net loss of $(91.575) million; basic net loss per share attributable to common stockholders of $(5.22); and diluted net loss per share attributable to common stockholders of $(5.23).

164.    Pursuant to the requirements of the Securities Act of 1933, Amendments No. 3 to the S-1 Forms were signed by Defendants Rive and Kelly in their official capacities.

165.    Defendants' statements in ¶ 158 above were materially false and misleading because:

i.    SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $84.856 million vs. its reported $64.429 million, a difference of $20.427 million or over 31.7% (Compl. ¶¶ 29-73);

ii.    SolarCity's overall gross profit was materially lower than reported, at $27.456 million vs. its reported $50.887 million, a difference of $23.431 million or 46.0%; and its corresponding gross margin was materially lower than reported, at 21.63% vs. its reported 40% (Compl. ¶¶ 29-73);

iii.    SolarCity's net loss was materially higher than reported, at $(113.726) million vs. its reported $(91.575) million, a difference of $22.151 million or 24.2% (Compl. ¶¶ 29-73); and

iv.    SolarCity's basic EPS was materially lower than reported, at $(7.68) vs. its reported $(5.22), a difference of $(2.46) or 47.1%; and SolarCity's diluted EPS was materially lower than reported, at $(7.69) vs. its reported $(5.23), a difference of $2.46 or over 47.0% (Compl. ¶¶ 29-73).

166.    Amendments No. 3 to the S-1 Forms also incorporated by reference SolarCity's Annual Report on Form 10-K for the fiscal year ended December 31, 2012.  As described above, the 2012 10-K contained materially false and misleading statements for the reasons set forth in ¶¶ 114-127 above.

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          50**

167.    Amendments No. 3 to the S-1 Forms further incorporated by reference SolarCity's Quarterly Report on Form 10-Q for the quarter ended March 31, 2013.  As described above, the Q1 2013 10-Q contained materially false and misleading statements for the reasons set forth in ¶¶ 133-137 above.

168.    Amendments No. 3 to the S-1 Forms further incorporated by reference SolarCity's Quarterly Report on Form 10-Q for the quarter ended June 30, 2013.  As described above, the Q2 2013 10-Q contained materially false and misleading statements for the reasons set forth in ¶¶ 153-157 above.

*(16)    Statements Made in SolarCity's Amendments No. 4 to Forms S-1 Registration Statements Filed With the SEC on September 16, 2013*

169.    On September 16, 2013, the Company filed with the SEC Amendments No. 4 to the Forms S-1 Registration Statements, announcing an offering of $100,000,000 aggregate Convertible Senior Notes due 2018 and a concurrent offering of 2,800,000 shares of SolarCity common stock.  For the year ended December 31, 2012, the Company reported cost of revenues for its solar energy systems sales of $64.429 million; gross profit of $50.887 million; net loss of $(91.575) million; basic net loss per share attributable to common stockholders of $(5.22); and diluted net loss per share attributable to common stockholders of $(5.23).

170.    Pursuant to the requirements of the Securities Act of 1933, Amendments No. 4 to the S-1 Forms were signed by Defendants Rive and Kelly in their official capacities.

171.    Defendants' statements in ¶ 164 above were materially false and misleading because:

   i.    SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $84.856 million vs. its reported $64.429 million, a difference of $20.427 million or over 31.7% (Compl. ¶¶ 29-73);

   ii.    SolarCity's overall gross profit was materially lower than reported, at $27.456 million vs. its reported $50.887 million, a difference of $23.431 million or 46.0%; and its corresponding gross margin was materially lower than reported, at 21.63%  vs. its reported 40% (Compl. ¶¶ 29-73);

   iii.    SolarCity's net loss was materially higher than reported, at $(113.726) million vs. its reported $(91.575) million, a difference of $22,151 million or 24.2% (Compl. ¶¶ 29-73); and

   iv.    SolarCity's basic EPS was materially lower than reported, at $(7.68) vs. its reported $(5.22), a difference of $(2.46) or 47.1%; and SolarCity's diluted EPS

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**          **51**

was materially lower than reported, at $(7.69) vs. its reported $(5.23), a difference of $2.46 or over 47.0% (Compl. ¶¶ 29-73).

