1

2

3          **UNITED STATES DISTRICT COURT**

4          **NORTHERN DISTRICT OF CALIFORNIA**

5          **SAN JOSE DIVISION**

6

7    TAI JAN BAO, et al.,                  Case No.  14-cv-01435-BLF

           Plaintiffs,
8
                                           **ORDER GRANTING MOTION TO**
9      v.                                  **DISMISS THIRD AMENDED**
                                           **COMPLAINT WITH PREJUDICE**
10   SOLARCITY CORPORATION, et al.,
                                           [Re:  ECF 81]
           Defendants.
11

12

13          Over the past two years, Plaintiffs have offered four iterations of their complaint for this

14   securities class action case. *See* Compl., ECF 1; First Amended Compl. ("FAC"), ECF 56; Second

15   Amended Compl. ("SAC"), ECF 66; Third Amended Compl. ("TAC"), ECF 78. The Court has

16   previously dismissed the complaint on two occasions, both times through a reasoned order

17   specifically outlining the deficiencies in Plaintiffs' allegations and with leave to amend. *See* Order

18   Granting Motion to Dismiss Amended Compl. With Leave to Amend ("First Dismissal Order"),

19   ECF 65; Order Granting Motion to Dismiss SAC With Leave to Amend ("Second Dismissal

20   Order"), ECF 77. Defendants argue that, notwithstanding this guidance, Plaintiffs have again

21   failed to cure the deficiencies and that the TAC should be dismissed with prejudice. Mot., ECF 81.

22   This time, the Court agrees. For the reasons stated below, Defendants' Motion to Dismiss the TAC

23   is granted with prejudice.

24   **I.      BACKGROUND**

25          The Court has previously granted Defendants' motion to dismiss on two occasions. In the

26   First Dismissal Order, the Court granted leave to amend all claims. In the Second Dismissal Order,

27   the Court dismissed former defendant Elon Musk with prejudice but otherwise allowed

28   amendment. The following is a summary of the amended allegations of the TAC.

Defendant SolarCity Corporation ("SolarCity") is a Delaware corporation that offers solar energy systems for sale or lease. TAC ¶¶ 20, 28-30. Defendant Lyndon R. Rive is SolarCity's Chief Executive Officer ("CEO"). *Id.* ¶ 21. Defendant Robert D. Kelly was the company's Chief Financial Officer ("CFO") during the relevant period. *Id.* ¶ 22. The Court refers to Mr. Rive and Mr. Kelly collectively as "Individual Defendants." Although he is not a named defendant, Plaintiffs make certain allegations against Peter Rive, SolarCity's co-founder and Chief Technology Officer and Lyndon Rive's brother. *Id.* ¶ 21.

Lead Plaintiff James Webb and Plaintiff Tai Jan Bao ("Plaintiffs") seek to represent a putative class of investors who purchased SolarCity securities between December 12, 2012 and March 18, 2014 ("Class Period"). *Id.* ¶¶ 1, 19. Plaintiffs allege that, during this time, Defendants manipulated an accounting formula to "portray the illusion of profitability" by shifting overhead costs from sales, where they would be recognized immediately, to leases, where they amortized over a twenty-year period. *Id.* ¶¶ 58, 71. Specifically, Plaintiffs allege that Defendants inflated a ratio used to allocate overhead costs to leases ("burden ratio") by including the prior period's overhead costs in the numerator, but excluding the prior period's direct costs from the denominator. *Id.* ¶¶ 71-72. This formula change did not affect the company's allocation of direct costs between sales and leases, but did cause an inflated portion of overhead costs to go to leases.

Plaintiffs allege that this error in the burden ratio violated Generally Accepted Accounting Principles ("GAAP") and enabled Defendants to overstate sales gross margins for seven consecutive quarters. *Id.* ¶¶ 31-33, 61-63. Plaintiffs allege that the timing of the misreporting, which began in Q1 2012, enabled SolarCity to raise $ 94 million in its December 2012 initial public offering ("IPO"). *Id.* ¶ 74. In addition to the IPO, the change in the burden ratio—which permitted the company to report seven consecutive quarters of highly improved sales gross margins—enabled SolarCity to secure an additional $396 million from stock and note offerings in 2013 and to acquire two companies by paying with SolarCity's common stock. *Id.* ¶¶ 74, 79, 81-86. Plaintiffs allege that this fundraising was necessary for SolarCity, and that the acquisitions enabled SolarCity to acquire complementary technologies and assets, thereby giving Defendants a clear motive for the fraud. *Id.* ¶ 83.

United States District Court
Northern District of California

Plaintiffs allege that Defendants were also motivated to create the accounting error and misstate their financials to help Elon Musk, who allegedly provided the initial concept for SolarCity, is Mr. Rive's cousin, and remains SolarCity's largest shareholder. *Id.* ¶¶ 91-92. Plaintiffs allege that Mr. Musk secured $275 million in loans from Goldman Sachs in part with SolarCity capital stock and that Defendants were motivated to keep SolarCity's common stock at artificially inflated prices to avoid a forced sale of Mr. Musk's stock. *Id.* ¶¶ 91, 95.

Plaintiffs additionally allege that Defendants knew that SolarCity's internal controls were weak, having had to issue restatements of 2008, 2009, and 2010 consolidated financial statements and having experienced delays in the close process for the 2010 and 2011 statements because of deficiencies in the design and operation of SolarCity's internal controls. *Id.* ¶ 35.

