**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JAMES WEBB, Lead Plaintiff,<br>*Plaintiff-Appellant*,<br>v.<br><br>SOLARCITY CORPORATION; LYNDON R. RIVE; ROBERT D. KELLY,<br>*Defendants-Appellees.* | No. 16-16440<br><br>D.C. No. 5:14-cv-01435-BLF<br><br>OPINION |

Appeal from the United States District Court
for the Northern District of California
Beth Labson Freeman, District Judge, Presiding

Argued and Submitted December 4, 2017
San Francisco, California

Filed March 8, 2018

Before: MILAN D. SMITH, JR. and SANDRA S. IKUTA, Circuit Judges, and JOHN D. BATES,* District Judge.

Opinion by Judge Milan D. Smith, Jr.

---

* The Honorable John D. Bates, Senior United States District Judge for the District of Columbia, sitting by designation.

**SUMMARY**[**]

**Securities Fraud**

The panel affirmed the district court's dismissal of a securities fraud action brought on behalf of a class of plaintiffs who bought SolarCity shares.

The complaint alleged that the defendants violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 when they changed the company's accounting formula prior to the initial public offering in order to misrepresent SolarCity's profitability. The panel held that plaintiff's third amended complaint failed to adequately plead facts giving rise to a strong inference of scienter, as required by the Private Securities Litigation Reform Act. Rather, based on the facts alleged, an inference of scienter was not at least as compelling as the inference of an honest mistake made by a mismanaged organization.

**COUNSEL**

Jeremy A. Lieberman (argued), Emma Gilmore, and Jennifer B. Sobers, Pomerantz LLP, New York, New York, Plaintiff-Appellant.

Ignacio E. Salceda (argued), Benjamin M. Crosson, and Cheryl W. Foung, Wilson Sonsini Goodrich & Rosati, Palo Alto, California, for Defendants-Appellees.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## OPINION

M. SMITH, Circuit Judge:

Plaintiff-Appellant James Webb brought this class action lawsuit against Defendants-Appellees SolarCity Corporation (SolarCity or the company), Lyndon R. Rive, and Robert D. Kelly on behalf of the class of plaintiffs who bought SolarCity shares between December 12, 2012—the date of the company's initial public offering (IPO)—and March 18, 2014 (the Class Period). Webb claims that Defendants-Appellees violated § 10(b) of the Securities Exchange Act of 1934 (the Act), 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5 (Rule 10b-5), and that Rive and Kelly also violated § 20(a) of the Act, 15 U.S.C. § 78t(a), when Defendants-Appellees changed the company's accounting formula prior to the IPO in order to misrepresent SolarCity's profitability. After allowing Webb to amend his complaint three times, the district court held that Webb's Third Amended Complaint (TAC) failed to adequately plead scienter, and dismissed it with prejudice. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. SolarCity's Business Model and Accounting Protocols

During the relevant time period, SolarCity was a Delaware corporation that sells renewable energy through the leasing and sale of solar energy systems. Defendant-Appellee Rive, who cofounded SolarCity in 2006 with his brother, Peter Rive, and cousin, Elon Musk, was the company's Chief Executive Officer. Defendant-Appellee Kelly was the company's Chief Financial Officer.

Since 2006, SolarCity has grown significantly. The company went public in 2012, raising over $92 million, of which the company received $85,305,010 after expenses. SolarCity now operates in fourteen states and serves a mix of commercial entities, government entities, and residential users. The company claims to have "provided or contracted to provide solar systems or services to more than 50,000 customers" since its founding.

SolarCity generates its revenues by both selling and leasing its solar energy systems to these customers. SolarCity "offers its customers the option to either purchase and own solar energy systems, or to purchase the energy that its solar energy systems produce through various financed arrangements, i.e. long-term contracts structured as leases and power purchase agreements." If a customer chooses the second route, and executes a lease or power purchase agreement (PPA), SolarCity then "installs its solar energy system at the customer's premises and charges the customer a monthly fee for the power produced." With a lease, "the monthly payment is predetermined and includes a production guarantee." With a PPA, SolarCity charges the customer "a fee per kilowatt hour (kWh), based on the amount of electricity actually produced by the solar energy system." Thus, "[t]he amount of operating lease revenues depends partly on the amount of energy generated by solar energy systems under power purchase agreements, which in turn depends in part on the amount of sunlight." The standard lease or PPA agreement term is 20 years.