172. Amendments No. 4 to the S-1 Forms also incorporated by reference SolarCity's Annual Report on Form 10-K for the fiscal year ended December 31, 2012. As described above, the 2012 10-K contained materially false and misleading statements for the reasons set forth in ¶¶ 114-127 above.

173. Amendments No. 4 to the S-1 Forms further incorporated by reference SolarCity's Quarterly Report on Form 10-Q for the quarter ended March 31, 2013. As described above, the Q1 2013 10-Q contained materially false and misleading statements for the reasons set forth in ¶¶ 133-137 above.

174. Amendments No. 4 to the S-1 Forms further incorporated by reference SolarCity's Quarterly Report on Form 10-Q for the quarter ended June 30, 2013. As described above, the Q2 2013 10-Q contained materially false and misleading statements for the reasons set forth in ¶¶ 153-157 above.

### (17)  Statements Made in SolarCity's Amendments No. 5 to Forms S-1 Registration Statements Filed With the SEC on October 11, 2013

175. On October 11, 2013, the Company filed with the SEC Amendments No. 5 to the Forms S-1 Registration Statements, announcing an offering of $125,000,000 aggregate Convertible Senior Notes due 2018 and a concurrent offering of 3,400,000 shares of SolarCity common stock. For the year ended December 31, 2012, the Company reported cost of revenues for its solar energy systems sales of $64.429 million; gross profit of $50.887 million; net loss of $(91.575) million; basic net loss per share attributable to common stockholders of $(5.22); and diluted net loss per share attributable to common stockholders of $(5.23).

176. Pursuant to the requirements of the Securities Act of 1933, Amendments No. 5 to the S-1 Forms were signed by Defendants Rive and Kelly in their official capacities.

177. Defendants' statements in ¶ 170 above were materially false and misleading because:

  i.  SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $84.856 million vs. its reported $64.429 million, a difference of $20.427 million or over 31.7% (Compl. ¶¶ 29-73);

ii.   SolarCity's overall gross profit was materially lower than reported, at $27.456 million vs. its reported $50.887 million, a difference of $23.431 million or 46.0%; and its corresponding gross margin was materially lower than reported, at 21.63% vs. its reported 40% (Compl. ¶¶ 29-73);

iii.   SolarCity's net loss was materially higher than reported, at $(113.726) million vs. its reported $(91.575) million, a difference of $22.151 million or 24.2% (Compl. ¶¶ 29-73); and

iv.   SolarCity's basic EPS was materially lower than reported, at $(7.68) vs. its reported $(5.22), a difference of $(2.46) or 47.1%; and SolarCity's diluted EPS was materially lower than reported, at $(7.69) vs. its reported $(5.23), a difference of $2.46 or over 47.0% (Compl. ¶¶ 29-73).

178.   Amendments No. 5 to the S-1 Forms also incorporated by reference SolarCity's Annual Report on Form 10-K for the fiscal year ended December 31, 2012.  As described above, the 2012 10-K contained materially false and misleading statements for the reasons set forth in ¶¶ 114-127 above.

179.   Amendments No. 5 to the S-1 Forms further incorporated by reference SolarCity's Quarterly Report on Form 10-Q for the quarter ended March 31, 2013.  As described above, the Q1 2013 10-Q contained materially false and misleading statements for the reasons set forth in ¶ 133-137 above.

180.   Amendments No. 5 to the S-1 Forms further incorporated by reference SolarCity's Quarterly Report on Form 10-Q for the quarter ended June 30, 2013.  As described above, the Q2 2013 10-Q contained materially false and misleading statements for the reasons set forth in ¶¶ 153-157 above.

   *(18)   Statements Made in SolarCity's Amendments No. 6 to Forms S-1 Registration Statements Filed With the SEC on October 15, 2013*

181.   On October 15, 2013, the Company filed with the SEC Amendments No. 6 to the Forms S-1 Registration Statements, announcing an offering of $200,000,000 aggregate Convertible Senior Notes due 2018 and a concurrent offering of 3,400,000 shares of SolarCity common stock.  For the year ended December 31, 2012, the Company reported cost of revenues for its solar energy systems sales of $64.429 million; gross profit of $50.887 million; net loss of $(91.575) million; basic net loss per share attributable to common stockholders of $(5.22); and diluted net loss per share attributable to common stockholders of $(5.23).