Plaintiffs also offer statements by eleven confidential witnesses ("CWs") to suggest that the Individual Defendants knew of or deliberately ignored this accounting error at the time that it was made. CWs 1 and 2 have been in the complaint since the FAC. Both of these witnesses left SolarCity before the Class Period. They stated that SolarCity's accounting and financials were "a mess" and that the corporate controller likely informed Individual Defendants of "what they were doing" with overhead accounting. *Id.* ¶¶ 37-38.

In the SAC, Plaintiffs introduced eight new CWs. Five of the new witnesses—CWs 3, 6, 8, 9, and 10—similarly did not work at SolarCity during the Class Period, which commenced in December 2012, the same month SolarCity went public.[1] These witnesses explained that, during their tenure with SolarCity, the cost accounting team was "lean," *id.* ¶ 39 (CW 3); Mr. Kelly sat with the accounting department, *id.* ¶ 50 (CW 8), and was involved in accounting policy decisions, *id.* ¶¶ 39 (CW 3), 48 (CW 6); and Mr. Rive was also involved in accounting discussions at "a high

---

[1] CW3 was a Senior Manager for fund relations in SolarCity's Structured Finance Department from September 2011 to September 2012. SAC ¶ 39. CW6 was Director of Fund Accounting at SolarCity from June 2012 to September 2012. *Id.* ¶ 48. CW8 worked at SolarCity from November 2007 to September 2012, first as a solar consultant from November 2007 to March 2010 and then as a Commercial Project Development Manager from March 2010 to September 2012. *Id.* ¶ 50. CW9 worked as an Administrative Assistant and Sales Operations Administrator at SolarCity from October 2008 to January 2012. *Id.* ¶ 51. CW10 worked as Director of Sales at SolarCity from May 2008 to January 2011. *Id.* ¶ 52.

1    level," *id.* ¶ 48 (CW 6), and the decisions of other departments on a more detailed basis, *id.* ¶¶ 51

2    (CW 9), 52 (CW 10). CWs also recalled that the Rive brothers told employees at all-hands

3    meetings, held at unidentified times between November 2007 and September 2012, "We're not

4    profitable on a GAAP basis" but that, on a non-GAAP basis, long-term revenue could cover short-

5    term costs, *id.* ¶ 50 (CW 8), and stated that the company had to show profit before it could go

6    public, *id.* ¶ 51 (CW 9).

7        Of the witnesses who worked at SolarCity during the Class Period, CW 4, an Accounts

8    Payable Specialist from January 2011 to August 2014, stated that the overhead costs team

9    consisted of seven employees who stayed in corporate headquarters even after other accounting

10   department employees transferred to Las Vegas in 2012. *Id.* ¶ 40. CW 5 was a Project

11   Development Manager at SolarCity from July 2011 to May 2014, both before and during the Class

12   Period. CW 5 made "cash sales," which Plaintiffs define as "generally sales of large solar

13   systems," to public entities. *Id.* ¶ 41. S/he reported to the Vice President of Commercial Sales and

14   participated on conference calls with Mr. Rive. CW 5 stated that Mr. Rive knew about cash sale

15   projects that came in with negative margins. *Id.* ¶ 41, 45.

16       In the TAC, Plaintiffs offer additional statements from CW 5. *Id.* ¶¶ 42-44, 46. CW 5

17   specified that sales "were not making profit margins, or if they were, they were much lower than

18   expected" during the Class Period. *Id.* ¶ 42. CW 5 explained that, by talking with other sales

19   people, s/he learned that the company's cash sale projects in general, and not only his/her own

20   sales, were showing negative or far below expected "cash margins." *Id.* ¶ 42. CW 5 also stated that

21   "everybody at the high level knew about" the poor performance of the cash sales and that, starting

22   in mid-2012, unspecified individuals "kept discouraging us from doing cash deals." *Id.* ¶ 44. As in

23   the SAC, CW 5 explained that s/he regularly participated in conference calls with Mr. Rive and

24   sometimes Mr. Kelly "to discuss cash sale projects that came in with negative margins." *Id.* ¶ 45.

25   CW 5 also recalled that reports about cash sales projects were submitted to Individual Defendants.

26   CW 5 did not know if Individual Defendants "looked at [the reports] line by line" but stated that

27   "[t]hey were verbally aware of the situation." *Id.* ¶ 46.

28       In the TAC, Plaintiffs also introduce CW 11, the Office Manager for SolarCity's corporate

United States District Court
Northern District of California

4

headquarters in San Mateo from June 2010 to September 2013. *Id.* ¶ 53. CW 11 stated that s/he knew from conversations with colleagues and comments by Mr. Rive and Mr. Kelly in meetings that SolarCity was not earning profit during his/her employment. *Id.* ¶ 53.

On March 3, 2014, Defendants announced that senior management had discovered an error in the overhead accounting formula that had originated in Q1 2012. *Id.* ¶ 67. Shortly before the disclosure, Peter Rive stepped down as Chief Operations Officer. *Id.* ¶ 81. On March 18, 2014, Defendants issued restated financials, which revealed that, contrary to SolarCity's prior reports of consistent sales profit, sales had had a negative gross margin for six of the affected quarters (Q2 and Q4 2012 and every quarter of 2013) and made only a slight profit in two of them (Q1 and Q3 2012). *Id.* ¶ 203. In August 2014, Mr. Kelly resigned as CFO. *Id.* ¶ 82.

Plaintiffs allege that the disclosure shows that Individual Defendants were responsible for and monitored the company's gross margins, and were well-versed in cost accounting. *Id.* ¶ 69. Plaintiffs also allege that the burden ratio was properly calculated for the years that did not directly affect the IPO, as shown by the fact that Defendants did not need to restate financial for 2010 and 2011. *Id.* ¶ 74.