The revenues generated by SolarCity's sales and leases are accounted for differently in SolarCity's financial records. Under generally accepted accounting principles (GAAP), "[r]evenue is comprised of the gross income generated by selling goods (sales) or by performing services (professional

fees, commission income)." Accounting for sales revenues is simple: They "are generally recognized when the Company installs the solar energy system and it passes inspection by the utility or applicable authority." All costs associated with a sale are realized at the time of the sale, and subtracted from sales revenue to calculate gross profit. These costs include both the direct costs of each individual sale or lease, such as the cost of the solar system and its installation, and the indirect overhead costs that apply to the whole company, such as factory or facilities costs.

Accounting for lease and PPA revenues—which are treated as operating leases for GAAP purposes—is more complex. Under GAAP, SolarCity must account for these revenues ratably, on a straight-line basis, over the term of each lease. This means that notwithstanding the "typically significant" total revenues collected over a lease's 20-year term, "SolarCity can only recognize a fraction of those revenues per year." Installation and overhead costs are amortized over the lease term, while costs from the underlying solar system itself are depreciated over its longer, thirty-year life.

SolarCity uses a specific "burden ratio" (BR) to allocate its indirect overhead costs between its sales and lease divisions. The formula for its calculation is:

$$\text{BR} = \frac{\text{Allocable Indirect Overhead Costs}}{\begin{array}{c}\text{Prior Period Direct Costs}\\ + \\ \text{Current Period Direct Costs}\end{array}}$$

SolarCity applies this ratio to its total direct expenses to determine how much overhead to allocate to each division. The burden ratio percentage is first allocated to the Leasing

Division's total direct expenses, and then the remainder is allocated to the sales division. For example, if prior period allocable overhead costs were $10 million, and direct costs were $20 million, the correct burden ratio pursuant to the formula would be 50%. The Leasing Division would be allocated this percentage of the $20 million in total direct costs, resulting in an allocation of $10 million of overhead costs to leases. The $10 million remainder would be allocated to sales.

## II. SolarCity's Accounting Error and its Aftermath

Beginning in the first quarter of 2012 and continuing for seven consecutive quarters, SolarCity failed to adhere to its GAAP-compliant protocols. During this period, the company retained prior period overhead costs in the numerator of its burden ratio formula, but omitted prior period direct costs from the denominator. As a result of that error, if $5 million of the $20 million direct costs in our example above were related to the prior period, the company would have calculated its burden ratio as 66.6% ($10 million / $15 million). Applying this ratio to the total direct costs of $20 million would result in an allocation of $13.3 million of overhead costs to leases, with only $6.7 million of overhead costs allocated to sales. Thus, SolarCity was able to push the costs associated with its sales from the sales' revenue onto leases, "where they would be amortized over the 20-year lease term."

This error inflated the gross margins of the company's sales, which led the company to report profits inaccurately for both sales and leases. For example, while SolarCity reported gross sales margins of -19% in 2010 and -14% in 2011, beginning in Q1 2012, the company's sales margin jumped, and it reported a gross sales margin of +21% in 2012. SolarCity's accounting error also affected the

company's reported net income and earnings per share, which led the company to materially understate net loss and report higher earnings per share.

SolarCity's improved financial situation allowed the company to expand in 2013. After its December 2012 IPO, SolarCity made two secondary offerings on October 15, 2013, which generated net proceeds of $174.2 million from the issuance of 3,910,000 shares of stock and $222.4 million from the issuance of convertible senior notes. The company also made two major acquisitions. First, on September 6, 2013, SolarCity purchased assets from Paramount Energy Solutions, LLC, a direct-to-consumer marketer and one of SolarCity's channel partners. This purchase enabled SolarCity to develop and offer solar energy systems directly to a broader customer base, to compete better with other energy producers, and to lower its customer acquisition costs. SolarCity paid $3.7 million in cash and 3,674,565 shares—worth $108.8 million, or 95% of the total sale price—for Paramount's assets. Second, on December 11, 2013, SolarCity acquired Zep Solar, Inc., a manufacturer and licenser of solar system mounting apparatuses, and one of SolarCity's key suppliers. This acquisition enabled SolarCity to control the design and manufacture of the Zep Solar products, which are critical components in the installation of SolarCity's solar energy systems. SolarCity paid $157.823 million for Zep Solar with $2.4 million in cash and roughly three million shares of stock—equal to 98% of the total sale price.