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**        **53**

182.    Pursuant to the requirements of the Securities Act of 1933, Amendments No. 6 to the S-1 Forms were signed by Defendants Rive and Kelly in their official capacities.

183.    Defendants' statements in ¶ 176 above were materially false and misleading because:

i.      SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $84.856 million vs. its reported $64.429 million, a difference of $20.427 million or over 31.7% (Compl. ¶¶ 29-73);

ii.     SolarCity's overall gross profit was materially lower than reported, at $27.456 million vs. its reported $50.887 million, a difference of $23.431 million or 46.0%; and its corresponding gross margin % was materially lower than reported, at 21.63%  vs. its reported 40% (Compl. ¶¶ 29-73);

iii.    SolarCity's net loss was materially higher than reported, at $(113.726) million vs. its reported $(91.575) million, a difference of $22.151 million or 24.2% (Compl. ¶¶ 29-73); and

iv.     SolarCity's basic EPS was materially lower than reported, at $(7.68) vs. its reported $(5.22), a difference of $2.46 or 47.1%; and SolarCity's diluted EPS was materially lower than reported, at $(7.69) vs. its reported $(5.23), a difference of $2.46 or over 47.0% (Compl. ¶¶ 29-73).

184.    Amendments No. 6 to the S-1 Forms also incorporated by reference SolarCity's Annual Report on Form 10-K for the fiscal year ended December 31, 2012.  As described above, the 2012 10-K contained materially false and misleading statements for the reasons set forth in ¶¶ 114-127 above.

185.    Amendments No. 6 to the S-1 Forms further incorporated by reference SolarCity's Quarterly Report on Form 10-Q for the quarter ended March 31, 2013.  As described above, the Q1 2013 10-Q contained materially false and misleading statements for the reasons set forth in ¶¶ 133-137 above.

186.    Amendments No. 6 to the S-1 Forms further incorporated by reference SolarCity's Quarterly Report on Form 10-Q for the quarter ended June 30, 2013.  As described above, the Q2 2013 10-Q contained materially false and misleading statements for the reasons set forth in ¶¶ 153-157 above.

(19)    *Statements Made in SolarCity's Prospectuses Filed With the SEC on October 17, 2013*

187.    On October 17, 2013, the Company filed with the SEC two separate Prospectuses, one for the offering of $200,000,000 aggregate Convertible Senior Notes due 2018 and the other for the

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**          **54**

concurrent offering of 3,400,000 shares of SolarCity common stock.  For the year ended December 31, 2012, the Company reported cost of revenues for its solar energy systems sales of $64.429 million; gross profit of $50.887 million; net loss of $(91.575) million; basic net loss per share attributable to common stockholders of $(5.22); and diluted net loss per share attributable to common stockholders of $(5.23).

188.     Defendants' statements in ¶ 182 above were materially false and misleading because:

   i.     SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $84.856 million vs. its reported $64.429 million, a difference of $20.427 million or over 31.7% (Compl. ¶¶ 29-73);

   ii.    SolarCity's overall gross profit was materially lower than reported, at $27.456 million vs. its reported $50.887 million, a difference of $23.431 million or 46.0%; and its corresponding gross margin % was materially lower than reported, at 21.63%  vs. its reported 40% (Compl. ¶¶ 29-73);

   iii.   SolarCity's net loss was materially higher than reported, at $(113.726) million vs. its reported $(91.575) million, a difference of $22,151 million or 24.2% (Compl. ¶¶ 29-73); and

   iv.    SolarCity's basic EPS was materially lower than reported, at $(7.68) vs. its reported $(5.22), a difference of $2.46 or 47.1%; and SolarCity's diluted EPS was materially lower than reported, at $(7.69) vs. its reported $(5.23), a difference of $2.46 or over 47.0% (Compl. ¶¶ 29-73).