Based on the above allegations, the TAC, like the FAC and SAC, asserts that (1) all Defendants violated § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 of the Securities and Exchange Commission ("SEC") and (2) each Individual Defendant is liable as a controlling person under § 20(a) of the Exchange Act.

## II.    LEGAL STANDARDS

### A.    Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When considering a motion to dismiss, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.,* 519 F.3d 1025, 1031 (9th Cir. 2008). The Court "need not, however, accept as true allegations that contradict matters properly subject to judicial notice or by

1    exhibit." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

2         **B.    Rule 9(b) and the PSLRA**

3         In addition, a plaintiff asserting a private securities fraud action must meet the heightened

4    pleading requirements imposed by Federal Rule of Civil Procedure 9(b) and the PSLRA. *See In re*

5    *VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Rule 9(b) requires a

6    plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see*

7    *also In re VeriFone*, 704 F.3d at 701. Similarly, the PSLRA requires that the complaint "specify

8    each statement alleged to have been misleading, [and] the reason or reasons why the statement is

9    misleading . . . ." 15 U.S.C. § 78u–4(b)(1)(B).

10        The PSLRA further requires that the complaint "state with particularity facts giving rise to

11   a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2)(A).

12   "To satisfy the requisite state of mind element, a complaint must allege that the defendant[ ] made

13   false or misleading statements either intentionally or with deliberate recklessness." *In re VeriFone*,

14   704 F.3d at 701 (internal quotation marks and citation omitted) (alteration in original). The

15   scienter allegations must give rise not only to a plausible inference of scienter, but to an inference

16   of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent

17   intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

18        **C.    Confidential Witnesses**

19        To satisfy the PSLRA, "a complaint relying on statements from confidential witnesses

20   must pass two hurdles." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir.

21   2009) (citing *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015-16 (9th Cir. 2005)). First, the confidential

22   witnesses "must be described with sufficient particularity to establish their reliability and personal

23   knowledge [of the events they report]." *Id.* "Second, those statements . . . must themselves be

24   indicative of scienter." *Id.*

25   **III.   DISCUSSION**

26        **A.    Claim 1 – Section 10(b) and Rule 10b-5**

27        "To state a securities fraud claim, plaintiff must plead: (1) a material misrepresentation or

28   omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or

United States District Court
Northern District of California

6

omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Reese v. Malone*, 747 F.3d 557, 567 (9th Cir. 2014) (internal quotation marks and citation omitted). As in their prior motions to dismiss, Defendants challenge only the sufficiency of the allegations with respect to scienter. Mot. at 6-22. Because of the overlap between this motion and the preceding ones, the Court briefly reviews its findings from the two prior dismissal orders.[2]

### 1. FAC

In the First Dismissal Order, the Court determined that a holistic analysis of the FAC did not support a strong inference of scienter. First Dismissal Order at 5-7. The Court found the existing allegations deficient: the "allegations of corporate reshuffling and Defendants' Sarbanes-Oxley certifications lack[ed] . . . probative value" while the confidential witnesses offered "little reliable insight into what occurred during the class period" because "both left SolarCity before the first of the disputed statements were made." *Id.* at 7. The Court highlighted the lack of allegations suggesting that the accounting error was something more than non-actionable mistake, such as, for example, allegations that the formula changed just before the Class Period and that Defendants knew it had changed "in a way that was contrary to prior practice and to GAAP," "that Defendants had actual access to information suggesting that the overhead expenses had been misallocated," or that "allocation of overhead expenses is such a prominent piece of financial information that it would have been absurd for management to be unaware of the misallocation." *Id.* at 5-6.

At the hearing, the Court emphasized the specific nature of the alleged error: failure to put one factor (direct costs) in the denominator while putting a different factor (overhead costs) in the

---

[2] In connection with the present motion, Defendants filed a Request for Judicial Notice ("RJN") of seven exhibits. ECF 82. Exhibits 2 and 3 are referenced in the SAC and may be considered as incorporated by reference therein. *Tellabs*, 551 U.S. at 322. Exhibits 4 and 6 are SEC filings that are appropriate for judicial notice because they are matters of public record not subject to reasonable dispute. Fed. R. Evid. 201(b); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008). Exhibits 1 and 5 are transcripts from this Court's proceedings and, as court records, are similarly not subject to reasonable dispute. *See Bovarie v. Giurbino*, 421 F. Supp. 2d 1309, 1313 (S.D. Cal. 2006) (citing *U.S v. Author Svcs.*, 22 Inc., 804 F.2d 1520, 1522 (9th Cir. 1986)). Finally, Exhibit 7 is a red-lined version of the TAC, comparing it to the SAC. Plaintiffs also offered a red-lined version as an exhibit to the TAC, but the two exhibits are not identical and are therefore disputed. As such, Defendants' RJN is GRANTED with respect to Exhibits 1-6 and DENIED with respect to Exhibit 7.

United States District Court
Northern District of California

1    numerator of a formula used to allocate overhead expenses, but not all costs. The Court therefore

2    found that Plaintiffs could not establish a core operations inference, discussed further below, based

3    on the theory that the error was "of such prominence that it would be absurd to suggest that

4    management was without knowledge of the matter," *see Police Ret. Sys*., 759 F.3d at 1062

5    (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785–86 (9th Cir.2008). As a result, the

6    discussion at the hearing focused on other avenues for a core operations inference, including

7    whether Individual Defendants were "down in the weeds" of accounting such that they had access

8    to this specific accounting formula. Plaintiffs asked to amend.