It was not until 2014 that SolarCity realized that it had made a serious accounting error. On March 3, 2014, the company "announced that it [had] discovered tens of millions in overhead expenses that it had incorrectly classified." The company explained that the

misclassification resulted from "an error in the formula for allocating overhead expenses between operating lease assets and the cost of solar energy systems sales originating in Q1 2012." Specifically, the company had omitted prior period direct costs from the denominator of the burden ratio. This error was identified by "senior management," who noticed that gross sales margins appeared inconsistent during the course of their review of preliminary year-end financial statements and internal controls. SolarCity announced that it would "reallocate overhead expenses from leased systems to systems sales," which it expected would increase "the cost of solar energy systems sales [by] approximately $16–$20 million on the statement of operations for the nine month period [ending on] September 30, 2013" and by "approximately $20–$23 million" for the full year of 2012. In response, SolarCity's securities declined by $1.70 per share—just over 2%—to close on the day of the announcement at $83.26 per share.

A second announcement was made on March 18, 2014. The company issued its restated financials for the year of 2012 and for each quarter of that year and 2013. "These disclosures revealed for the first time that the Company's solar energy systems sales unit had operated at a loss for six quarters (each quarter of 2013 as well as Q2 and Q4 2012) and barely broke even in two quarters (Q1 2012 and Q3 2012)." SolarCity securities declined again, dropping $4.40 per share—nearly 6%—to close at $72.70 per share on March 19, 2014, on unusually high trading volume. Overall, SolarCity's share price fell by $23.58, or 27.8%, between Friday, February 28 (the final close before the announcement) and Friday, March 28.

### III. Prior Proceedings

The present suit was filed on March 28, 2014. Webb was appointed lead plaintiff on August 11, 2014. Twice Webb amended his complaint and twice his pleadings were dismissed. The appeal now before us arises from the district court's August 9, 2016 dismissal—its third dismissal overall—of Webb's TAC for failure to adequately plead scienter.

## STANDARD OF REVIEW

We review de novo the district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 700–01 (9th Cir. 2012). We may affirm the judgment of the district court on any ground supported by the record. *Glick v. Edwards*, 803 F.3d 505, 508 (9th Cir. 2015).

## ANALYSIS

Webb believes that the TAC adequately alleges scienter. He contends that in miscalculating its profits during the Class Period, SolarCity sought to "have its cake and eat it too." That is, Defendants-Appellees intentionally changed SolarCity's burden ratio in order to make the sales division and company as a whole appear more profitable than it actually was, and thereby maximize their gains from the company's IPO. We disagree for the reasons that follow.

## I. Webb's § 10(b) and Rule 10b-5 Claims

### A. The Applicable Pleading Requirements

Under § 10(b) of the Securities Exchange Act, it is

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j (footnote omitted). Rule 10b-5, promulgated by the SEC under § 10(b), further provides that a person may not

> employ any device, scheme, or artifice to defraud[;] . . . make any untrue statement of a material fact or [] omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[;] or . . . engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[;] in

> connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To state a claim under § 10(b) and Rule 10b-5, Webb must show "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (quoting *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

Our focus in this appeal is on scienter, the second of these elements. The standard for pleading scienter is established by the Private Securities Litigation Reform Act (PSLRA), which requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). A "strong inference" that a defendant acted with scienter is not an irrefutable inference, though it "must be more than merely plausible or reasonable . . . ." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). A "strong inference" cannot be identified "in a vacuum," as "[t]he inquiry is inherently comparative[.]" *Id.* at 323. Rather, a "strong inference" is an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. To determine whether a "strong" inference has been pleaded, "the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326; *see also Matrixx Initiatives*, 563 U.S. at 48–50.

We have held that plaintiffs can meet this standard by alleging facts demonstrating an "intent to deceive, manipulate, or defraud" or "deliberate recklessness." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017) (quoting *Schueneman v. Arena Pharm.*, 840 F.3d 698, 705 (9th Cir. 2016)). "Deliberate recklessness is an *extreme* departure from the standards of ordinary care[,] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017) (alterations omitted) (quoting *Schueneman*, 840 F.3d at 705).