189.     The Prospectuses also incorporated by reference SolarCity's Annual Report on Form 10-K for the fiscal year ended December 31, 2012.  As described above, the 2012 10-K contained materially false and misleading statements for the reasons set forth in ¶¶ 114-127 above.

190.     The Prospectuses further incorporated by reference SolarCity's Quarterly Report on Form 10-Q for the quarter ended March 31, 2013.  As described above, the Q1 2013 10-Q contained materially false and misleading statements for the reasons set forth in ¶¶ 133-137 above.

191.     The Prospectuses further incorporated by reference SolarCity's Quarterly Report on Form 10-Q for the quarter ended June 30, 2013.  As described above, the Q2 2013 10-Q contained materially false and misleading statements for the reasons set forth in ¶¶ 153-157 above.

   *(20)*     ***Statements Made in SolarCity's Form 8-K Filed With the SEC on November 6, 2013***

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**          **55**

192.     On November 6, 2013, the Company issued a press release, which was also filed with the SEC on Form 8-K, regarding the Company's financial results for third quarter ended September 30, 2013, and certain other information.  For the three months ended September 30, 2013, the Company reported cost of revenues for its solar energy systems sales of $22.640 million; overall gross profit of $17.537 million; net loss of $34.593 million; and basic and diluted net income per share attributable to common stockholders of $0.04.

193.     Pursuant to the requirements of the Securities Exchange Act of 1934, SolarCity had duly caused the Form 8-K to be signed on its behalf by Defendant Rive in its official capacity.

194.     Defendants' statements in ¶ 187 above were materially false and misleading because:

    i.    SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $26.128 million vs. its reported $22.640 million, a difference of $3.488 million or 15.4% (Compl. ¶¶ 29-73);

    ii.    SolarCity's overall gross profit was materially lower than reported, at $13.853 million vs. its reported $17.537 million, a difference of $3.684 million or 21.0% (Compl. ¶¶ 29-73);

    iii.    SolarCity's net loss was materially higher than reported, at $(37.810) million vs. its reported $(34.593) million, a difference of $3.217 million or 9.3% (Compl. ¶¶ 29-73); and

    iv.    SolarCity's basic and diluted EPS numbers were materially lower than reported, at a loss of $(0.03) vs. its reported profit of $0.04, a difference of $0.07 or over 175% (Compl. ¶¶ 29-73).

**(21)    *Statements Made in SolarCity's Form Q3 2013 10-Q Filed With the SEC on November 12, 2013***

195.     On November 12, 2013, the Company filed with the SEC a quarterly report on Form 10-Q for the period ended September 30, 2013, which included Certifications by Defendants Rive and Kelly, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's financial reporting.  For the three months ended September 30, 2013, the Company reported cost of revenues for its solar energy systems sales of $22.640 million; overall gross profit of $17,537 million; net loss of $(34.593) million; basic net loss per share attributable to common stockholders of $0.04; and diluted net loss per share attributable to common stockholders of $0.04.  The Company also reported $1.164 million of gross profit for its solar energy system sales and a corresponding gross profit margin of 5%.

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**          **56**

196.    Pursuant to the requirements of the Securities Exchange Act of 1934, SolarCity had duly caused the Form 10-Q to be signed on its behalf by Defendant Rive in its official capacity.

197.    Defendants' statements in ¶ 190 above were materially false and misleading because:

i.     SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $26.128 million vs. its reported $22.640 million, a difference of $3.488 million or 15.4% (Compl. ¶¶ 29-73);

ii.    SolarCity's overall gross profit was materially lower than reported, at $13.853 million vs. its reported $17.537 million, a difference of $3.684 million or 21.0% (Compl. ¶¶ 29-73);

iii.   SolarCity's net loss was materially higher than reported, at $(37.810) million vs. its reported $(34.593) million, a difference of $(3.217 million) or 9.3% (Compl. ¶¶ 29-73);

iv.    SolarCity's basic and diluted EPS numbers were materially lower than reported, at a loss of $(0.03) vs. its reported profit of $0.04, a difference of $0.07 or over 175% (Compl. ¶¶ 29-73); and

v.     SolarCity's gross profit from solar energy system sales was materially lower than reported, a loss of $(2.324) million instead of its reported profit of $1.164 million, a difference of $3.488 million or over 299.7%; and its corresponding gross margin was materially lower than reported, at (9.76)% vs. its reported 4.89%, a difference of over 100% (Compl. ¶¶ 29-73).