9        **2.  SAC**

10           In the SAC, Plaintiffs added eight CWs and further described the March 3, 2014

11    disclosure. Second Dismissal Order at 7. The SAC relied on the same allegations of corporate

12    reshuffling and Sarbanes-Oxley certifications, which the Court had previously found insufficient,

13    but also added to the holistic picture by alleging that the formula changed just before the Class

14    Period. The Court nevertheless found the allegations deficient. Because the TAC is largely

15    identical to the SAC, the Court reviews the Second Dismissal Order in detail to identify the

16    deficiencies the TAC was meant to address.

17           In the Second Dismissal Order, the Court first explained that, "just like the confidential

18    witnesses in the FAC, five of the eight new CWs . . . did not work at SolarCity during the Class

19    Period and therefore offer 'little reliable insight into what occurred during the class period.'" *Id.* at

20    8 (citing First Dismissal Order at 7; *Zucco Partners*, 552 F.3d at 996-97). The Court then found

21    that all of the CWs, including those who worked at SolarCity during the Class Period, lacked

22    sufficient contact with Defendants to establish "personal knowledge of Defendants' specific

23    conduct regarding accounting practices that would provide sufficient support for a reasonable

24    inference regarding Defendants' state of mind." *Id.* at 9 (citing *City of Dearborn Heights Act 345

25    Police & Fire Ret. Sys. v. Align Tech., Inc*., 65 F. Supp. 3d 840, 859 n.8 (N.D. Cal. 2014); *In re

26    Accuray, Inc. Sec. Litig*., 757 F. Supp. 2d 936, 949 (N.D. Cal. 2010)). Instead, the Court

27    determined that the CWs' statements were "too conclusory, speculative, and/or vague to hold

28    weight" because they "offer[ed] no detail about the decisions the Individual Defendants made or

United States District Court
Northern District of California

8

knew about," save for one decision that did not appear to relate to accounting, and did not even "allege[ ] that Individual Defendants were involved in overhead accounting." *Id.* at 8-9 (discussing the statements of CWs 3, 6, 9, and 10). "Perhaps most glaringly," the Court explained, "not a single confidential witness allege[d] that Defendants knew of the accounting error central to this case." *Id.* at 9. As a result, the Court could not "infer Individual Defendants' knowledge of any specific accounting decision, much less the overhead accounting error." *Id.* at 8.

With regard to CW 5, who the Court found to be the strongest witness and whose statements Plaintiffs have fleshed out in the TAC, the Court concluded that his/her statements were also too conclusory to indicate scienter and noted that CW 5 did not specify to which Rive brother his/her statements applied. *Id.* at 9. The Court also explained that "CW 5's seeming lack of understanding of the concepts discussed on the calls casts some doubt on his/her understanding of Rive's knowledge." *Id.* at 10. At the hearing, however, Plaintiffs represented that CW 5's testimony was meant to establish that Individual Defendants knew that gross margins for the entire sales segment were negative at the same time that they were publishing positive results. Noting that it would find such allegations "convincing," the Court identified two ways in which CW 5's statements, as alleged in the SAC, fell short: CW 5 did not specify whether the conference calls occurred during the Class Period nor did s/he specify the relationship between cash sales and total sales. With regard to the latter point, the Court explained, "CW 5 only worked with large, public sector projects. The Court cannot infer whether negative margins for cash sales necessarily translated into negative gross sales margins, the number at issue here." *Id.* at 10. Because Plaintiffs stated that they could amend these deficiencies, the Court granted leave to amend.

### 3. TAC

Plaintiffs have now filed a TAC with five new allegations, TAC ¶¶ 42-44, 46, and 53, and new detail in a few of the earlier allegations. Defendants again contend that Plaintiffs' allegations fail to establish scienter. Mot. at 6.

Plaintiffs assert that the TAC establishes the scenario the Court stated it would find convincing: that at the same time Defendants knew SolarCity was experiencing negative gross sales margins, they were reporting positive gross sales margins to investors. Opp. at 13. Plaintiffs

contend that Mr. Rive[3] knew that SolarCity's sales segment often showed negative margins during the Class Period because he participated on phone conferences with CW 5, among others, where the sales segment negative margins were discussed. Opp. at 12. Nevertheless, the company reported positive gross margins for sales. In addition, the misreporting "dramatically . . . transformed what was . . . a money-*losing* business in 2010 and 2011, into a money-*making* one in 2012 and 2013 . . . reversing a core reality of [SolarCity's] business" just in time for the company's IPO. *Id.* at 15-16. This error was not present in 2010 and 2011, as the financials for those years did not need to be restated. *Id.* at 15. Defendants purportedly were alerted to the error two years later by a decrease in gross sales margins from 12.08 % in 2Q 2013 to 4.89 % in 3Q 2013 that "appeared inconsistent," while the rise from negative (14%) in 2011 to positive 21% in 2012 somehow had not triggered an investigation. *Id.* at 16.

As with the SAC, Plaintiffs' summary in their briefing offers more than their allegations deliver. Crucially, as Defendants identify and the Court discusses at length below, Plaintiffs have not addressed the Court's concerns from the Second Dismissal Order. In large part, Plaintiffs rely on the same body of allegations that the Court previously found to be insufficient. And, contrary to Plaintiffs' argument, their new allegations fail to support the scienter requirement that Individual Defendants knew that the entire sales segment was underperforming while at the same time reporting profits in the sales segment or to allege sufficient facts that otherwise tip the scale when the allegations are considered as a whole.