Allegations of securities fraud must also satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which requires a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see In re VeriFone*, 704 F.3d at 701.

**B. Webb's Scienter Allegations**

Webb alleges that Defendants-Appellees knew or were reckless not to know that SolarCity's accounting system was at a high risk of manipulation. He alleges that Rive and Kelly were involved in the company's accounting and financial decision making, understood SolarCity's accounting practices, and knew that the company's sales division had been performing poorly. In light of these facts, Webb claims that Defendants-Appellees' explanation of the accounting error—that SolarCity left prior period overhead costs in the numerator of the burden ratio and accidentally omitted prior period direct costs from the denominator after calculating the burden ratio properly in both 2010 and 2011—"strains credulity."

Though we ultimately review Webb's allegations holistically, "it would be folly to simply skirt the major allegations." *In re VeriFone*, 704 F.3d at 704. Thus, we will summarize the TAC's primary scienter allegations individually in the sections below before addressing their legal sufficiency. *Id.*

**1. Confidential Witness Statements**

Eleven confidential witnesses (CWs) who worked at SolarCity—mostly prior to the Class Period—described flaws in the company's accounting and financial systems, and their knowledge of the company's negative gross sales margins.[1]

CW1, an Accounts Payable Specialist at SolarCity from January 2010 to July 2012, stated that the company's accounting and financials were "a mess." Specifically, CW1 indicated that SolarCity's monthly and annual "close process," which "required the Company to accrue all of its debt, its credit, revenue," was "never on time."

[1] The district court discounted many of the CWs' statements, in part because "the majority of the CWs were not employed during the Class Period and [could] therefore offer 'little reliable insight into what occurred during the class period.'" The court still considered the statements though, and was correct to do so. Information from before the class period is relevant because it can "confirm what a defendant should have known during the class period." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001); *see also In re Quality Sys.*, 865 F.3d at 1145 (crediting statements from witness who "was not at [defendant company] during the Class Period," but who "had personal knowledge of executive-level management's real-time access to" relevant reports); *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005). Accordingly, we will consider all of the CWs' statements in our holistic analysis.

CW2 was a Senior Accountant at SolarCity's San Mateo, California, headquarters from January 2012 to the end of May 2012. CW2 reported that as of his/her hiring, SolarCity "hadn't closed the books in a year." He also stated that Ajmer Dale, the corporate controller, had talked with Defendant-Appellee Rive and his brother regarding accounting issues, including the recognition of revenue and allocation of overhead costs.

CW3 was a Senior Manager for fund relations in SolarCity's Structured Finance Department from September 2011 to September 2012. CW3 described the cost accounting team as "lean," composed of six or seven people based at SolarCity's corporate headquarters, who all reported to Dale. CW3 was aware that Defendant-Appellee Kelly "was involved in financial and accounting policy decisions at SolarCity" because CW3 "was responsible for providing financial information to third party vendors."

CW4 was an Accounts Payable Specialist at SolarCity from January 2011 to August 2014. CW4 "was responsible for paying and keeping books of the invoices for subcontractors on solar installation projects." CW4 observed "that a separate team of [about seven] Accounts Payable Specialists worked on overhead cost accounting" exclusively, and submitted overhead reports to the Accounting Manager, who reported to Dale.

CW5, who the parties and court below identified as the strongest witness, was "directly involved in solar system sales during the Class Period." Specifically, CW5 was a Project Development Manager at SolarCity from July 2011 to May 2014. CW5 stated that during his/her tenure at SolarCity, the company's "sales segment often showed negative margins." CW5 believed Defendant-Appellee Rive

was "aware of the negative margins of the cash sale projects and the costs for the projects."

CW5's job involved the regular sale of large solar systems to public entities. CW5 was required to charge a mark-up margin of at least 10% on all sales, though the mark-up on smaller sales was sometimes greater. Even so, at least 60% of CW5's twelve cash sales projects "came in with a negative margin at the time construction of the system was completed." CW5 knew "from talking with other sales people at SolarCity" that "cash sale projects in general at the Company were showing negative or far below expected cash margins—not just [CW5's] own sales." SolarCity employees shared a general understanding that the company's cash sales were not profitable.