198.    The Q3 10-Q 2013 also reported the following metrics for the three months ended September 30, 2012: cost of revenues for its solar energy systems sales of $13.900 million; gross profit of $15.751 million; net loss of $(29.043) million; and basic and diluted net loss per share attributable to common stockholders of $(3.41).   The Company also reported $4,157 million of gross profit for its solar energy system sales and a corresponding gross profit margin of 23%.

199.    Defendants' statements in ¶ 193 above were materially false and misleading because:

i.     SolarCity's cost of revenues for its solar systems sales was materially higher than reported, at $17.025 million vs. its reported $13.900 million, a difference of $3.125 million or 22.5% (Compl. ¶¶ 29-73);

ii.    SolarCity's overall gross profit was materially lower than reported, at $12.514 million vs. its reported $15.751 million, a difference of $3.237 million or 20.6% (Compl. ¶¶ 29-73);

iii.   SolarCity's net loss was materially higher than reported, at $(32.295) million vs. its reported $(29.043) million, a difference of $(3.252 million) or 11.2% (Compl. ¶¶ 29-73);

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**          **57**

iv.    SolarCity's basic and diluted EPS numbers were materially lower than reported, at $(4.14) vs. its reported $(3.41), a difference of $0.73 or 21.4% (Compl. ¶¶ 29-73); and

v.    SolarCity's gross profit from solar energy system sales was materially lower than reported, at $1.032 million instead of its reported $4.157 million, a difference of $3.125 million or 75.2%; and its corresponding gross margin was materially lower than reported, at 5.72% vs. its reported 23.02% (Compl. ¶¶ 29-73).

## THE TRUTH BEGINS TO EMERGE

200.    On March 3, 2014, SolarCity announced that it had discovered an error in the formula for allocating overhead expenses between operating lease assets and the cost of solar energy system sales originating in Q1 2012.  The purported error resulted in tens of millions in overhead expenses being improperly classified:

> SolarCity today announced that there will be a reallocation of overhead expenses from leased systems to system sales, which will affect the 2013 and 2012 GAAP financial statements. The estimated changes are described below and final, audited statements will be filed on or before Tuesday, March 18, 2014.

> During an internal review of fourth quarter financial statements, we discovered an error in the formula for allocating overhead expenses between Operating Lease assets and the cost of Solar Energy System Sales originating in Q1 2012. We reported this to our auditors, who agreed with our assessment that a correction needed to be made. It is important to note that overhead expenses in total will not be amended and that these changes do not affect the net cash flows or any forward financial guidance of the company.

> The GAAP impact is expected to be a downward adjustment on the balance sheet primarily in Solar Energy Systems, Leased and to Be Leased of approximately 2.5%-3.0% as of September 30, 2013.  *We also expect an increase in the cost of Solar Energy Systems Sales of* approximately *$16-$20 million on the statement of operations for the nine month period ended September 30, 2013 and an increase of approximately $20-$23 million to the same line item for the full-year 2012*, while we are currently evaluating the materiality of the impact on 2011.

201.    The Company also announced that its previously issued financial statements, a related audit report and a completed interim report can no longer be relied on as a result of the misallocated expenses:

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**     **58**

On February 27, 2014, the board of directors of SolarCity and management of the Company concluded, after discussion with SolarCity's independent registered public accounting firm, Ernst & Young LLP, that the consolidated financial statements as of December 31, 2012 and for the year then ended included in SolarCity's Annual Report on Form 10-K for the fiscal year ended December 31, 2012 and the consolidated financial statements included in the Quarterly Reports on Forms 10-Q for the periods ended March 31, 2012, June 30, 2012, September 30, 2012, March 31, 2013, June 30, 2013 and September 30, 2013, should no longer be relied upon as a result of an error in the allocation of overhead expenses. As a result, SolarCity will recognize a downward adjustment of assets related to solar energy systems leased and to be leased and an upward adjustment to the costs of solar energy system sales in the periods mentioned above.