As in its prior dismissal orders, the Court follows the Ninth Circuit's approach in *Verifone* by beginning with a holistic assessment of the complaint. "The relevant inquiry is 'whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *VeriFone*, 704 F.3d at 701 (citing *Tellabs*, 551 U.S. at 323). "[A] dual analysis"—that is, first considering whether any individual allegation gives rise to scienter and then assessing the allegations in combination— "remains permissible so long as it does not unduly focus on the weakness of individual allegations

---

[3] The Court notes that, while Plaintiffs consistently refer to both Defendant Lyndon Rive and his brother, Peter Rive, only Lyndon Rive is a defendant in this action. *See* TAC ¶ 21.

United States District Court
Northern District of California

to the exclusion of the whole picture." *Id.* at 703. "To avoid potential pitfalls that may arise from conducting a dual analysis," a court can instead "approach [a] case through a holistic review of the allegations . . . [without] simply ignor[ing] the individual allegations and the inferences drawn from them." *Id.*

No individual allegation, standing alone, meets the scienter pleading requirement. Having previously determined that the sum was not greater than its parts, the Court revisits the allegations in the TAC as a whole to determine whether Plaintiffs have adequately alleged scienter. *Id.* at 698. In the TAC, Plaintiffs plausibly allege the following:

- Prior to 2012, Defendants' financial statements accurately showed that SolarCity's sales segment had negative gross margins and that the company as a whole was not profitable, but the precise numbers reported for 2008, 2009, and 2010 were inaccurate and had to be restated in 2013. Material weaknesses in the company's accounting controls also led to delays in the financial statement close process for 2010 and 2011. The testimony of former employees who worked at SolarCity before the Class Period corroborates this picture of a troubled accounting team. One former employee described the company's accounting and financials before the Class Period as "a mess" while another recalled that two executives who were responsible for accounting and finances had an antagonistic relationship and withheld information about the company's finances. TAC ¶¶ 35, 37, 39.

- At some undisclosed time, apparently prior to the Class Period, when Individual Defendants were asked about the company's profitability at all-hands meetings, the Rive brothers would respond that the company was not profitable on a GAAP basis and needed to be before it went public. At the same time, they reassured employees that if they looked at the finances on a non-GAAP basis, they could show more revenue over a long-term basis that would cover short-term cost. *Id.* ¶¶ 50-51.[4]

- Beginning in Q1 2012 and lasting for the next six quarters, Defendants' financial reporting was again inaccurate. As before, Defendants accurately reported that the company as a whole was not profitable (though, again, the precise numbers were incorrect) but occasionally reported positive sales margins when the sales margins were in reality negative. Specifically, SolarCity reported the following positive sales gross margins: 27.40% for Q1 2012; 8.98% for Q2 2012; 23.02% for Q3 2012; 42.13% for Q4 2012; 20.87% for Q1 2013; 12.08% for Q2 2013; and 4.89% for Q3 2013. TAC ¶¶ 43, 60. In reality, SolarCity experienced positive gross sales margins in only Q1 2012 and Q3 2012, and even the growth in those quarters was lower than reported. In 2014, the company

---

[4] Although this allegation is offered to support an inference that Individual Defendants were foreshadowing an intentional deception, it is more plausibly supportive of the alternate inference that the Rive brothers were giving a pep talk to their worried employees that projected rosier days ahead.

United States District Court
Northern District of California

restated the gross sales margins for these seven quarters to show the accurate numbers, which were: positive 1.12% for Q1 2012; were negative 7.10% in Q2 2012; positive 5.72% in Q3 2012; negative 24.70% in Q4 2012; negative 12.14% in Q1 2013; negative 32.71% in Q2 2013; and negative 9.76% in Q3 2013.

- The misreporting that began in Q1 2012 arose from a change in the formula that SolarCity used to allocate overhead costs between leases and sales. The error was small—inclusion of one variable in the burden ratio's numerator and omission of a different variable in the burden ratio's denominator—but significant, resulting in seven quarters of misreporting, and was not GAAP compliant.

- There is no evidence regarding who caused or crafted the error, or whether it was intentional or a mistake.

- The employees who were responsible for overhead cost accounting remained in corporate headquarters when other accounting staff members were moved to Las Vegas in 2012.

- Individual Defendants were generally known to be involved in decision making at least at a high level and considered by certain employees to be knowledgeable about accounting. However, a number of the employees who characterized Individual Defendants as knowledgeable about accounting did not work at SolarCity during the Class Period and/or based their opinions on speculation and hearsay.

- Unspecified reports about cash sales projects, which are defined as "generally sales of large solar systems," were submitted to the Rive brothers and Mr. Kelly. While the reports showed "the negative and low margins of the projects," the timing of the reports is not specified, nor is it clear whether they summarized cash sales as a whole or only described individual projects. In addition, former employees do not know if Individual Defendants "looked at [the reports] line by line" and recall only that Individual Defendants "were verbally aware of the situation." TAC ¶ 47. The alleged reports are not described by title or with any further detail.

- A former employee knew that, during the Class Period, the cash sales segment was underperforming, showing negative or lower-than-expected margins. This employee participated on conference calls with Individual Defendants and other employees to discuss underperforming cash sales projects, but does not state that Individual Defendants knew that the entire sales segment was experiencing negative gross margins at the same time that the company was publicly reporting positive margins. When asked if Individual Defendants knew about the poor performance of the cash sales segment, this former employee stated that "everybody at the high level knew about it." For two of the quarters at issue, the reports of positive margins were accurate.

- The error began to affect financial statements almost one year before SolarCity's IPO.