This understanding was shared by "everybody at the high level" as well. The sales projects' negative margins were discussed in "a number of conference calls" in which CW5, the Rive brothers, and sometimes Kelly participated. In these calls the Rive brothers questioned the negative margins, asked about timelines for revenue recognition, and evinced an awareness of both specific cost information and purchasing information. CW5 was aware that Rive and Kelly received reports about cash sales projects that "showed the negative and low margins of the projects," as well as a verbal overview of the situation. CW5 believed the Rive brothers were smart, as well as "knowledgeable and adept with complex accounting rules and issues, such as revenue recognition requirements." It was apparent to CW5 that the Rive brothers "had an understanding of what overhead is" and "kn[ew] what they [were] doing."

CW5 reports that as of mid-2012, SolarCity's salespeople were discouraged from doing cash deals and directed to transition away from cash sales and toward

leases. CW5 explained this move was made because leases "allowed SolarCity to spread costs . . . out over several years," which improved profits. While a PPA would allow the company "to make [a] (negative margin) up with cash flow analysis," a cash deal would not.

CW6 was Director of Fund Accounting at SolarCity from June 2012 to September 2012. This position "involved accounting for the funds set up with third party investors to pay for the cost of installation of solar systems." CW6 explained that "on the fund side" where he/she was involved, Defendants-Appellees Kelly and Rive were involved "[a]t a high level" in discussions and decisions about accounting policies. CW6 also reported that Rive "appeared to fully understand and grasp the accounting issues discussed."

CW7 worked as a Project Development Associate on SolarCity's Walmart account from June 2011 to May 2013, and worked as a B2B Marketing Manager at the company from May 2013 to April 2014. "CW7 learned from his/her conversations with SolarCity's Director of Corporate Finance, Carlo Woods[,] that Woods met weekly with CFO Robert Kelly, CEO Lyndon Rive and COO Peter Rive to discuss the financial health of the Company, and that Kelly and the Rive brothers were actively involved in SolarCity's financials." CW7 knew that sales projects had a lower margin than lease projects.

CW8 was a solar consultant for SolarCity from November 2007 to March 2010, and a Commercial Project Development Manager from March 2010 to September 2012. CW8 recalled that the Rive brothers held internal meetings once or twice each year in 2010, 2011, and 2012, where they admitted that SolarCity "was not profitable on a GAAP basis," though it was if its finances were viewed in a

different light. CW8 indicated that Kelly's desk was located in the accounting department.

CW9 was an Administrative Assistant and Sales Operations Administrator at SolarCity from October 2008 to January 2012. In this position, CW9 "was regularly involved in presenting the Rive brothers with proposals from CW9's department that needed the Rive brothers' approval." CW9 believed that the Rive brothers were "intimately involved in the Company in all aspects." Though others participated in the decision-making process, CW9 said that the Rive brothers made all final decisions. Thus, CW9 believed the Rive brothers "totally would have been aware of" any decision to change the company's accounting method for overhead costs. CW9 recalled the Rive brothers discussing accounting methods at company-wide meetings, admitting that the company was not profitable according to the accounting method required of a public company. And "[d]uring the last few months of CW9's employment, CW9 said the Company was making shifts in how it was doing things in preparation for going public."

CW10 worked as Director of Sales at SolarCity from May 2008 to January 2011. CW10 reported that the Rive brothers were very hands-on, and Defendant-Appellee Rive in particular was hands-on with regard to sales, participating often in CW10's regional sales calls. CW10 also remembered the discussion of profitability at the company's meetings, and the admission that the company was not profitable "in terms of GAAP accounting standards."

CW11 was the Office Manager for SolarCity's corporate headquarters in San Mateo, California, from June 2010 to September 2013. "From discussions CW11 had with his/her colleagues and from comments made by CEO Lyndon Rive, COO Pete Rive[,] and CFO Bob Kelly in meetings, CW11

was aware that SolarCity was not earning a profit during his/her employment," and wondered how the company stayed in business.

### 2. Motive

Webb alleges that a sales-division-profitability turnaround was critical to the company's successful IPO. The sales division's performance was an obvious vulnerability; though it generated the majority of SolarCity's annual revenues, the sales division had run losses in 2010 and 2011. Moreover, the TAC alleges that the company needed a successful IPO to generate badly needed cash, to allow SolarCity to attract and retain employees, and to fund capital expenditures and strategic acquisitions that would increase the company's efficiency and lower its costs. Maintaining the company's inflated stock price after the IPO was critical to these goals.