The impact of the related restatements of the Company's previously filed consolidated statements of operations and balance sheets for the first three quarters of 2012, the 2012 fiscal year, and the first three quarters of 2013 will be explained in the Notes to Consolidated Financial Statements in the Company's Annual Report on Form 10-K for the year ended December 31, 2013, which the Company anticipates to be filed on or before March 18, 2014. SolarCity is currently evaluating the materiality of this error on its consolidated financial statements as of December 31, 2011 and for the year then ended, and the impact on its assessment of internal control over financial reporting.

202.   On this news, SolarCity securities declined $1.70 per share, or over 2%, to close at $83.26 per share on March 3, 2014.

203.   The severity of the Company's accounting manipulations was only fully revealed on March 18, 2014, when the Company issued its restated financials, which for the first time revealed restated numbers for the year ended December 32, 2012.  The Company disclosed restated solar energy systems sales costs of revenues of $84.856 million; gross profit of $27.456 million; net loss of $(113.726) million; basic net loss per share of $(7.68) and diluted net loss per share of $(7.69).  For the first time, the Company also disclosed restated numbers for each quarter of 2012 and for each quarter of 2013, as shown in the table below, for each of the following relevant metrics: cost of solar energy systems sales; gross profit; net loss; and basic and diluted earnings per share.  These disclosures revealed for the first time that the Company's solar energy systems sales unit had operated at a loss for six quarters (each quarter of 2013 as well as Q2 and Q4 2012) and barely broke even in two quarters (Q1 2012 and Q3 2012):

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS        59**

| | Year Ended December 31, 2012 | | |
| --- | --- | --- | --- |
| | As Previously Reported | Adjustment | As Restated |
| **Revenue:** | | | |
|     Operating leases and solar energy systems incentives(1) | $ 47,616 | $ (1,518) | $ 46,098 |
|     Solar energy systems sales(1) | 81,046 | (236) | 80,810 |
|     Total revenue | 128,662 | (1,754) | 126,908 |
| **Cost of revenue:** | | | |
|     Operating leases and solar energy systems incentives(2) | 13,346 | 1,250 | 14,596 |
|     Solar energy systems sales(11) | 64,429 | 20,427 | 84,856 |
| Total cost of revenue | 77,775 | 21,677 | 99,452 |
| Gross profit | 50,887 | (23,431) | 27,456 |
| **Operating expenses:** | | | |
|     Sales and marketing | 69,392 | — | 69,392 |
|     General and administrative(1) | 50,355 | (1,280) | 49,075 |
| Total operating expenses | 119,747 | (1,280) | 118,467 |
| Loss from operations | (68,860) | (22,151) | (91,011) |
| Interest expense – net | 20,142 | — | 20,142 |
| Other expense – net | 2,519 | — | 2,519 |
| Loss before income taxes | (91,521) | (22,151) | (113,672) |
| Income tax provision | (54) | — | (54) |

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**          **60**

| | | | |
|---|---|---|---|
| Net loss | | (91,575) | (22,151) | (113,726) |
| Net loss attributable to noncontrolling interests and nonredeemable noncontrolling interests(12) | | (27,384) | 12,993 | (14,391) |
| Net loss attributable to stockholders | $ (64,191) $ | (35,144) $ | (99,335) |
| *Net loss attributable to common stockholders* | | | | |
|    Basic | $ (74,282) $ | (35,144) $ | (109,426) |
|    Diluted | $ (74,559) $ | (35,144) $ | (109,703) |
| *Net loss per share attributable to common stockholders* | | | | |
|    Basic | $ (5.22) $ | (2.46) $ | (7.68) |
|    Diluted | $ (5.23) $ | (2.46) $ | (7.69) |
| *Weighted average shares used to compute net loss per share attributable to common stockholders* | | | | |
|    Basic | 14,240,187 | — | 14,240,187 |
|    Diluted | 14,267,767 | — | 14,267,767 |

*See* 2013 10-K at 85, filed with the SEC on March 18, 2014.