- During the period of misreporting, SolarCity raised $94.6 million in its IPO and an additional $396.6 million in net proceeds from a common stock and note offering in October 2013. In addition, SolarCity acquired two businesses, paid for largely with SolarCity stock. And SolarCity Chairman Elon Musk avoided a margin call on $125

12

million in loans that were secured in part by a pledge of his SolarCity capital stock.

- During the Class Period, Mr. Musk purchased more than 2.1 million shares and Lyndon Rive purchased 107,000 shares.

Viewing these allegations as a whole, the Court again finds that Plaintiffs have failed to establish a strong inference of scienter that is as "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Nor is there enough to suggest that Defendants were deliberately reckless to the truth or falsity of their financial statements. *See Verifone*, 704 F. 3d at 708.

Unlike *Verifone*, there is no allegation that Individual Defendants directed staff to "fix the problem" of poor financials through "aggressive" accounting. *Id.* at 699. Instead, the allegations show that, while Individual Defendants knew about individual cash sale projects that were underperforming, employees were directed to shift away from cash sales as a legitimate way to decrease the unprofitable sales segment rather than engage in accounting manipulation. Furthermore, Plaintiffs have consistently failed to allege that Individual Defendants knew about negative performance in the sales segment as a whole while they were publicly reporting profit in the sales segment. Rather, the restated numbers show that during the Class Period, the sales segment was flirting with profitability. Thus, taken as a whole, the allegations paint a picture of leadership that, like all leadership, wants its company to turn a profit, a company whose performance was in fact improving, and an accounting department that made a variety of mistakes throughout SolarCity's history. As a result, the "opposing inference of nonfraudulent intent"—an accounting mistake that Individual Defendants neither knew about nor had reason to know about—is more compelling than the inference of scienter or reckless disregard.

The allegations clearly show that Defendants had the motive and perhaps even the opportunity to cause the accounting error (although no CW provides any support for the possibility that Individual Defendants actually conceived of and implemented the formula change at issue or pressured other employees to do so). But "[i]f scienter could be pleaded merely by alleging that officers and directors possess motive and opportunity to enhance a company's business prospects, 'virtually every company in the United States that experiences a downturn in

United States District Court
Northern District of California

1    stock price could be forced to defend securities fraud actions.'" First Dismissal Order at 6-7

2    (quoting *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002)). There is nothing

3    more here.

4          Instead of giving rise to an inference of scienter, as the Court discussed at length in the

5    Second Dismissal Order, the CW statements suggest only that knowledge of SolarCity's poor

6    performance was in the air and that Individual Defendants were in a position to know about it.

7    This is because the majority of the CWs were not employed during the Class Period and can

8    therefore offer "little reliable insight into what occurred during the class period," First Dismissal

9    Order at 7; *see also Zucco Partners*, 552 F.3d at 996-97 (9th Cir. 2009). As in the prior round of

10   briefing, Plaintiffs again argue that the Court should not discount their statements simply for this

11   reason, Opp. at 21-24, and Defendants correctly reply that the Court also found in the Second

12   Dismissal Order—and finds now—that CWs 1, 2, 3, 6, 8, 9, and 10 "fail to offer statements that

13   are 'themselves . . . indicative of scienter.'" Second Dismissal Order at 8 (quoting *Zucco*, 552 F.3d

14   at 995. *See also* Reply at 4-5. The Court walked through the statements made by each of these

15   CWs and determined that they "offer no detail about the decisions the Individual Defendants made

16   or knew about" nor do they allege "that Individual Defendants were involved in overhead

17   accounting." *Id.* Furthermore, CWs who were not present during the Class Period simply cannot

18   bear out Plaintiffs' apparent new focus on Individual Defendants' contemporaneous knowledge of

19   negative sales margins.

20         The Court similarly found in the Second Dismissal Order—and finds now—that the CWs

21   who were at SolarCity during the Class Period lacked sufficient contact with Individual

22   Defendants to have personal knowledge of their state of mind. Second Dismissal Order at 9. CW

23   7's knowledge based on hearsay "is not enough to satisfy [the] reliability standard" necessary for

24   CWs. *Id.* at 9 (quoting *Zucco*, 552 F. 3d at 997). CW 4 does not even assert knowledge of

25   Individual Defendants' state of mind.

26         CW 11 does not alter the Court's holistic assessment. Although CW 11 worked for

27   SolarCity during the Class Period, Defendants correctly identify that CW 11's "aware[ness] that

28   SolarCity was not earning a profit" during his/her tenure offers nothing new. SolarCity's net loss

1    overall, rather than in the sales segment alone, is not disputed. As Plaintiffs' prior allegations

2    show, SolarCity's SEC filings at the time correctly disclosed that the company was not earning a

3    profit—though the filings understated the full extent of the losses. *See* FAC ¶ 44; SAC ¶¶ 60-61.

4    The fact that CW 11 knew that the company was not profitable as a whole during his/her tenure

5    says nothing about what Individual Defendants knew about the *sales* segment's margins, which is

6    the relevant metric for this case.