Webb also alleges motives of a more personal nature: Because Rive and Kelly owned 4,160,711 and 96,840 SolarCity shares, respectively, they were incentivized to maintain the company's stock price. Additionally, Rive and Kelly were motivated to help Elon Musk—Rive's cousin, SolarCity's founder and largest shareholder, and the Chairman of the company's Board of Directors—who needed stock prices to stay high to avoid a forced sale of his shares. Six million of Musk's 18,849,991 shares of SolarCity stock were collateral for $275 million in loans from Goldman Sachs, and Goldman's loans allowed it to issue a margin call requesting that Musk provide additional collateral or sell shares if SolarCity's stock price declined. Webb points out that the SEC frowns upon such borrowing for precisely the reason it was a problem here: namely, because it "ha[s] the potential to influence management's performance and decisions."

### 3. Leadership Reshuffling

Webb alleges that the shake-up of SolarCity's leadership adds another piece to the scienter puzzle. On February 24, 2014, a week before releasing its statement regarding the allocation error, SolarCity announced that COO Peter Rive had been replaced by Tanguy Serra. Then, on July 30, 2014, Kelly announced he would resign as CFO. He left within weeks, on August 18, 2014.

### 4. Sarbanes-Oxley Certifications

Webb alleges cursorily that because Rive and Kelly discussed and provided Sarbanes-Oxley certifications and executed SolarCity's Form 10-K, they "are deemed knowledgeable" about the "cost of revenues associated with the sales and lease systems, including the gross margins for these units . . . ."

### 5. Core Operations Inference

Finally, Webb also invokes the "core operations" doctrine. This doctrine allows us to infer "that facts critical to a business's 'core operations' or an important transaction are known to a company's key officers." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 783 (9th Cir. 2008). "[A]llegations regarding management's role in a company may . . . help to satisfy the PSLRA scienter requirement in three circumstances": (1) "in any form," as part of a holistic analysis; (2) on their own, "where they are particular and suggest that defendants had actual access to the disputed information"; and (3) on their own "in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that

management was without knowledge of the matter." *Id.* at 785–86.

Here, Webb alleges that it "strains credulity that SolarCity could include the prior period overhead in the numerator but exclude the related prior period direct costs from the denominator, yet have no idea whatsoever that this calculation was improper." He wonders how SolarCity could "properly place[] prior period overhead costs in the numerator and prior period direct costs in the denominator for the years of 2011 and 2010, [and] yet conveniently forget to apply such costs in the denominator for 2012 and the first three quarters of 2013." After all, to avoid the current situation, "[a]ll SolarCity needed to do was to apply the same formula it had applied in prior years." Instead, SolarCity changed its burden ratio calculation in a way that permitted it to realize a sudden, dramatic increase of over 100% in gross margins for solar energy sales in fiscal year 2012. Thus, Webb contends that the core operations doctrine should apply because this turnaround was so dramatic that it would be absurd to think that Defendants-Appellees did not know about the burden-ratio change during the Class Period.

### C. Webb's Allegations Are Insufficient

Webb takes issue with the district court's dismissal for several reasons; namely, the district court (1) did not conduct a properly holistic review of his allegations; (2) rejected relevant confidential witness testimony; (3) failed to account for the TAC's allegations regarding motive, GAAP non-compliance, the company's leadership reshuffling, and Rive and Kelly's Sarbanes-Oxley certifications; and (4) improperly analyzed Webb's core operations theory. We reject these arguments. Our own holistic review of the TAC's allegations confirms that Webb has not pleaded facts giving rise to a strong inference of scienter.

### 1. No Individual Allegation Was Sufficient on its Own

Webb argues that the district court erred because it unduly focused on his allegations one-by-one. We disagree. The district court was correct that each of Webb's allegations, considered alone, would be insufficient to establish scienter. *See, e.g.*, *City of Dearborn Heights*, 856 F.3d at 621–23 (failure to follow GAAP, employee resignations, and magnitude of error); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016) (accounting inaccuracies and failure to follow GAAP); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009) (corporate reshuffling); *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 747–48 (9th Cir. 2008) (motive allegations and Sarbanes-Oxley certifications). The court did not err in considering each allegation on its own before holding that they also failed to support a strong inference of scienter in combination; although we have recognized its "potential pitfalls," *In re VeriFone*, 704 F.3d at 703, such an analytical process is permitted under our precedents. *See City of Dearborn Heights*, 856 F.3d at 620; *In re VeriFone*, 704 F.3d at 703–04.