204.   The 10-K also disclosed materially restated financials for each quarters affected:

| | Three Months Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | December 31, 2013 | September 30, 2013 (restated) | June 30, 2013 (restated) | March 31, 2013 (restated) | December 31, 2012 (restated) | September 30, 2012 (restated) | June 30, 2012 (restated) | March 31, 2012 (restated) |
| | (in thousands, except share and per share amounts) | | | | | | | |
| Revenue: | | | | | | | | |
| Operating leases and solar energy systems incentives | $ 22,363 | $ 24,796 | $ 20,608 | $ 15,089 | $ 12,514 | $ 13,917 | $ 11,528 | $ 8,139 |
| Solar energy systems sales | 24,937 | 23,804 | 17,341 | 14,899 | 11,241 | 18,057 | 35,046 | 16,466 |
| Total revenue | 47,300 | 48,600 | 37,949 | 29,988 | 23,755 | 31,974 | 46,574 | 24,605 |
| Cost of revenue: | | | | | | | | |
| Operating leases and solar energy systems incentives | 11,580 | 8,619 | 6,794 | 5,752 | 5,461 | 2,435 | 3,896 | 2,804 |
| Solar energy systems sales | 25,874 | 26,128 | 23,014 | 16,707 | 14,017 | 17,025 | 37,533 | 16,281 |
| Total cost of revenue | 37,454 | 34,747 | 29,808 | 22,459 | 19,478 | 19,460 | 41,429 | 19,085 |
| Gross profit | 9,846 | 13,853 | 8,141 | 7,529 | 4,277 | 12,514 | 5,145 | 5,520 |
| Operating expenses: | | | | | | | | |
| Sales and marketing | 33,893 | 24,310 | 21,344 | 17,879 | 19,416 | 18,145 | 15,700 | 16,131 |
| General and administrative | 31,258 | 21,426 | 22,266 | 16,371 | 17,171 | 12,554 | 10,788 | 8,562 |

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**     **61**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Total operating expenses | 65,151 | 45,736 | 43,610 | 34,250 | 36,587 | 30,699 | 26,488 | 24,693 |
| Loss from operations | (55,305) | (31,883) | (35,469) | (26,721) | (32,310) | (18,185) | (21,343) | (19,173) |
| Interest expense, net | 8,217 | 5,781 | 5,421 | 6,319 | 5,220 | 6,587 | 4,841 | 3,494 |
| Other expense (income), net | 1,016 | 123 | 162 | 140 | (15,376) | 7,466 | 1,455 | 8,974 |
| Loss before income taxes | (64,538) | (37,787) | (41,052) | (33,180) | (22,154) | (32,238) | (27,639) | (31,641) |
| Income tax benefit (provision) | 24,742 | (23) | (25) | 105 | 53 | (57) | (30) | (20) |
| Net loss | (39,796) | (37,810) | (41,077) | (33,075) | (22,101) | (32,295) | (27,669) | (31,661) |
| Net (loss) income attributable to noncontrolling interests and redeemable noncontrolling interests | (66,489) | (35,707) | (1,614) | 7,842 | (14,057) | 13,911 | 4,388 | (18,633) |
| Net income (loss) attributable to stockholders | $ 26,693 | $ (2,103) | $ (39,463) | $ (40,917) | $ (8,044) | $ (46,206) | $ (32,057) | $ (13,028) |
| *Net income (loss) attributable to common stockholders* | | | | | | | | |
| Basic | $ 26,694 | $ (2,103) | $ (39,463) | $ (40,917) | $ (18,135) | $ (46,206) | $ (32,057) | $ (13,028) |
| Diluted | $ 26,694 | $ (2,103) | $ (39,463) | $ (40,917) | $ (32,951) | $ (46,206) | $ (32,057) | $ (13,028) |
| *Net income (loss) per share attributable to common stockholders* | | | | | | | | |
| Basic | $ 0.31 | $ (0.03) | $ (0.52) | $ (0.54) | $ (0.75) | $ (4.14) | $ (2.94) | $ (1.24) |
| Diluted | $ 0.28 | $ (0.03) | $ (0.52) | $ (0.54) | $ (1.30) | $ (4.14) | $ (2.94) | $ (1.24) |
| *Weighted-average shares used to compute net income (loss) per share attributable to common stockholders* | | | | | | | | |
| Basic | 87,358,869 | 79,918,110 | 76,529,698 | 75,186,430 | 24,283,731 | 11,161,789 | 10,897,198 | 10,503,931 |
| Diluted | 95,156,846 | 79,918,110 | 76,529,698 | 75,186,430 | 25,310,651 | 11,161,789 | 10,897,198 | 10,503,931 |