7         Therefore, as before, CW 5 remains Plaintiffs' strongest witness. Plaintiffs contend that

8    CW 5 now addresses the Court's concerns by confirming that the sales segment's negative

9    margins occurred in 2012 and 2013, during the Class Period, and that the margins s/he was

10   referring to were gross margins. TAC ¶ 42.[5]

11        As summarized above, Plaintiffs allege the following with regard to CW 5. CW 5 was a

12   Project Development Manager at SolarCity from July 2011 to May 2014 and reported to the VP of

13   Commercial Sales. *Id.* ¶ 41. CW5 was one of the few employees at SolarCity directly involved in

14   cash sales, which Plaintiffs define as "generally sales of large solar systems," and CW5 regularly

15   sold large projects to public entities. *Id.* ¶ 41. Each of CW 5's sales included a mark-up, usually

16   around 10 percent, but many of CW 5's cash sale projects nevertheless came in with a negative

17   margin once the construction was completed. *Id.* ¶ 41. During CW 5's tenure, s/he sold about 12

18   projects, with sales of $12-13 million in each of his/her three years at SolarCity. S/he recalled that

19   of those "at least 60 percent were negative." *Id.* ¶ 41. CW 5 confirmed that during 2012 and 2013,

20   sales "were not making profit margins, or if they were, they were much lower than expected." *Id.* ¶

21   42. CW 5 explained that cash sale projects throughout the company were experiencing negative

22   gross margins, which s/he learned from talking with other salespeople at SolarCity. *Id.* ¶ 42.

23        With regard to Individual Defendants' knowledge, CW 5 stated that "everybody at the high

24   level knew about it" and explained that salespeople were discouraged from cash deals starting

25   _____

26   [5] Defendants first respond by noting that, contrary to Plaintiffs' representation at the hearing on
     the SAC, CW 5 now states that the margins were "negative *or much lower than expected.*" *Id.* at

27   11-12 (citing TAC ¶ 42) (emphasis added). The Court is less troubled by this difference, as a
     lower-than-expected margin may still trigger a CEO or COO to look into the company's

28   financials—as it did in SolarCity's case in 2014, when quarterly margins fells from 12.08% to
     4.89%. *See* TAC ¶ 76.

United States District Court
Northern District of California

1    about a year after s/he started at SolarCity, which would have been in mid-2012. *Id.* ¶ 44. CW 5

2    explained that there was a general understanding among employees that cash sales were not

3    profitable for the company. *Id.* ¶ 47. CW 5 regularly participated in conference calls with others,

4    including the Rive brothers and occasionally Mr. Kelly, to discuss cash sale projects that came in

5    with negative margins. *Id.* ¶ 45. During the calls, the Rive brothers would want to know why

6    projects were coming in with negative margins and would inquire about "really strange kind of

7    accounting rules" to find out when and how SolarCity could recognize revenue from the cash sale

8    projects. *Id.* ¶ 45. CW 5 additionally stated that reports about cash sales projects were submitted to

9    the Rive brothers and Mr. Kelly. *Id.* ¶ 46. S/he did not know "if they looked at [the reports] line by

10   line," but stated that "[t]hey were verbally aware of the situation." *Id.* ¶ 46.

11          Crucially, as Defendants identify, Plaintiffs have not materially amended the one

12   paragraph that describes CW 5's direct interaction with Individual Defendants on the conference

13   calls. *See id.* ¶ 45. CW 5 still does not state when in his/her tenure, which spanned from July 2011

14   to May 2014, the conference calls occurred, nor does CW 5 "explain the relationship between cash

15   sales and total sales." In fact, Plaintiffs offer a specific definition of "cash sales" as "generally

16   sales of large solar systems," *id.* ¶ 41, but seem to expand that definition without explanation

17   throughout the TAC. The Court must take Plaintiffs at their word that "cash sales" are limited as

18   defined in the TAC, especially because Defendants identified this deficiency in their motion and

19   Plaintiffs failed to respond with any explanation for this glaring discrepancy in their pleading. As

20   a result, the Court remains unable to infer that the negative margins CW 5 discussed on conference

21   calls with Individual Defendants occurred during the Class Period or concerned the segment as a

22   whole. *See* Mot. at 11. In other words, contrary to Plaintiffs' assertion, they have cured neither

23   identified defect.

24          Even assuming that the sales segment was comprised entirely of cash sales and that the

25   sales at issue occurred during the Class Period, CW 5 states only that the conference calls were

26   held to "discuss cash sale projects *that came in with negative margins*"—not to discuss cash sales

27   as a whole. TAC ¶ 45 (emphasis added). While CW 5 now states that s/he knew that "cash sale

28   projects in general at the company were showing negative or far below expected cash margins,"

s/he "learned this from talking with other sales people"—not through the conference calls. *Id.* ¶ 42. Thus, as Defendants argue, at best, CW5's allegations show that Individual Defendants knew that some sales were, at times, unprofitable. *See* Mot. at 14. This does not suffice to establish that Defendants knew of the entire segment's underperformance and therefore should have known of the falsity of their public statements.

In fact, as Defendants point out, the rest of CW 5's testimony shows that his/her awareness of Individual Defendants' contemporaneous knowledge is, like that of the other CWs, merely speculative. When asked if Mr. Rive and Mr. Kelly were aware of the cash sale segment's poor performance, CW 5 responded that "everybody at the high level knew about it," and not, for example, that "everybody on the conference calls knew about it." TAC ¶ 44. Such vague claims of common knowledge cannot establish scienter. *See, e.g., In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1163 (S.D. Cal. 2008). And, as before, CW 5's description of discussions of "really strange kind of accounting rules" calls into question his/her "reliability and personal knowledge" regarding his/her understanding of what Individual Defendants knew. *See Zucco,* 552 F. 3d at 995.

CW 5's new reference to "reports about cash sales projects" fares no better in adding to the holistic assessment or showing that Individual Defendants had contemporaneous knowledge of the negative sales margins. As Defendants correctly point out, CW 5 does not even assert that Individual Defendants read the reports, instead stating only that "[t]hey received an overview . . . [and] were verbally aware of the situation." *See* Mot. at 13 (citing TAC ¶ 46). Moreover, the reports are not described in any detail.