### 2. The Allegations Were Not Sufficient in Combination

Considered holistically, we find that Webb's scienter allegations—consisting of the CW statements, Defendants-Appellees' motive, the magnitude and duration of the GAAP violations, the Sarbanes-Oxley certifications, and the core operations inference—likewise are insufficient. The bar set by *Tellabs* is not easy to satisfy: It requires that Webb plead an inference of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." 551 U.S. at 324. Here, Webb falls short

of meeting that standard. Admittedly, Webb has alleged facts that give us pause insofar as they indicate that all was not right at the helm of SolarCity during the Class Period. However, with all things relevant considered, we hold that Webb's allegations do not support a strong inference of scienter.

At best, Webb's allegations paint a picture of a mismanaged organization in need of closer financial oversight that made a minute error at a critical stage in its development. Confidential witness statements demonstrate that Defendants-Appellees Rive and Kelly knew that SolarCity was generally unprofitable, that they were hands-on managers who generally understood the company's accounting obligations, and that they had reason to suspect that the company's internal accounting controls were imperfect. We also credit the allegation that there is a strong incentive to present an appearance of profitability and to keep stock prices high in the months immediately preceding and following a company's IPO.

However, these facts do not give rise to an inference of scienter that is at least as compelling as the inference of an honest mistake. *See Tellabs*, 551 U.S. at 314. For example, Webb's allegations regarding Defendants-Appellees' behavior are not consistent with scienter. Neither Rive nor Kelly are alleged to have sold any SolarCity stock during the Class Period, and we have recognized that a lack of stock sales can detract from a scienter finding. *See In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 884–85 (9th Cir. 2012). To the contrary, Defendants-Appellees' actions with regard to their stock support an inference of innocence: Rive, for example, granted a third-party entity an option to purchase over 330,000 of his shares prior to the Class Period, evidencing an expectation that stock prices would not rise.

Moreover, rather than selling shares, both Rive and Musk purchased additional stock during the Class Period.

We note also that, by all accounts, Rive and Kelly were accurate when speaking about the company's profitability. For example, confidential witnesses confirm that Rive and Kelly were forthcoming with their employees, admitting at company meetings that the sales division and the company as a whole were not profitable. In particular, Defendants-Appellees acknowledged that the company was not profitable under GAAP, which is compelling evidence of their expectation that GAAP-compliant protocols would be applied after the company transitioned from private to public. Moreover, and even more importantly, Defendants-Appellees were forthcoming with the public. SolarCity showed in its Prospectus for the IPO that it was not profitable. Thus, the 2014 restatement merely increased the company's stated losses.

Next, we find Webb's motive allegations unhelpful. First, Webb's allegations regarding Defendants-Appellees' motive to boost the company's profitability and stock prices in the months surrounding the company's IPO are not "specific" or "particularized," as our precedents require. To the contrary, they speak to precisely the "routine corporate objectives such as the desire to obtain good financing and expand" that we have rejected in the past. *In re Rigel Pharm.*, 697 F.3d at 884; *see also Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002). Surely every company that goes public wants to maximize its apparent profitability prior to its IPO and to maintain a high share price afterward in order to finance acquisitions and expand. Second, we are skeptical that Defendants-Appellees were motivated to help Musk avoid a hypothetical margin call, concerning which we see no evidence, or that Musk would

not have been able to meet such a call if it were made. Webb has not pleaded any facts that support an inference that Defendants-Appellees were at all interested in or concerned for Musk's relationship with Goldman Sachs.

Webb's corporate reshuffling allegations are similarly unpersuasive. Correctly, Webb points out that COO Peter Rive was replaced just before the restatement and that Kelly left five months thereafter. However, Webb pleads no facts to rebut the "reasonable assumption" that the reshuffling "occurred as a result of [the] restatement's issuance itself." *Zucco Partners*, 552 F.3d at 1002. Without such allegations, that reasonable assumption guides our analysis.