*Id*. at 68.

205.   On this news of the Company's true lack of profitability, the Company's shares fell $4.40, or almost 6%, to close on March 19, 2014 at $72.70 per share on unusually high trading volume.

206.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

207.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired SolarCity securities during the Class Period (the "Class"); and were damaged upon the revelation of the truth about Defendants' false statements.  Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

208.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SolarCity securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by SolarCity or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

209.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

210.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

211.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;
- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of SolarCity;
- whether the Individual Defendants caused SolarCity to issue false and misleading

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          63**

financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of SolarCity securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

212.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

213.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- SolarCity securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold SolarCity securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

214.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

215.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United*

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**          **64**

*States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

<u>COUNT I</u>

**(Against All Defendants for Violations of**
**<u>Section 10(b) and Rule 10b-5 Promulgated Thereunder)</u>**

216.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

217.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

218.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of SolarCity securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire SolarCity securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

219.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for SolarCity securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about SolarCity's finances and business prospects.

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          65**

220.     By virtue of their positions at SolarCity, the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

221.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of SolarCity securities from their personal portfolios.

222.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of SolarCity, the Individual Defendants had knowledge of the details of SolarCity's internal affairs.

223.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of SolarCity.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to SolarCity's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of SolarCity securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning SolarCity's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired SolarCity securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

224.    During the Class Period, SolarCity securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of SolarCity securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of SolarCity securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of SolarCity securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

225.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

226.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

227.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

228.    During the Class Period, the Individual Defendants participated in the operation and management of SolarCity, and conducted and participated, directly and indirectly, in the conduct of SolarCity's business affairs.  Because of their senior positions, they knew the adverse non-public information about SolarCity's misstatement of income and expenses and false financial statements.

229.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to SolarCity's financial condition and results of operations, and to correct promptly any public statements issued by SolarCity which had become materially false or misleading.

230.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which SolarCity disseminated in the marketplace during the Class Period concerning SolarCity's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause SolarCity to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of SolarCity within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of SolarCity securities.

231.     Each of the Individual Defendants, therefore, acted as a controlling person of SolarCity. By reason of their senior management positions and/or being directors of SolarCity, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, SolarCity to engage in the unlawful acts and conduct complained of herein.   Each of the Individual Defendants exercised control over the general operations of SolarCity and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

232.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by SolarCity.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          68**

1          C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment

2    interest, as well as his reasonable attorneys' fees, expert fees and other costs; and

3          D.      Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: February 15, 2016

Respectfully submitted,

**POMERANTZ LLP**

By: */s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Emma Gilmore
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665

*Lead Counsel for Lead Plaintiff*

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy

1925 Century Park East
Suite 2100
Los Angeles, CA 90067-2722
(310) 201-9150
Fax: (310) 201-9160

*Liaison Counsel for Lead Plaintiff*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll
Daniel S. Sommers
S. Douglas Bunch
Genevieve O. Fontan
1100 New York Avenue N.W.
Suite 500, East Tower
Washington, DC 20005
Telephone: (202) 408-4600

**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          69**

Facsimile: (202) 408-4699

*Attorneys for Plaintiff*

**<u>Certificate of Service</u>**

I hereby certify that on February 15, 2016, I electronically filed the foregoing Third Amended Complaint with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record registered with the CM/ECF system, and will electronically send the foregoing to those indicated as non-registered participants on February 15, 2016.

This 15th day of February, 2016

*/s/   Jeremy A. Lieberman*