Such generalized allegations of access to reports showing negative margins are insufficient to establish Defendants' contemporaneous knowledge of negative sales margins. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (affirming dismissal of a securities fraud complaint that similarly relied in part on allegations that individual defendants knew or should have known of decreased growth because it was "evident from the software-generated reports to which the executives had access"); *see also Zucco*, 552 F.3d at 1000 (finding "allegations that senior management . . . closely reviewed the accounting numbers

17

1    generated . . . each quarter . . . and that top executives had several meetings in which they

2    discussed quarterly inventory numbers" insufficient to establish scienter). This conclusion is

3    bolstered by the fact that SolarCity was "experiencing a trend of increasing profitability,

4    countering Plaintiff's argument of the obviousness of the error." *See* Second Dismissal Order at

5    11.

6           Though Plaintiffs argue otherwise, the new allegations are equally insufficient to establish

7    the core operations inference—another argument that Plaintiffs have made and the Court has

8    rejected in each round of dismissal. As described in the Court's prior dismissal orders, "[t]he core

9    operations theory of scienter relies on the principle that 'corporate officers have knowledge of the

10   critical core operation of their companies.'" *Police Ret. Sys.*, 759 F.3d at 1062 (quoting *Reese*, 747

11   F. 3d at 569). Core operations may support a strong inference of scienter "along with other

12   allegations that, when read together, raise an inference of scienter that is cogent and compelling,"

13   or "independently . . . where [the allegations for the core operations inference] are particular and

14   suggest that defendants had actual access to the disputed information," or "[f]inally . . . in a more

15   bare form, without accompanying particularized allegations, in rare circumstances where the

16   nature of the relevant fact is of such prominence that it would be absurd to suggest that

17   management was without knowledge of the matter." *Id.* (quoting *S. Ferry LP, No. 2 v. Killinger*,

18   542 F.3d 776, 785–86 (9th Cir.2008)). As noted above, it was Plaintiffs' attempt to establish this

19   inference that led to the Court's initial focus on allegations of Individual Defendants being "down

20   in the weeds" as one avenue for this lawsuit's survival.

21          "Proof under this theory is not easy. A plaintiff must produce either specific admissions by

22   one or more corporate executives of detailed involvement in the minutia of a company's

23   operations, such as data monitoring . . . or witness accounts demonstrating that executives had

24   actual involvement in creating false reports." *Id.* (internal citation omitted). Courts in the Ninth

25   Circuit—including the *Mulligan* court from which the Court distinguished this case, *see* Second

26   Dismissal Order at 12-13, and the one on which Plaintiffs again rely—have also found a core

27   operations inference to be appropriate where "the nature of the relevant fact is of such prominence

28   that it would be absurd to suggest that management was without knowledge of the matter.'"

United States District Court
Northern District of California

18

*Mulligan v. Impax Labs, Inc.,* No. C-13-1037-EMC, 2014 WL 1569246, at *20 (N.D. Cal. Apr. 18, 2014) (quoting *Reese*, 747 F.3d at 575).

Plaintiffs contend that, where the FAC and SAC failed, the TAC now succeeds because Defendants knew of negative sales margins when SolarCity was publishing positive numbers and because system sales represented 63% of SolarCity's revenues for the year ended December 2012 and eclipsed revenues derived from other sources throughout the Class Period. Opp. at 17. As discussed at length above, the Court disagrees with Plaintiffs and finds that the TAC fails to allege Individual Defendants' contemporaneous knowledge. Thus, Plaintiffs still have "no witness accounts demonstrating that executives had actual involvement in creating false reports." And, as before, the Court finds that "the relevant fact—an error from a ratio used to allocate one subset of fixed costs—was not sufficiently prominent to make Defendants' ignorance of it 'absurd.' Rather, the error was, as the Court noted at the hearing on the first motion to dismiss, 'down in the weeds.'" Second Dismissal Order at 13. Nor do Plaintiffs offer specific admissions by executives of their involvement in such decisions. As a result, the Court continues to find, as it did twice before, that "[t]he falsity of the original representations would not be immediately obvious to corporate management." *Id.* at 13 (quoting *Zucco*, 553 F.3d at 1000-01).[6]

Thus, as before, the allegations do not give rise to a core operations inference and, viewed holistically as required under *Tellabs*, Plaintiffs' allegations do not give rise to a strong inference of scienter that is as "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

Furthermore, notwithstanding the Court's clear guidance on two prior occasions and Plaintiffs' representation at the hearing on the previous motion to dismiss that he could cure the identified defects, Plaintiffs still offer no CW who alleges that Defendants knew that sales margins were negative when SolarCity published positive numbers or that Defendants knew or recklessly failed to know about the error in the accounting formula. Accordingly, the Court GRANTS the

---

[6] Plaintiffs devote substantial briefing to the issue of materiality in his discussion of the core operations inference. However, as Defendants note in their Reply, materiality is not at issue in this motion. *See* Reply at 12, n.6.

United States District Court
Northern District of California

motion to dismiss with prejudice.

**B.    Claim 2 – Section 20(a)**

Section 20(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controller person." A plaintiff suing under § 20(a) must demonstrate: (1) "a primary violation of federal securities laws" and (2) "that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). The SEC has defined "control" as "the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 230.405.

As before, Plaintiffs have failed to state a § 20(a) claim because he has failed to state a claim of a primary violation of the securities laws. *See* First Dismissal Order at 8. For the reasons stated above, the Court GRANTS the motion to dismiss this claim with prejudice.

**IT IS SO ORDERED.**

Dated:  August 9, 2016

BETH LABSON FREEMAN
United States District Judge