Finally, we reject Webb's invocation of the core operations doctrine. Webb has alleged that Defendants-Appellees had a hands-on style and general accounting acumen, but not that they were involved in accounting decisions as minute as the calculation of the burden ratio and inclusion of prior period direct costs in the ratio's denominator. Webb has not alleged that Defendants-Appellees had actual access to the accounting formula, but only generalized access to reports that may have documented its application. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (holding that proof under the core operations doctrine "is not easy," and requires "either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring, . . . or witness accounts demonstrating that executives had actual involvement in creating false reports"); *see also Zucco*, 552 F.3d at 1000 (finding "allegations that senior management . . . closely reviewed the accounting numbers generated . . . each quarter . . . and that top executives had

several meetings in which they discussed quarterly inventory numbers" insufficient to establish scienter).

Webb also has not alleged facts supporting the inference that the accounting error's impact on the company's financials was so dramatic that it would be *absurd* to think that Defendants-Appellees did not know that something was wrong. SolarCity's sales division is a relatively minor portion of the company's overall business. In 2012 and 2013, for example, cash sales accounted for less than 10% of installations per year. *Cf. Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 & n.5 (9th Cir. 2008) (applying core operations inference because it was "hard to believe" that defendants—executives who were "directly responsible" for day-to-day operations—would not have known about stop-work orders that halted a large amount of work, including work on "the company's largest contract with one of its most important customers"). Moreover, the accounting error was so subtle that it appears that even the company's specialized accounting division and professional auditors missed it: The error was not discovered for seven consecutive quarters, and the record indicates that SolarCity's management and Board of Directors only concluded that there was an error—on the basis of which the company's financials "should no longer be relied upon"—after consultation with the company's "independent registered public accounting firm, Ernst & Young, LLP." True, CW statements indicate that Defendants-Appellees were concerned about the performance of the sales division and encouraging employees to transition from sales to leases. However, Defendants-Appellees had no reason to suspect this strategy was not working, such that the sales division's apparently improved performance *must have been* the result of an accounting error. Notwithstanding that accounting error, the sales division was actually improving to the point of "flirting

with profitability" during the Class Period. SolarCity's restatement indicated that the sales division's gross margins improved from -19% in 2010 to -14% in 2011 to -5% in 2012, and were positive in Q1 and Q3 of 2012. Thus, rather than projecting a "facade of profitability," the company's original financials only misstated the degree of the company's *un*profitability: SolarCity reported a net *loss* of $91.575 million in 2012, even with the accounting error, which was later restated to $113.726 million. These facts preclude us from holding that the falsity of the erroneous financials was necessarily "immediately obvious" to Defendants-Appellees. *Zucco Partners*, 552 F.3d at 1001. To be sure, Webb's allegations regarding Defendants-Appellees' hands-on approach to management are relevant, and we have taken them "into account when evaluating all circumstances together." *S. Ferry*, 542 F.3d at 786. Independently though they are not strong enough to create an inference of involvement sufficient to satisfy the PSLRA. *See id.*

Therefore, we conclude that on the whole, Webb's narrative of fraud is simply not as plausible as a nonfraudulent alternative. *See ESG Capital Partners, LP* v. *Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016). Admittedly, the magnitude of the requisite restatement—15% to 67% per quarter—and the seven-quarter duration of the alleged fraud are troubling and potentially indicative of scienter. *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1018, 1023 (9th Cir. 2005). But even those facts, cobbled together with all of the others aforementioned, are not enough to satisfy the standard required by the PSLRA. Therefore, we affirm the dismissal of Webb's § 10(b) and Rule 10b-5 claims.

## II. Webb's § 20(a) Claim

Section 20(a) of the Securities Exchange Act establishes that "[e]very person who, directly or indirectly, controls any person liable under [the Securities Exchange Act and its implementing regulations] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 78t(a). A plaintiff suing under § 20(a) must demonstrate: "(1) a primary violation of federal securities laws" and "(2) that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

The district court dismissed Webb's § 20(a) claim against Rive and Kelly because Webb failed to state a claim of a primary violation of the securities laws. Because we also find that Webb failed to state a claim for a primary violation, we affirm the dismissal of Webb's § 20(a) claim.

## CONCLUSION

For the foregoing reasons, we affirm the district court's dismissal of the TAC. Plaintiff-Appellant's pending motion for judicial notice is granted. Plaintiff-Appellant shall bear the costs on appeal.

AFFIRMED.